# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - -x
LISA CORSON,
                    Plaintiff,

                                        Index No.
        -against-           1:16-cv-00545-AKH-DCF
BROWN HARRIS STEVENS OF THE HAMPTONS, LLC,
                    Defendant.
- - - - - - - - - - - - - - - - - - - - - -x


                    Duane Morris, LLP
                    1540 Broadway, Suite 1400
                    New York, New York 10036


                    November 3, 2016
                    1:20 p.m.



        EXAMINATION BEFORE TRIAL of ERIK
DAVIDOWICZ, the Witness appearing on behalf of
the Defendant herein, held at the
above-mentioned time and place, pursuant to
Court Order, before Ilysa A. Linzer, a Notary
Public in and for the State of New York.

            MAGNA LEGAL SERVICES
        320 West 37th Street, 12th Floor
            New York, New York 10018
                (866) MAGNA-21



Page 2

```
 1
 2    A P P E A R A N C E S:
 3
 4        DUANE MORRIS, LLP
              Attorneys for Plaintiff
 5              1540 Broadway, Suite 1400
                New York, New York 10036
 6        BY:   KEVIN P. POTERE, ESQ.
 7
 8        LAW OFFICES OF ANDREW P. SAULITIS
              Attorneys for Defendant
 9              40 Wall Street, 37th Floor
                New York, New York 10005
10        BY:   ANDREW P. SAULITIS, ESQ.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 3

```
 1
 2      E R I K   D A V I D O W I C Z,
 3              the Witness appearing on behalf of the
 4              Defendant herein, having been duly sworn
 5              by the Notary Public, was examined and
 6              testified as follows:
 7      EXAMINATION BY
 8      MR. POTERE:
 9          Q.      State your name for the record,
10      please.
11          A.      Erik Davidowicz.
12          Q.      State your address for the record,
13      please.
14          A.      27 Main Street, East Hampton, New
15      York 11937.
16                  MR. SAULITIS:   The
17              transcript may be sworn to before
18              any officer authorized to
19              administer oaths.   And request
20              will be made for a copy of the
21              transcript to be provided to the
22              Witness pursuant to the procedures
23              in Federal Rule of Civil
24              Procedures 30.   I normally say
25              that at the end, but I will say it
```



```
 1                    E. DAVIDOWICZ
 2     coordinator.
 3          Q.    Okay.  What were your primary
 4     responsibilities as advertising coordinator?
 5          A.    Planning and organizing print ads
 6     mostly, catalogs, web advertising, and working
 7     with the president of the company directly.
 8          Q.    All right.  So did your position
 9     change after that company was acquired?
10          A.    It actually -- yes, but not
11     immediately.  The company was growing, and so
12     the responsibilities grew as well.
13          Q.    So how long would you say you had
14     your first position for with those --
15          A.    About three years.
16          Q.    Okay.  And then what did your
17     position grow into?
18          A.    Director of advertising.
19          Q.    And that was for the new entity,
20     Brown Harris?
21          A.    Yes.
22          Q.    As director of advertising, what
23     were your new responsibilities?
24          A.    They were primarily the same just
25     enhanced really.  We were growing as a company,
```



Page 20

```
 1                    E. DAVIDOWICZ
 2        Q.    So let's back up a second.  So you
 3   did gather documents to respond to some of these
 4   topics?
 5        A.    Yes.
 6        Q.    What documents did you gather to
 7   respond to these topics?
 8        A.    Google Analytics reports.
 9        Q.    Which you mentioned earlier?
10        A.    Right.
11        Q.    Any other documents besides that?
12        A.    No.
13        Q.    Did you speak to anyone in regards
14   to any of these topics, other than your Counsel,
15   to be able to address these topics?
16        A.    No.
17        Q.    All right.
18             MR. POTERE:  This is going
19             to be a two part exhibit,
20             Exhibit 2 and 3.  Actually, there
21             are going to be three documents,
22             so it will be extra confusing for
23             you.
24             Exhibit 2 is going to be a
25             Wall Street Journal article
```



```
 1                    E. DAVIDOWICZ
 2          entitled, "the Race to the 100
 3          Million Spec House."
 4               (Whereupon, Wall Street
 5          Journal article "the Race to the
 6          100 Million Spec House," was
 7          marked as Davidowicz Exhibit 2 for
 8          identification, as of this date.)
 9               MR. POTERE:  Exhibit 2A is
10          just an enlargement of this
11          article.  I will represent on the
12          record that it is the exact same
13          document just re-photocopied to
14          make it bigger so that the Witness
15          can actually read it.
16               (Whereupon, enlargement of
17          Exhibit 2 was marked as Davidowicz
18          Exhibit 2A for identification, as
19          of this date.)
20               MR. POTERE:  Exhibit 3 --
21          actually, can we go back to
22          Exhibit 2, it is Bates stamped LOC
23          00041 and LOC 00040.  It is in
24          reverse order.
25               Exhibit 3 is Bates stamped
```



MAGNA
LEGAL SERVICES

```
 1                    E. DAVIDOWICZ
 2              DDP 000005 and it is a blog post
 3              from the Brown Harris Stevens
 4              website.  It has the same title,
 5              "the Race to the 100 Million Spec
 6              House."
 7                   (Whereupon, blog post from
 8              the Brown Harris Stevens website
 9              was marked as Davidowicz Exhibit 3
10              for identification, as of this
11              date.)
12         Q.    Does that make sense, this is just
13    an enlargement?
14         A.    Yes.
15         Q.    And this is Exhibit 3.  I will give
16    your Counsel a copy of everything, and if you
17    can take a moment to familiarize yourself with
18    those documents.
19         A.    (Perusing.)
20         Q.    For Exhibit 1, maybe put it face
21    down here.
22         A.    This one?
23         Q.    Here.  To keep ourselves from going
24    crazy with all of the exhibits.
25         A.    Okay.
```



Page 23

E. DAVIDOWICZ

1

2      Q.     Have you had an opportunity to look

3 at these documents?

4      A.     Yes.

5      Q.     Have you seen these documents

6 before?

7      A.     I've seen the original.

8      Q.     Let's go through each one

9 individually.  Exhibit 2, the Wall Street

10 Journal article, have you seen that document

11 before?

12     A.     Yes, the article I have seen.

13             MR. SAULITIS:  Let's make

14             this -- because it may be unclear

15             to the reader of the transcript.

16             What I understand Exhibit 2A to be

17             is a reprint of a print edition of

18             an article.

19             MR. POTERE:  It is actually

20             just the exhibit, Exhibit 2

21             enlarged.

22             MR. SAULITIS:  And

23             Exhibit 2, which is headed:

24             "Mansion" something, it appears to

25             be from a print edition of the



```
 1                    E. DAVIDOWICZ
 2          Wall Street Journal.
 3              MR. POTERE:  We produced
 4          the document.  I don't know the
 5          origin of it.  It is a Wall Street
 6          Journal article.
 7              MR. SAULITIS:  Yeah,
 8          because what --
 9              THE WITNESS:  It does look
10          like a print edition.
11              MR. SAULITIS:  Yeah, what I
12          just -- because we are going to
13          lead to confusion, my
14          understanding is that whatever the
15          original -- whatever the Witness
16          looked at and saw was online.
17              MR. POTERE:  I understand.
18              MR. SAULITIS:  And I think
19          the purpose of showing this was to
20          be able to assist to read the
21          article because the one that is
22          screen print of what was online
23          contains very small type.
24              MR. POTERE:  There is
25          another purpose as well.
```



```
 1                    E. DAVIDOWICZ
 2                    MR. SAULITIS:  So be
 3               careful because if you haven't
 4               physically seen the print edition,
 5               unless you say something like
 6               that, the reader will think you
 7               read it, the article, and this was
 8               something that you read or
 9               whatever, so be careful to, you
10               know, differentiate between what
11               you actually experienced versus
12               what has been put in front of you.
13                    THE WITNESS:  Okay.
14          Q.    Let me ask a couple of questions.
15     Have you seen the print edition of this article
16     before?
17          A.    No, I have not.
18          Q.    Have you seen an electronic version
19     of this article before?
20          A.    Yes.
21          Q.    To the best of your recollection, is
22     the print version you are looking at now similar
23     to the online version that you originally saw?
24                    MR. SAULITIS:  Objection to
25               form.
```



Page 26

1                        E. DAVIDOWICZ

2                        MR. POTERE:   That's fine.

3        A.      It has been quite a long time, but

4     to the best of my recollection, yes, it is

5     similar, obviously the content.

6        Q.      Approximately when was the first

7     time you saw the article in online form?

8        A.      I believe it was the day that it was

9     published, which was March 20th of 2015.

10       Q.      And so you -- did you receive an

11    e-mail that contained the document, or were you

12    looking online and you saw it online somewhere?

13                       MR. SAULITIS:   Objection to

14                  form.

15       A.      I was looking online, reading the

16    Wall Street Journal.

17       Q.      So you first saw it on the Wall

18    Street Journal's website; is that correct?

19       A.      That's correct.

20       Q.      You believe you saw it the day the

21    article was posted to the Wall Street Journal

22    website?

23       A.      To the best of my recollection I

24    believe.

25       Q.      Okay.   So looking at Exhibit 2 and



                        E. DAVIDOWICZ

1
2    Exhibit 2A, and then looking over at Exhibit 3,
3    I know it is a little confusing, would you say
4    that the contents of the Wall Street Journal
5    article were what you used to create the blog
6    post that is represented as Exhibit 3?
7                        MR. SAULITIS:  Objection to
8              form.
9        A.    Yes, the blog post was directly
10    based on the Wall Street Journal article, that
11    was what was done.
12        Q.    And so who was responsible for
13   copying the Wall Street Journal article?
14        A.    I was.
15        Q.    Okay.  When approximately did you
16   copy the article?
17        A.    I believe it was the same day when I
18    read the article.
19        Q.    Okay.  How did you copy the article
20   to create the Brown Harris blog post?
21        A.    Simply by using electronic copy and
22    paste tools.
23        Q.    Okay.  And so who at Brown Harris
24   gave you permission to copy the article?
25                        MR. SAULITIS:  Objection to



Page 28

```
 1                    E. DAVIDOWICZ
 2            form.
 3       A.    I made the decision to do so.
 4       Q.    Have you copied similar articles in
 5   the past to create blog posts on the Brown
 6   Harris website?
 7       A.    Yes.
 8       Q.    And have you ever spoken to a
 9   superior about this practice of copying articles
10   and posting them into the Brown Harris website?
11                    MR. SAULITIS:  Objection to
12            form.
13       A.    I don't think there were any
14    specific conversations about the exact process
15    of doing it, but we have had had discussions
16    about maintaining the blog, and putting content
17    into it.
18       Q.    Did you contact anyone at the Wall
19   Street Journal to gain permission to copy the
20   article?
21       A.    No, I did not.
22       Q.    Did you review the Wall Street
23   Journal's licensing policies before copying the
24   article?
25       A.    No, I did not.
```



Page 29

```
 1                    E. DAVIDOWICZ
 2         Q.    Did Brown Harris pay anything to the
 3   Wall Street journal for use of the article?
 4         A.    Not to my knowledge.
 5         Q.    Were other Wall Street Journal
 6   articles used by Brown Harris to create blog
 7   posts?
 8         A.    That I don't know.  I don't recall.
 9    It is possible, but I couldn't say for
10    certainty without reviewing all of the blog
11    items in the past.
12         Q.    Can you take a look specifically at
13   Exhibit 3.
14         A.    Mm-hmm.
15         Q.    So who selected the photograph that
16   was used in the blog post that's represented in
17   Exhibit 3?
18                     MR. SAULITIS:  Objection to
19                form.
20         A.    I made that selection.
21         Q.    How did you make that selection?
22         A.    That I couldn't really say.  It has
23    been quite a while.  I believe I was looking
24    for an appropriate image to go with the blog
25    item.
```



```
 1                        E. DAVIDOWICZ
 2        Q.      Understand.
 3        A.      Why that particular one was
 4   selected, aside from maybe catching my eye, I
 5   couldn't say for sure.
 6        Q.      Now, here is where the magnifying
 7   glass may come into play.  If you turn the page
 8   of both Exhibit 2 and Exhibit 2A, I will
 9   represent that there are basically four lines
10   going horizontally of photographs, and the
11   fourth line has four individual pictures in it.
12   Do you see that?
13        A.      Yes, I do.
14        Q.      Do you see the second picture in
15   that row of four pictures?
16        A.      I do.
17        Q.      And is that the same picture that
18   was copied and pasted into the Brown Harris blog
19   post in Exhibit 3?
20                     MR. SAULITIS:  Objection to
21                form.
22        A.      It certainly looks like it is the
23   same photo.
24        Q.      Okay.  If you look at that same row,
25   and feel free to use the magnifying glass, can
```



```
1                      E. DAVIDOWICZ
2    you see that there is a credit, a photographer
3    credit running up the side of the photographs?
4          A.     Yes, I can.
5          Q.     I don't know if you are able to make
6    out, can you make out the name that's associated
7    with that?
8          A.     Looks like Lisa Corson for the Wall
9     Street Journal, then there is a number in
10    parentheses.
11         Q.     Can you take another look at
12    Exhibit 3, the photograph incorporated into the
13    blog post?
14         A.     Yes.
15         Q.     Do you see any photograph credit for
16    Lisa Corson in the blog post?
17         A.     No.
18         Q.     What was the reason for leaving out
19    the photography credit in the blog post?
20                       MR. SAULITIS:  Objection to
21                  form.
22         A.     The structure of the blog, the way
23     it was created didn't have a space basically
24     for such a credit, it wasn't designed for those
25     purposes.
```



Page 32

1                          E. DAVIDOWICZ

2          Q.    When you say "the structure of the

3    blog," do you mean the computer program you were

4    using to generate the blog?

5          A.    Correct.

6          Q.    What was the name of that computer

7    program?

8          A.    I don't know.  I am not the web

9     developer.  It was developed by an outside

10    consultant who works for the company.

11          Q.    Okay.  Were any steps taken to

12    contact Lisa Corson to gain permission to use

13    the photograph in question?

14          A.    No.

15          Q.    Were any of the other photographers

16    whose photographs were used in the Wall Street

17    Journal article represented in Exhibit 2

18    contacted about their photographs for use in the

19    blog post?

20          A.    No.

21          Q.    Did Brown Harris Stevens believe

22    that copying Ms. Corson's photograph without her

23    permission infringed upon her copyright?

24                     MR. SAULITIS:  Objection to

25                form.



```
1                    E. DAVIDOWICZ
2       A.    I couldn't say what Brown Harris
3    Stevens as a corporation, I couldn't say.
4       Q.    But you understand that you are here
5    today as a witness representing the corporation;
6    right?
7                    MR. SAULITIS:  He's not
8                    here to represent anyone's mind.
9                    MR. POTERE:  Actually, I am
10                   going to ask him the question.
11                   Please don't interrupt.
12                   MR. SAULITIS:  Your
13                   question was misleading, Counsel.
14                   MR. POTERE:  You can object
15                   to the form, but he can answer the
16                   questions.
17                   MR. SAULITIS:  Objection to
18                   form.
19      Q.    Do you understand the question or
20   would you liked it repeated back to you?
21      A.    I understand.
22      Q.    So as a 30C(b)(6) Witness
23   representing Brown Harris Stevens, did you
24   believe that copying Ms. Corson's photograph
25   without her permission infringed upon her
```



MAGNA ◆
LEGAL SERVICES

Page 34

```
 1                    E. DAVIDOWICZ
 2    copyright?
 3                    MR. SAULITIS:  Objection.
 4              He's not a 30(b)(6) witness as to
 5              the operation of the mind of
 6              anyone but himself, let me be
 7              clear on that.  None of the topics
 8              in the 30(b)(6) notice requested a
 9              witness on any of the mental
10              processes of the individuals
11              within the organization.  So he's
12              not here to attest to any of those
13              things, and I am specifically
14              excluding that from any
15              designation that may be applicable
16              to this Witness.  You may ask him
17              his own mental processes, but no
18              answer he gives in that regard is
19              going to be deemed testimony on
20              behalf of anyone but himself.
21                    MR. POTERE:  Okay.  So your
22              objection is noted for the record.
23    Q.        Did you understand the question?
24    A.        Yes.
25    Q.        Can you answer it, please?
```



Page 35

                         E. DAVIDOWICZ

1

2       A.      I don't believe that I felt that

3    there was any copyright infringement at the

4    time.  We were linking directly to the original

5    source of the article with the blog, and by

6    doing so I believed that that was adequate at

7    the time.

8       Q.      So because he objected to my

9    original question, which was as a 30(b)(6)

10   witness, and you answered "I," let me ask the

11   question again, but asking you individually, and

12   you can answer the question again however you

13   like.

14              So you personally as an individual,

15   the person that selected the photograph, did you

16   believe that you were violating Ms. Corson's

17   copyright by copying and pasting it into the

18   blog?

19       A.      No, I did not believe that.

20       Q.      Okay.  Why did you not believe that?

21              MR. SAULITIS:  Objection to

22              form.

23       A.      My understanding, again at the time,

24   was because I was being faithful to the

25   original content of the article, and not



Page 36

```
 1                    E. DAVIDOWICZ
 2    recreating it, or paraphrasing, and providing a
 3    link directly to the original source of the
 4    article, and crediting the source of the
 5    article that that was adequate.
 6         Q.    Did you believe that you personally
 7    infringed upon anyone's intellectual property by
 8    copying the picture and posting it into the
 9    blog?
10         A.    No, I did not.
11         Q.    So when was the photograph first
12    displayed on the Brown Harris blog?
13         A.    I believe, I can't say for certain,
14    but I believe it was the same date, March 20,
15    2015.
16         Q.    Okay.
17         A.    I don't think there would have been
18    any time lag.
19         Q.    Where was the photograph stored
20    after it was copied and pasted into the blog?
21              MR. SAULITIS:  Objection to
22              form.  To avoid -- when you say
23              "the photograph," is that -- do
24              you mean separately from the
25              article, or -- I am confused, and
```



Page 37

1              E. DAVIDOWICZ

2              perhaps the reader would be, too.

3              Are you talking about the article

4              that contained that photograph?

5              Do you understand my confusion?  I

6              don't know if the Witness shares

7              that, he can say so.

8      Q.      Let's take a step back.  You copied

9   the article from the Wall Street Journal online

10  source, and pasted it somehow into the Brown

11  Harris Stevens blog; is that correct?

12     A.      That is correct.

13     Q.      When you first copied the article,

14  where did you -- did you paste it directly into

15  the blog, or did you save it somewhere else on

16  the Brown Harris Stevens server?

17     A.      The text of the article, the words

18   themselves were copied and pasted directly into

19   the blog itself.  The photograph is handled

20   differently, it can't be copied and pasted.

21     Q.      So how is a photograph handled?

22     A.      The photograph was stored on my

23   local hard drive of my work computer

24   temporarily so I can then upload it into the

25   blog through an image uploader.



Page 38

```
 1                        E. DAVIDOWICZ
 2            Q.    I understand.  So I -- through my
 3   own experience I know when I save a picture off
 4   the Internet I usually right click on the
 5   photograph and do save as.  Did you do a similar
 6   process to copy the image from the online source
 7   on to your local server?
 8            A.    I believe that's how it was done.
 9            Q.    Then the photograph, once it was on
10   your local server, was then uploaded onto the
11   blog post using the proprietary software that
12   was developed for Brown Harris Stevens; correct?
13            A.    Correct.
14            Q.    Is the photograph still saved
15   locally on your hard drive?
16            A.    No, it is not.
17            Q.    To your knowledge, is the photograph
18   stored anywhere on the Brown Harris Stevens
19   servers?
20            A.    Not to my knowledge, I don't believe
21   so.
22            Q.    As a 30C(b)(6) Witness, do you know
23   whether the photograph is stored anywhere on the
24   Brown Harris Stevens server?
25                        MR. SAULITIS:  Objection to
```



```
1                    E. DAVIDOWICZ
2              form.
3         A.    I don't believe so.  From my
4    knowledge of how our system is currently
5    operating, I don't believe it would exist
6    anywhere.  It was saved on my local hard drive,
7    not on a server.
8         Q.    Is there anyone that works at Brown
9    Harris, or consults with Brown Harris Stevens
10   who would have a better idea of whether the
11   photograph is still stored in some way on the
12   server?
13             MR. SAULITIS:  Objection to
14             form.
15        A.    It is possible that an IT consultant
16   would have an understanding of that.
17        Q.    Do any IT consultants' names come to
18   mind that would have knowledge of that?
19        A.    Yes, Walfrid Lundborg, W-A-L-F-R-I-D
20   L-U-N-D-B-O-R-G.
21        Q.    Was he employed at Brown Harris
22   Stevens at the time that the photograph was
23   originally copied into the blog post?
24             MR. SAULITIS:  Objection to
25             form.  Employed by?
```



**MAGNA** ▶
**LEGAL SERVICES**

Page 41

1                      E. DAVIDOWICZ

2        A.    Yes, to my knowledge.  I am not the

3   technical expert, but that was the intention,

4   and the belief, and purpose of removing it.

5   Not just to be invisible.

6        Q.    To your knowledge, has anyone else

7   requested to have a photograph taken down from

8   the Brown Harris Stevens blog?

9        A.    No.

10       Q.    We are going to look at something

11  that doesn't require a magnifying glass.

12                  MR. POTERE:  I am going to

13                  introduce this as Exhibit 4, and

14                  this is what I would categorize as

15                  more screen shots from the Brown

16                  Harris Stevens website.  They bear

17                  Bates stamped DDP 000006 through

18                  DDP 000015.

19                  (Whereupon, screen shots

20                  from the Brown Harris Stevens

21                  website was marked as Davidowicz

22                  Exhibit 4 for identification, as

23                  of this date.)

24                  MR. SAULITIS:  For the

25                  benefit of the Witness the code



Page 42

```
 1                      E. DAVIDOWICZ
 2              stands for Defendant's document
 3              production.  In order words, it
 4              came from Brown Harris.  That code
 5              is not part of the document.  It
 6              was added for the convenience of
 7              all of us.
 8                      THE WITNESS:  Okay.
 9      Q.      Take a moment to flip through those.
10      A.      (Perusing.)
11      Q.      So are you familiar with the images
12   there portrayed in Exhibit 4?
13      A.      Most of them, yes.
14      Q.      Can you tell me which ones you are
15   not familiar with?
16                      MR. SAULITIS:  Objection to
17              form.
18      A.      It looks like DDP 14.
19      Q.      So you haven't seen that one in the
20   past?
21      A.      No.
22      Q.      Okay.  For the documents -- for the
23   portions of Exhibit 4 that you are familiar
24   with, when have you seen these before?
25      A.      Do you mean the originals, or the
```



Page 43

1                    E. DAVIDOWICZ

2    reproduction of the document?

3        Q.    Why don't we start with the

4    originals.

5        A.    Well, whenever -- since I work in

6    the marketing department I am familiar with our

7    website and most of its contents, so I couldn't

8    say when I've seen any individual item, but it

9    is familiar to me because of my work with the

10   website.

11       Q.    Okay.  So does this appear to be

12   screen shots taken off the Brown Harris Stevens

13   website?  When I say "this" I mean everything

14   except for the exhibit you pointed out, which is

15   ending in 14.

16       A.    Yes, I believe so.  At the time, I

17   should say at least.  These wouldn't be

18   accurate screen shots taken today, for

19   instance.

20       Q.    I understand.  So what is "the Talk

21   of the Town?"  I've seen that listed on the

22   first page, DDP 000006, and it is referenced

23   throughout the exhibit.

24       A.    Right.  "Talk of the Town" was the

25   nickname, or name of the blog itself that was



Page 44

```
 1                    E. DAVIDOWICZ
 2   part of Brown Harris Stevens.
 3        Q.    If you can just refer back to
 4   Exhibit 3 for just a moment.  Was Exhibit 3,
 5   which is the blog post containing the photograph
 6   of Lisa Corson, was that included in the blog,
 7   "the Talk of the Town?"
 8        A.    Yes, it is.
 9        Q.    All right.  So when was the, I am
10   going to refer to "the Talk of the Town" as "the
11   blog" going forward just to make it easier for
12   everyone?
13        A.    Sure.
14        Q.    When was "the blog" first created?
15        A.    I believe it was in the first half
16   of 2013.
17        Q.    2013.  Who was primarily responsible
18   for creating the blog?
19        A.    It wasn't a single person.  At the
20   time we were redesigning the entire website,
21   and by "we" I mean Sia Comnas, the previous
22   senior managing director, Ed Rialey (phonetic)
23   at the time, myself, and Walfrid Lundborg.
24        Q.    Who was responsible for inserting
25   the content into the blog starting back in 2013?
```



Page 45

1                        E. DAVIDOWICZ

2    If there is more than one individual, you can

3    list those individuals.  What I mean by that,

4    just to clarify, the person that was physically

5    taking the articles, and pasting them into the

6    blog space?

7          A.    I was.

8          Q.    Was anyone else responsible for the

9    physical activity of taking articles, and

10   putting them into the blog?

11         A.    No.

12         Q.    So if you look at the first page

13   here, DDP 000006, that blog post is dated

14   December 31, 2015.  Do you see that?

15         A.    Yes.

16         Q.    Is that the last blog that was

17   posted to "the Talk of the Town," is that the

18   last blog post that was posted to "the Talk of

19   the Town" blog?

20         A.    I don't know.  I don't recall.  It

21    certainly could be.

22         Q.    Are you still to this day posting

23   new blogs to "the Talk of the Town?"

24         A.    No, we are not.

25         Q.    Why did you stop posting blogs to



Page 50

1                    E. DAVIDOWICZ

2  information that you told her about the lawsuit?

3                    MR. SAULITIS:  Objection to

4           form.

5      A.    I am sure she said something, but

6  honestly I can't recall.  I don't think it was

7  very much.  It was just she wanted information

8  about what it pertained to.  Beyond that, I

9  believe she thought that it was going to be a

10  matter handled by Counsel.

11     Q.    So the decision to stop the blog was

12  entirely left to you, and no one told you to

13  stop making blog posts; is that correct?

14                   MR. SAULITIS:  Objection to

15          form.

16     A.    It was my suggestion to do so, and

17  my manager approved of that.  But it was my

18  initial decision or suggestion to do so.

19     Q.    I understand.  You said part of the

20  reason for deciding not to continue updating the

21  blog was the fact that it wasn't serving its

22  purpose, which was to drive traffic to the

23  website; is that correct?

24     A.    Yes.

25     Q.    And so when you say "traffic," what



Page 51

1                          E. DAVIDOWICZ

2    do you mean by "traffic?"

3          A.     What users -- obviously as a website

4    we want people, the users, to come to our site

5    as frequently as possible, not just on a one

6    time basis.  Part of the original thinking was

7    that if we included more content on the

8    website, we might invite people to return to

9    the site.  Over time, when looking at which

10   pages people were visiting, the blog was not

11   one of the highly ranked pages that people were

12   visiting.

13         Q.     Did you advertise the blog, did

14   Brown Harris Stevens advertise the blog in any

15   way, shape, or form?

16         A.     No, we never had.

17         Q.     Were there ever any paid

18   advertisements posted in connection with the

19   blog?

20         A.     No.

21         Q.     Did you receive any advertising

22   revenue at all with regards to the blog itself?

23         A.     No.

24         Q.     Can you take a look at same exhibit,

25   Exhibit 4, DDP 000011.



Page 52

1                          E. DAVIDOWICZ

2          A.    (Witness complies.)

3          Q.    If you look at what I believe to be

4    an advertisements on the right-hand side that

5    says "Hamptonsbuilders.com."  Who paid for that

6    to be there?

7          A.    No one.  It is not a paid

8    advertisement.  We, Brown Harris Stevens, owned

9    Hamptonsbuilders.com.  It has a website that we

10   maintain and develop to advertise solely houses

11   that are listed with Brown Harris Stevens.

12         Q.    I see.  Was part of placing that

13   next to "the Talk of the Town" blog to promote

14   that particular service?

15         A.    Its position was not relevant to

16   "the Talk of the Town."  It was more relevant

17   to the navigation on the right side of the

18   page.

19         Q.    So I understand that the blog is not

20   currently being maintained.  Do you know what

21   the budget for the blog was being maintained?

22         A.    There was no specific budget set

23   aside for any particular part of the website

24   including the blog.

25         Q.    Were there any costs, besides your



Page 53

```
 1                         E. DAVIDOWICZ
 2   own salary, associated with maintaining the
 3   blog?
 4        A.    No.
 5                    MR. SAULITIS:  Objection to
 6               form.
 7        A.    Not that I am aware of.
 8        Q.    Was one of the goals of maintaining
 9   the blog to grow the Brown Harris brand?
10        A.    I think that's fair to say.  It is
11    part of the overall, all marketing and
12    advertising is with that in mind.
13        Q.    So you wanted to generate business
14   with the blog; is that correct?
15        A.    No, not necessarily.  I think that's
16    a little too direct of a relationship.  A brand
17    is more of an awareness, and recognizability of
18    a company, or a name.  We weren't -- the
19    website itself, in real estate we are not
20    selling items directly on the website.  It is
21    not like a retail store.  So in that sense we
22    are not thinking as to generate business that
23    way, but to generate interest in the company,
24    or awareness in the company.
25        Q.    Were you hoping to gain future
```



Page 54

```
 1                    E. DAVIDOWICZ
 2   clients by creating the blog?
 3                    MR. SAULITIS:  Objection to
 4             form.
 5        A.     Again, that wasn't the thinking in
 6     terms of a direct relationship in that sense.
 7     Again, we were looking to, in a competitive
 8     market, increate interest in visitors visiting
 9     our website.
10        Q.     Did you use social media to
11   distribute blog posts to help promote them on
12   the website?
13        A.     Not all of them, but certain
14     specific ones
15        Q.     What social media outlets did use?
16        A.     We would usually Twitter, Facebook,
17     and Google Plus.
18        Q.     Did you pay any money to enhance
19   those posts so they would go out to a broader
20   market than otherwise would have occurred had
21   you just posted them to the social media?
22        A.     No, we have not done that.
23        Q.     How did you measure the
24   effectiveness of the blog in terms of generating
25   traffic?
```



Page 56

```
1                          E. DAVIDOWICZ

2     have an interactive form.  We don't have

3     comments or feedback from users.  So to my

4     knowledge there isn't any information collected

5     in that sense.

6          Q.    I understand.  What was the purpose

7     of posting the specific article in question,

8     which was represented as Exhibit 2, which was

9     then copied and pasted into the blog post, which

10    is Exhibit 3?

11         A.    It is difficult to specify the exact

12    interest.  But we are a real estate firm, so we

13    were always looking for items that might

14    pertain to real estate, and we are in the

15    luxury market.  This particular article was

16    about the very high end of the market, spec

17    homes $100 million, so I think I just thought

18    that there was a connection, or correlation

19    between what we were doing and potential

20    audience for an article like that.

21         Q.    You mentioned earlier the program

22    you used to post the blogs, it sort of prevents

23    you from posting credits to specific photographs

24    that are posted on the blog; is that correct?

25                     MR. SAULITIS:  Objection to
```



MAGNA
LEGAL SERVICES

Page 57

1                        E. DAVIDOWICZ

2              form.

3         A.    Yes, I believe that to be the case.

4    I am not the designer of it, but from my use of

5    the program, that is my understanding of it.

6                   MR. POTERE:  I am going to

7                   enter two exhibits.  The first one

8                   is an article, or rather a blog

9                   post to "the Talk of the Town"

10                  blog.  It is entitled "Green Roof

11                  Options Renovated Ideas From

12                  Architecture Digest."  The date is

13                  November 3, 2016.

14                        (Whereupon, blog post "Green

15                  Roof Options Renovated Ideas From

16                  Architecture Digest," was marked

17                  as Davidowicz Exhibit 5 for

18                  identification, as of this date.)

19                  MR. POTERE:  Exhibit 6 is

20                  going to be an article taken from

21                  the Architectural Digest website,

22                  and the name of the article is

23                  "Green Roof Options Renovating

24                  Ideas."  The date of the article

25                  is July 31, 2015.  And the date at



Page 58

```
 1                    E. DAVIDOWICZ

 2              the bottom of the front page of

 3              the article is November 3, 2016.

 4                    (Whereupon, Architectural

 5              Digest article "Green Roof Options

 6              Renovating Ideas," was marked as

 7              Davidowicz Exhibit 6 for

 8              identification, as of this date.)

 9         Q.    Can you take a moment to look at

10   Exhibit 5 and Exhibit 6.

11         A.    (Perusing.)

12         Q.    So let's start with Exhibit 5.  Do

13   you recognize this blog post?

14         A.    I recognize it as a blog post.  I

15    don't particularly recall this specifically.

16         Q.    But you recognize it as a blog post

17   that was posted to "the Talk of the Town?"

18         A.    I do.

19         Q.    Turning to Exhibit 6, do you

20   recognize this article in Architectural Digest?

21   To be clear, when I say "recognize," I am

22   talking about just the content, not the physical

23   reproduction of the document?

24         A.    Certainly, yes.

25         Q.    You do recognize this article?
```



Page 59

1                      E. DAVIDOWICZ

2          A.    In conjunction with the blog post I

3    do.

4          Q.    Okay.  So if you look at the blog

5    post, which is Exhibit 5, and if you look at the

6    photograph there, do you see any photograph

7    credit on the photograph used in the blog post?

8          A.    No, I do not.

9          Q.    Okay.  If you look at Exhibit 6,

10   which is the Architectural Digest article

11   itself, do you see the photograph credit under

12   that article?

13         A.    I do.

14         Q.    Do you as an individual know why the

15   photograph credit in Exhibit 6 was not added to

16   the photograph used in the blog post in

17   Exhibit 5?

18         A.    As I mentioned, I believe it was not

19    included because of the structure of the blog

20    itself, and we were linking directly to the

21    original source of the article which contained

22    the photograph, and all subsequent credits that

23    it was not done, it wasn't included.

24         Q.    Did you contact Architectural Digest

25   to have permission to use their article?



Page 60

1                       E. DAVIDOWICZ

2        A.    No.

3        Q.    Did you contact the original

4    photographer to use the photo in the blog post?

5        A.    No.

6        Q.    Did you ever give credit to

7    photographers whose photos were used in any of

8    the blog posts that you posted to "the Talk of

9    the Town" blog?

10        A.    Not to my recollection, I don't

11      believe so.

12        Q.    Did you ever request permission to

13    use any of the articles that were used to create

14    the blogs that are posted to "the Talk of the

15    Town" blog on the Brown Harris Stevens website?

16        A.    No.

17        Q.    This is going to be a two-part

18    question.  Does Brown Harris Stevens have a

19    budget for purchasing content to be displayed

20    anywhere on the Brown Harris Stevens website?

21        A.    No.

22        Q.    Does Brown Harris Stevens have a

23    budget to purchase any content that was

24    displayed specifically on "the Talk of the Town"

25    blog?



Page 61

1                         E. DAVIDOWICZ

2          A.     No.

3          Q.     Does Brown Harris Stevens license

4     any intellectual property to be used with the

5     Brown Harris Stevens website?

6          A.     I am not sure I understand.  Do you

7      mean we purchase licensing?

8          Q.     That's correct.

9          A.     Not to my knowledge.  I can maybe

10     clarify that in terms of property photographs.

11     Not for the blog, but as a company we purchase

12     photographs from professional photographers who

13     are commissioned to photograph properties that

14     are listed with Brown Harris Stevens.

15         Q.     Those photographs are subsequently

16     posted to the website in conjunction with

17     propertied listed on the website?

18         A.     Correct.

19                    MR. POTERE:  We are going

20                    to mark this as Exhibit 7.  This

21                    is entitled "the Computer Use

22                    Policy," and the Bates range is

23                    DDP 0000001 through 003.

24                    (Whereupon, "the Computer

25                    Use Policy" was marked as



```
 1                    E. DAVIDOWICZ

 2              Davidowicz Exhibit 7 for

 3              identification, as of this date.)

 4        Q.    Please take a look at the document.

 5        A.    (Perusing.)

 6        Q.    Have you seen the Computer Use

 7   Policy previously?

 8        A.    I believe so.

 9        Q.    When was the first time you saw this

10   document?

11        A.    That I couldn't say.  I have been

12    with the company for many years.  It was

13    probably a while ago.

14        Q.    Who drafted this policy?

15        A.    I don't know.

16        Q.    Who would know who drafted this

17    policy?

18        A.    I believe someone at Tara Holdings

19    would know.  This was a document that wasn't

20    created locally at Brown Harris Stevens of the

21    Hamptons.  It originated from the New York City

22    office.

23        Q.    How do you know that?

24        A.    Because one, the language saying

25    that Tara Holdings Group of Affiliated
```



```
 1                    E. DAVIDOWICZ
 2      Companies in the beginning, and the document
 3      itself, I know in looking at it, wasn't
 4      something that was created locally in our
 5      company, in particular, the way it refers to
 6      the company itself.
 7           Q.    Do you know when this document was
 8      adopted?
 9           A.    I do not.
10           Q.    Do you know if there are other
11      versions of this document available?
12           A.    That I don't know.
13           Q.    Do you know what the purpose of this
14      document was, or is?
15           A.    Well, I can't say what someone
16      else's intent was, but as a policy document to
17      inform staff members and agents involved with
18      the company as to the policies of the company.
19           Q.    Did you see this document in
20      preparation for the deposition today?
21           A.    I did not.
22           Q.    Does the computer use policy apply
23      to all Brown Harris Stevens employees?
24           A.    I would believe so, but I couldn't
25      say for certain.  I don't see why it would not.
```



```
1                    E. DAVIDOWICZ
2    instance, this particular specific policy, but
3    that was my understanding.
4        Q.     Without divulging the contents of
5    conversation that you had, have you ever spoken
6    to anyone within Brown Harris Stevens including
7    general counsel about copyright infringement
8    issues?
9                    MR. SAULITIS:  Objection.
10                   That is going to be impossible to
11                   answer without breaking down --
12                   MR. POTERE:  He can answer
13                   whether or not he's communicating
14                   with general counsel, that's not
15                   privileged.  He just can't reveal
16                   the content.
17                   MR. SAULITIS:  Break it
18                   down to lawyer category first, and
19                   then --
20                   MR. POTERE:  Sure, I can
21                   clarify that.
22                   MR. SAULITIS:  -- anyone
23                   else will be fair game.
24       Q.     Did you ever speak to general
25    counsel within Brown Harris Stevens or the
```



Page 68

```
 1                     E. DAVIDOWICZ
 2   parent corporation about copyright issues in
 3   general?
 4        A.    Yes, after receipt of the Complaint.
 5        Q.    So prior to receiving the Lisa
 6   Corson Complaint, did you ever speak with
 7   general counsel at Brown Harris Stevens or the
 8   parent corporation?
 9        A.    No.
10        Q.    Did you speak to anyone else at
11   Brown Harris Stevens about copyright related
12   issues?
13        A.    No.
14        Q.    Does Brown Harris Stevens have any
15   other policy that you are aware of that deal
16   with intellectual property issues including a
17   potential copyright infringement?
18        A.    Not that I am aware of.
19                     (Whereupon, a short break
20                     was taken at this time.)
21                     MR. POTERE:  I am going to
22                     mark this as Exhibit 8.  This is
23                     the Halstead Property Social Media
24                     Policy and Guidelines.  It is
25                     D000024 through 29.
```



Page 80

1                      E. DAVIDOWICZ

2      the current lawsuit in which Brown Harris

3      Stevens had been sued for copyright or trademark

4      infringement?

5           A.    Not that I am aware of.

6           Q.    Are there any lawsuits where Brown

7      Harris Stevens has sued anyone else for

8      copyright or trademark infringement that you are

9      aware of?

10          A.    Not that I am aware of.

11          Q.    Do you know if your attorney present

12     today is on retainer with Brown Harris Stevens?

13          A.    I believe so.

14          Q.    What is your basis for that belief?

15          A.    I believe that he informed me of

16      that.

17          Q.    Do you know when he went onto

18     retainer with Brown Harris Stevens?

19          A.    I do not.

20          Q.    Can we turn back to Exhibit 3 for a

21     moment.  You testified previously that the

22     system you were using prevented you from

23     inserting a photographer's credit into the

24     photograph, or next to the photograph that you

25     used in the blog post; is that correct?



```
 1                    E. DAVIDOWICZ
 2              MR. SAULITIS:  Objection to
 3         form.
 4      Q.    Can you repeat for the record why
 5  you chose not to include credit for the
 6  photographer in the blog post?
 7              MR. SAULITIS:  Objection to
 8         form.
 9              MR. POTERE:  It is okay, I
10         understand your objection.
11      A.    Several different reasons.  As I
12  stated, we provided a direct link back to the
13  source material, and so I didn't necessarily
14  feel it was necessary to do so on the blog.
15  But the structure of the blog itself, again, to
16  my understanding of how it operates, and my use
17  of it didn't allow for a credit line to
18  function within that format.
19      Q.    Did you ever inquire from any
20  individual who had responsibility for
21  maintaining the program that you are using, or
22  provide some sort of support for it whether it
23  was possible to add a photo credit?
24      A.    I don't recall doing so.
25              MR. POTERE:  This is going
```



Page 82

```
 1                    E. DAVIDOWICZ
 2          to be marked as Exhibit 12.  It is
 3          a letter from Babette Krolik to
 4          Steven Crowley.  The Bates stamp
 5          is LOC 000005.  The e-mail is
 6          dated January 5, 2016.
 7                    (Whereupon, letter from
 8          Babette Krolik to Steven Crowley
 9          was marked as Davidowicz Exhibit
10          12 for identification, as of this
11          date.)
12          Q.    Have you had an opportunity to
13 review the exhibit in question?
14          A.    Yes.
15          Q.    Have you seen this exhibit prior to
16 today?
17          A.    Yes, and the date it was sent, I
18   believe.
19          Q.    Were you copied on this e-mail?
20          A.    Yes.
21          Q.    And so that's your e-mail address in
22 the CC?
23          A.    Yes, the EDavidowicz.
24          Q.    So I am going to read the following
25 sentence in the record, it occurred in the
```



Page 91

```
 1
 2                    C E R T I F I C A T E
 3
 4          I, ILYSA A. LINZER, a Shorthand Reporter
 5    and Notary Public of the State of New York, do
 6    hereby certify:
 7
 8          That, ERIK DAVIDOWICZ, the Witness whose
 9    examination is hereinbefore set forth, was duly
10    sworn, and that such examination is a true
11    record of the testimony given by such
12    Witness.
13
14          I further certify that I am not related
15    to any of the parties to this action by blood
16    or marriage; and that I am in no way interested
17    in the outcome of this matter.
18
19    _____                _____
      ILYSA A. LINZER                NOVEMBER 13, 2016
20
21
22
23
24
25
```

