I1o1cort

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

LISA CORSON,

                    Plaintiff,

          v.                              16 Civ. 545 (AKH)

BROWN HARRIS STEVENS OF THE
HAMPTONS, LLC,

                    Defendant.            Trial

------------------------------x

                                          New York, N.Y.
                                          January 24, 2018
                                          10:49 a.m.

Before:

                    HON. ALVIN K. HELLERSTEIN,

                                          District Judge

                              APPEARANCES

DUANE MORRIS, LLP
      Attorneys for Plaintiff
BY:  STEVEN COWLEY, ESQ.

LAW OFFICES OF ANDREW P. SAULITIS P.C.
      Attorneys for Defendant
BY:  ANDREW P. SAULITIS, ESQ.

I1o1cort

```
1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your

3    appearances for the record.

4              MR. COWLEY:  Good morning, your Honor.  Steven Cowley.

5              THE COURT:  Speak in a loud voice.

6              MR. COWLEY:  I'll do that, your Honor.  Steven Cowley

7    from Duane Morris, your Honor, for the plaintiff Lisa Corson.

8              THE COURT:  And you're with?

9              MR. COWLEY:  Ms. Corson.

10             THE COURT:  Second row?

11             MR. SAULITIS:  Good morning, your Honor.  Andrew P.

12   Saulitis, Law Offices of Andrew P. Saulitis, P.C., representing

13   Brown Harris Stevens of the Hamptons, LLC.  With me is Erik

14   Davidowicz and Babette Krolik with the organization.

15             THE COURT:  Thank you.  You may sit down.  And we may

16   begin.

17             MR. COWLEY:  Your Honor, may I ask, do you prefer that

18   I ask my questions from the table or --

19             THE COURT:  From the podium.

20             MR. COWLEY:  Okay.  And before we start, I move for

21   admission plaintiff's proposed exhibits that are not objected

22   to.

23             THE COURT:  Do them one at a time as you need them.

24             MR. COWLEY:  I'm sorry?

25             THE COURT:  You do them one at a time as and if you
```

I1o1cort

1    need them.

2              Shall I repeat one more time?

3              MR. COWLEY:  No.  I didn't understand at first, your

4    Honor, but now I do.

5              I call Ms. Corson.

6              THE COURT:  Come up here, Ms. Corson.

7              MR. COWLEY:  Ms. Corson has a throat lozenge that

8    she'd like to bring to the stand with her.  Is that acceptable,

9    your Honor?

10             THE COURT:  If she'll share with me.

11             MR. COWLEY:  Your Honor, I had the binder of proposed

12   exhibits --

13             THE COURT:  Mr. Cowley, we're about to administer an

14   oath.

15             MR. COWLEY:  I'm sorry.

16             THE COURT:  There's nothing more serious in a trial.

17   Please sit down.  Pay attention to the oath.

18             (Witness sworn)

19             THE COURT:  Mr. Cowley, what is it you want to tell

20   me?

21             MR. COWLEY:  I'm asking permission to put the witness'

22   copy of the proposed exhibits at the witness table.

23             THE COURT:  Has the notebook been given to the

24   defendant?

25             MR. COWLEY:  We exchanged all our lists last week.

I1o1cort                    Corson - Direct

1       THE COURT:  That was not my question.  If you're

2   giving something to the witness, then you should give whatever

3   you're giving to the witness to the opposing counsel.

4       MR. SAULITIS:  Is this an extra copy or --

5       MR. COWLEY:  We have our own copies.

6       MR. SAULITIS:  So thank you for the copy.

7       MR. COWLEY:  I'm not giving a copy to you.  We

8   exchanged our exhibits last week by email.  He asked me to show

9   it to you right before I give it to the witness.

10      THE COURT:  This will help the order of things.  Okay.

11  I'll give you time each time.

12      MR. SAULITIS:  Yes, because --

13      THE COURT:  All right.  Give it back.

14      MR. COWLEY:  Your Honor, I gave all these exhibits --

15      MR. SAULITIS:  They were listed, but the physical

16  exhibits were not provided.

17      THE COURT:  I understand.  I understand.  I

18  understand.  Let's go on.  I'll give you time.

19  LISA MICHELLE CORSON,

20      the Plaintiff, having been duly sworn,

21      testified as follows:

22  DIRECT EXAMINATION

23  BY MR. COWLEY:

24  Q.  Ms. Corson, please introduce yourself to the Court and

25  state where you live.

I1o1cort                         Corson - Direct

1    A.   I'm Lisa Michelle Corson.   I'm a professional photographer.

2    I life in Ojai, California.

3              THE COURT:   Were you hit by the fire?

4              THE WITNESS:   It was surrounding us, yeah, but

5    fortunately, no, we got lucky.

6    Q.   Ms. Corson, how long have you been a professional

7    photographer?

8    A.   Since 2013.

9    Q.   Are you the plaintiff in this lawsuit?

10   A.   Yes, I am.

11   Q.   Prior to becoming a full-time professional photographer in

12   2013, what did you do?

13   A.   I was a photo editor for -- since 1999.

14   Q.   And what is the role of a photo editor?

15   A.   A photo editor hires photographers and researches images

16   for -- I worked for publications, for magazines and newspapers.

17   Q.   How many publications did you work for as photo editor?

18   A.   Several; approximately five.

19   Q.   Can you identify any for the Court.

20   A.   The magazine New York Magazine, Art+Auction, and The Wall

21   Street Journal.

22   Q.   For how long did you work for the Wall Street Journal as

23   photo editor?

24   A.   I worked at the Wall Street Journal for -- between 2010 and

25   2013.

I1o1cort                              Corson - Direct

Q.  And after leaving the Wall Street Journal, did you begin

your career as a full-time photographer?

A.  I did.  That's why I left.

Q.  Prior to leaving the Wall Street Journal and beginning your

career as a full-time photographer, were you also a

photographer?

A.  I was.

Q.  What did you do in that capacity?

A.  I did personal work, fine artwork on my own and I

photographed stories for a few of the publications that I was

employed as a photo editor, from time to time.  It was not my

primary function.

Q.  Since beginning your career as a full-time photographer in

2013, can you tell the Court how you earn an income.

A.  I earn an income when a client, usually for me a magazine

or a newspaper, hires me to photograph stories to accompany an

article.  I also license those images and other images that I

take to other publications and other companies, as images from

my portfolio, licensed.

          THE COURT:  How do you make money from this?

          THE WITNESS:  How do I make money.  I charge a fee to

photograph a story for a client.  I charge a fee to license an

existing photo to a client.

          THE COURT:  So they're license fees.

          THE WITNESS:  License fees, yes.

I1o1cort                        Corson - Direct

1          THE COURT:  If you do a photographic shoot for a

2     particular item of media, can you use that same photograph

3     again?

4          THE WITNESS:  I can.  Sometimes with restrictions on

5     time, but I retain all of my copyrights for the assignments

6     that I make.

7     BY MR. COWLEY:

8     Q.  Can you identify for the Court some of your clients that

9     hire you to photograph images for them.

10    A.  Yes.  The Wall Street Journal, Sunset Magazine, Time Inc.,

11    Los Angeles Magazine, a number of other publications.

12    Q.  For your publishing clients that hire you as the

13    photographer, can you please describe to the Court what kind of

14    fees you charge them.

15    A.  There are a couple of ways that the magazines pay

16    photographers.  Sometimes it's a day rate plus expenses,

17    sometimes it's a flat project fee, and each publication is

18    different, and they typically set those terms and they

19    typically have a fee that they propose to me and I agree or

20    not, but it's typically not flexible.

21         THE COURT:  Specifically not what?

22         THE WITNESS:  It's typically not flexible.  The fee --

23         THE COURT:  I understand.  Okay.

24         THE WITNESS:  Okay.

25    Q.  You mentioned to the Court in your answer a moment ago that

1    you retain the copyrights that you're licensing.  Please

2    explain what you mean by that.

3    A.   I register my copyrights, either before publication or

4    within three months of publication.  I register those

5    copyrights with the U.S. Copyright Office.  I typically have a

6    contract with my client, with the publication, that states that

7    I retain the copyright to my images.

8    Q.   You mentioned a second type of license fee for works in

9    your portfolio.  Can you please describe for the Court the

10   types of clients who pay for such licenses.

11   A.   Some of those clients are also publications, newspapers and

12   magazines; some of those clients are various companies, tourism

13   bureaus, other companies, companies that maybe make a product

14   that's featured in a photograph, if it's a home shoot or a

15   developer, if I photograph a property that the developer has a

16   stake in.

17   Q.   And how is it that you make people aware of your

18   photographs that are available for license from your portfolio?

19   A.   Some people, often they -- they see the photograph in a

20   publication.  If I photograph something for a newspaper or

21   magazine and it's published with my name, then it's easy to

22   find me.  Clients will look up my name or they'll contact the

23   publication to ask how to contact me.

24   Q.   Do you put your photographs or any photographs from your

25   portfolio out for publication so that people can see them?

I1o1cort                          Corson - Direct

A.  I do.  I have images on my portfolio website, and my

contact information is there.  People can contact me looking to

license any of those.

        I also have a stock agency that I work with.  They are

called Gallery Stock.  They syndicate some of my photographs.

        And I have another website that's called Photo

Shelter.  It's with a service called Photo Shelter, where I

post certain images to, so that people can find them and

contact me to license them.

Q.  When you are contacted by people looking to use one of your

photographs, how is it that you arrive at compensation for that

permissive use, if you're going to give it?

A.  The factors include what type of company it is, is it

editorial use, is it commercial use, and what is the form,

where will the image appear, will it appear on a website, will

it appear in a brochure, an advertisement, what the duration of

time that the photograph is used for, is it used for one month

or one year or forever.  There are a lot of different factors.

The size that it's used.

Q.  Who makes the decision as to the price that should be

charged for the license based on the particular fact of the

transaction?

A.  Sometimes a client will come to me and say, I have this

much money to use this one picture.  Do you agree or not?  And

I say yes or I say, you know -- I negotiate, you know, for more

I1o1cort                        Corson - Direct

money if I feel it's worth more money.  Sometimes clients come

to me and ask, how much would you charge for this use or for

this job?

Q.  Have you turned down offers for licensing photos from your

portfolio because of the price offer?

A.  Yes, a number of times.

Q.  And have you successfully negotiated licensing fees on

occasions so that somebody did license a photo for their use

from your portfolio?

A.  Yes, a number of times.

Q.  Do you charge the -- strike the question I started.

        The Court a little while ago asked you, if you do a

photograph for a publication, whether you can also license that

same photograph again, and you answered the Court that you

could because you retained your copyright.  Following up on

that question, in those circumstances, do you charge the

license fee to the client who wants to use it a second time the

same amount that the first publication gave you?

A.  No.  Those numbers are unrelated.

Q.  Please explain why that is.

A.  Well, when I -- when a magazine or newspaper hires me to

photograph a story, they -- there's a certain amount of

publicity that I myself get from being in a prestigious

publication, in a national publication that has name

recognition, and my name being out there in a publication with

I1o1cort                          Corson - Direct

1    my images, especially if they're large and it's an important

2    large story, that directs new clients to me and that's a way

3    that I find new clients.

4    Q.  And you say that getting your photographs published by a

5    well-known publication gets new clients to you.  First of all,

6    how do they know you took the photograph?

7    A.  My name appears on the page with the photograph.

8    Q.  Is that photographer's credit?

9    A.  It is.

10   Q.  And how is it that you know that on occasion some customers

11   have found you that way, asked to license that same photograph?

12   A.  Because they told me specifically that they found this

13   picture in this publication that I took and they are interested

14   in licensing it.

15   Q.  You've stated earlier that in deciding on the license fee

16   to charge for such usage, a number of factors are considered.

17   In establishing your fee, what weight do you give and how does

18   it affect the price you'll charge if a user says, I want to use

19   your photograph on my website but give you no credit

20   whatsoever?

21   A.  That is definitely something that increases the fee

22   significantly, substantially.  It's not something that I agree

23   to.  I would -- actually do not -- I cannot think of an

24   instance where I've agreed to that.  It's not out of the

25   question, but it -- the fee would increase substantially,

I1o1cort                         Corson - Direct

1    because the end use doesn't -- if it doesn't have my name on

2    it, it doesn't further my -- my business in any way.

3    Q.   Approximately what percentage of your overall income of

4    your photography business do you earn from the users who seek

5    to license photographs from your portfolio after they've

6    already been published?

7    A.   About a third of my income.

8    Q.   In your binder in front of you, I'm going to ask you to

9    turn to the second tab, Exhibit No. 2, Plaintiff's Exhibit

10   No. 2.  What is that document?

11   A.   This is my freelance agreement with The Wall Street

12   Journal.

13   Q.   When did you enter into that agreement?

14   A.   March 27, 2013.

15   Q.   What was the purpose of, as you understood it, of entering

16   that agreement with The Wall Street Journal?

17   A.   Well, that was right before I left The Wall Street Journal

18   as a staff photo editor to start my photography career, and

19   they asked me to sign this agreement so that they could contact

20   me in the future after I moved to California to photograph

21   assignments for them.

22   Q.   Was this agreement, was that specific to any particular

23   photography assignment?

24   A.   No.  It's a standing agreement for every assignment that I

25   would shoot for them.

I1o1cort                          Corson - Direct

1   Q.  Since March 2013 have you done photography assignments for

2   The Wall Street Journal?

3   A.  I've done over 20 assignments.

4   Q.  And how have those assignments come about?

5   A.  A photo editor -- there are a few that I work with.  The

6   photo editor would contact me and ask if I'm interested in a

7   certain story and available on a certain date or a range of

8   dates, tell me what the fee is, and what type of photos they're

9   looking for, and ask if I'm interested.

10          MR. COWLEY:  First of all, your Honor, I'd move for

11  admission of Plaintiff's Exhibit No. 2.

12          MR. SAULITIS:  No objection.

13          THE COURT:  Received.

14          (Plaintiff's Exhibit 2 received in evidence)

15          THE COURT:  There's no indication of amount, is there?

16          THE WITNESS:  No, your Honor.

17  BY MR. COWLEY:

18  Q.  To follow up on the judge's question, why, in the first

19  agreement you signed with The Wall Street Journal in 2013, is

20  there not a reference to a specific amount?

21          THE COURT:  Says so in the agreement itself.  The fee

22  will be set each time, each time a photograph is submitted.

23          THE WITNESS:  Yes.

24  Q.  In the over 20 instances of taking on photography

25  assignments from The Wall Street Journal, have you negotiated

1    specific fees for each one of those assignments?

2    A.  Each assignment, they will tell me what the fee is.  It

3    varies.  Mainly, if an assignment is intended to run on the

4    cover of the section -- in the case of the home stories that I

5    shoot, it's the mansion section.  If it's intended to run on

6    the cover, they typically have a little bit more budget and the

7    fee is higher.  If it's intended to be a smaller story, they

8    have what is their standard day rate across the paper.  It's a

9    little bit lower.

10   Q.  Is that a similar relationship with the other publications

11   that you work for doing photography assignments?

12   A.  It is.  Some publications pay more for say a feature story

13   that runs across 10 pages versus a smaller story that just runs

14   on one page.

15   Q.  I asked you a little while ago about the few different

16   types of revenue streams -- the journals that pay you to take

17   photographs or people who license from your portfolio.  Which

18   one of those fees, which one of the per-assignment charges tend

19   to be higher, which tends to be lower?

20   A.  Typically licensing an existing image is a -- has a higher

21   fee.  You know what you're getting.  You know that it's the

22   exact image that you want to use.  When you hire a photographer

23   for an assignment, there's a certain amount of uncertainty.

24   You don't know what the weather will be like, what the exact

25   situation will be like, and what types of images you will get

I1o1cort                          Corson - Direct

1    out of that assignment.

2    Q.   In your experience licensing photographs from your

3    portfolio that have already been used before to a new user,

4    what's the range of fees you charge for a photograph license of

5    that nature?

6    A.   If there's likely -- based on where the image is used and

7    who is using it, I've charged as much as $5,000 for a single

8    image and -- to a commercial user and -- but the range is wide.

9

10   Q.   Can you explain what you mean by commercial user.  What are

11   you distinguishing?

12   A.   Well, a commercial -- the distinctions between the usage

13   are typically commercial use or editorial use.  Editorial use

14   is news.  Editorial use is generally in a magazine or newspaper

15   or perhaps a newsy website, whereas commercial use is used by a

16   company that's meant to just specifically drive business to

17   that company.

18   Q.   Which of the two types of uses did the defendant make of

19   your photograph at issue in this case?

20   A.   That was commercial use.

21   Q.   Looking at Exhibit 2 again, I draw your attention to the

22   second number.  It ends with the sentence, "You further agree

23   that Dow Jones may grant third parties a license to republish

24   the photographs in connection with the article or other content

25   with which the photographs initially appear in WSJ."

I1o1cort                    Corson – Direct

1          First of all, who did you understand was referred to

2     as Dow Jones and WSJ?

3     A.   Dow Jones is the parent company of The Wall Street Journal,

4     which is referred to as WSJ.

5     Q.   What did you understand you were agreeing to in that

6     sentence when you said that Dow Jones could give permission to

7     others to use your photographs that they were --

8          THE COURT:  I think the agreement is self-explanatory.

9     What do we need this for?

10         MR. COWLEY:  Well, your Honor, an issue has been made

11    as to whether or not this could have been given away for free.

12         THE COURT:  If they wanted to, they could have.

13         MR. COWLEY:  That's not the witness' understanding.

14    That's what I'd like to explain to the Court.

15         THE COURT:  Well, go ahead.

16    BY MR. COWLEY:

17    Q.   Ms. Corson, what did you understand you were agreeing to in

18    that sentence of Section 3?

19    A.   Well, I have a very firm understanding of what their

20    intention was with this sentence.  When I was a photo editor,

21    it was part of my job -- when I was a photo editor at The Wall

22    Street Journal, it was part of my job to ask photographers to

23    sign this agreement and to explain any, you know, question --

24    to answer any questions that they had about it and to explain

25    any parts of it, and my -- my boss at the time, the photo

I1o1cort                       Corson - Direct

director of The Wall Street Journal, explained to me that this

clause allowed The Wall Street Journal to use social media

sharing tools on their website, the -- there's a button you can

click to post a little headline, a small image to Facebook and

also to Twitter, you can email the article to a friend, and The

Wall Street Journal allows their subscribers to use these tools

to share the article in limited ways, which helps drive

business to The Wall Street Journal and helps them increase

their subscribers, and he specifically told me that -- that

this sentence did not mean that The Wall Street Journal was

going to let everybody use the pictures for free or to

license -- to sell the pictures to anybody else to use.

          MR. SAULITIS:  Move to strike, your Honor, on the

grounds of hearsay and also parallel evidence.

          THE COURT:  Granted.

          MR. COWLEY:  Your Honor --

          THE COURT:  Testimony stricken.  Go on to the next

question.

BY MR. COWLEY:

Q.  Ms. Corson, in negotiating your freelance agreement with

other photographers on behalf of The Wall Street Journal, did

you ever tell any photographer that The Wall Street Journal

could give their photographs away to some other user for free?

A.  I told them that The Wall Street Journal did not intend to

license their pictures to other people, other companies, did

I1o1cort                          Corson – Direct

1   not intend to become -- to act as a stock agency and sell

2   pictures to anybody else.  I told --

3            MR. SAULITIS:  Objection.  Same objection.

4            THE COURT:  Overruled.

5   Q.  Based on your experience working as a photo editor for The

6   Wall Street Journal, did you have experience from time to time

7   with the Wall Street --

8            THE COURT:  The document says they could.  It stands

9   to reason that they're doing things for a fee.  They're a

10  profit-making company.  A profit-making company doesn't give

11  things away and thus there's no advantage for it to give it

12  away.  Why don't we move on to another subject.

13           But they have the right to give it away.  If there's

14  an advantage to The Wall Street Journal of giving it away, they

15  give it away.

16  BY MR. COWLEY:

17  Q.  Ms. Corson, in your experience working with The Wall Street

18  Journal as photo editor and working for them since you left as

19  a freelance photographer, has The Wall Street Journal ever

20  given permission to any third party to use one of your

21  photographs without you giving permission and obtaining the

22  licensing?

23           MR. SAULITIS:  Objection.

24           THE COURT:  Overruled.

25  A.  Not to my knowledge.  They have --

I1o1cort                      Corson - Direct

1       THE COURT:  You've answered the question.

2   Q.  Have you ever experienced the opposite?  In other words,

3   have you ever had occasion to experience some third party

4   wanting to use one of your photographs that appeared in the

5   Wall Street Journal?

6   A.  Yes, I have.

7   Q.  And in that circumstance what did The Wall Street Journal

8   do?

9   A.  My photo editor emailed me and told me that -- there is one

10  instance where a magazine, Sabato, in Belgium, licensed text, a

11  story that ran in The Wall Street Journal.  They licensed the

12  text from The Wall Street Journal and paid The Wall Street

13  Journal a fee, and they were interested in using my photographs

14  in connection with that article, and that they would be

15  contacting me to negotiate usage fees for those images.

16          MR. SAULITIS:  Objection.  Hearsay.

17          THE COURT:  Sustained.

18          MR. COWLEY:  Your Honor, I'm not admitting it for the

19  truth as much as I'm admitting it for her practice.

20          THE COURT:  You're admitting it for the truth.  That's

21  what you want.

22  BY MR. COWLEY:

23  Q.  Did the third party contact you --

24          THE COURT:  You've established this never happened.

25  So let's move on, please.

I1o1cort                      Corson - Direct

1    Q.  Ms. Corson, I'd like to make sure the record is clear.

2    Earlier the Court pointed out that The Wall Street Journal

3    presumably charges a fee.  You just mentioned The Wall Street

4    Journal charging a fee for text.  Please explain to the Court

5    what you understood The Wall Street Journal charged users who

6    wanted to take a Wall Street Journal article --

7              THE COURT:  What was the typical fee?

8              THE WITNESS:  I'm not sure across the board.  I looked

9    up an article on their --

10             THE COURT:  You were the photo editor.

11             THE WITNESS:  I was the photo editor.

12             THE COURT:  When you were the photo editor, did you

13   know the prices of the licensing that Wall Street Journal did?

14             THE WITNESS:  Not for the text.

15             THE COURT:  But for photographs.

16             THE WITNESS:  For photographs --

17             THE COURT:  What was the typical pricing?

18             THE WITNESS:  What The Wall Street Journal would pay a

19   photographer to run in The Wall Street Journal?

20             THE COURT:  That's one thing.

21             THE WITNESS:  It ranged from -- for an existing photo,

22   not an assignment, but for an existing single photo, it would

23   range from $100 to perhaps $600 per image.

24             THE COURT:  And what were the variables?

25             THE WITNESS:  The size of the image.  There are kind

I1o1cort                    Corson – Direct

1    of standard sizes that determine different rates.

2                 THE COURT:  Anything else?

3                 THE WITNESS:  The placement of the image, whether it's

4    on the cover of a section, the cover of the newspaper, the full

5    newspaper, or an inside -- on subsequent pages.

6                 THE COURT:  Okay.

7    BY MR. COWLEY:

8    Q.  Did you ever experience, in your time working as photo

9    editor for The Wall Street Journal, The Wall Street Journal

10   agreeing to license a photograph that it had acquired from a

11   photographer to some third-party user who wanted to use it?

12   A.  No.

13   Q.  Can anyone read The Wall Street Journal articles and photos

14   that you have given and licensed to The Wall Street Journal

15   along with these articles online for free?

16   A.  Not to my knowledge.

17   Q.  What do users that want to read The Wall Street Journal

18   article and see your photograph online, what do they have to

19   do?

20   A.  They have to subscribe to The Wall Street Journal and log

21   in to the site to see the full article.  They can typically see

22   a small portion, a headline, and a little bit of text at the

23   beginning, and then it blocks the rest of it and asks them to

24   log in or subscribe.

25   Q.  I'm going to ask you now to turn to Exhibit 3.

I1o1cort                         Corson - Direct

1        What is that document?

2   A.   This is the online version of the article that I

3   photographed the photograph in question for; ran on WSJ.com.

4   Q.   So when you say it's the online version, whose version?

5   A.   The Wall Street Journal's.

6   Q.   Do you see your photograph -- do you see a photograph that

7   you took for The Wall Street Journal in Exhibit 3?

8   A.   Yes.

9   Q.   Where?

10  A.   On the second page of the exhibit.

11           MR. COWLEY:  Your Honor, I move for admission of

12  Plaintiff's Exhibit 3.

13           MR. SAULITIS:  May I see a copy, please.

14           THE COURT:  Don't you have it?

15           MR. SAULITIS:  No.  It wasn't provided.

16           THE COURT:  It wasn't provided?

17           MR. COWLEY:  Your Honor, we provided everything.

18           MR. SAULITIS:  It was in a list, but --

19           THE COURT:  By having a list, you have access to the

20  photographs, right?

21           MR. SAULITIS:  Not quite, because it wasn't one of the

22  discovery documents.  I don't think it will be a problem, but I

23  just wanted to make sure that we were talking about the same --

24           MR. COWLEY:  Your Honor, defense counsel asked me to

25  use this exhibit and not the exhibit we proposed because we

I1o1cort                          Corson - Direct

1    proposed the printed exhibit and he said we had to use the

2    online version.  I told him we did that, and he said fine.

3              MR. SAULITIS:  No objection.  It's not a problem.  I

4    just wanted to --

5              THE COURT:  The exhibit is received.

6              (Plaintiff's Exhibit 3 received in evidence)

7              THE COURT:  This is your photograph.

8              THE WITNESS:  Yes, Judge.

9    BY MR. COWLEY:

10   Q.  How did this assignment come about?

11   A.  My photo editor emailed me and gave me a brief description

12   of the story, told me what it was and what the fee was, and

13   asked if I was interested and available on a date or date

14   range.  I don't recall.

15   Q.  Just generally speaking, what did you understand the story

16   was in the photograph?

17   A.  The story was about luxury spec homes that are built

18   without a buyer.

19   Q.  And what did you do to accomplish that photography

20   assignment?

21   A.  I spent an afternoon at the house with the -- the people

22   who designed and built the home, and I photographed all of the

23   primary rooms in the home, I photographed the grounds, the

24   exterior of the home, special luxury features of the home; I

25   made a number of images there.

I1o1cort                        Corson - Direct

1   Q.  And then did you do anything else before submitting

2   photographs to The Wall Street Journal?

3   A.  I processed the images.

4   Q.  What did that entail?

5   A.  I take what is basically a digital negative that's flat

6   visually, colorwise, and contrastwise, and I make adjustments

7   in a program called Adobe Lightroom and I add kind of my style

8   to the images and just adjust them and make them look their

9   best.

10  Q.  And then what did you do with the photographs?

11  A.  I sent a selection of those photographs, the ones I deemed

12  to be the best, to The Wall Street Journal via their FTP

13  service.

14  Q.  When you submitted photographs to the Wall Street Journal

15  on the occasion of this assignment, did you agree to transfer

16  your copyrights of the photographs to The Wall Street Journal?

17  A.  No, I did not.

18  Q.  What did you do with regard to your copyrights in those

19  photographs?

20  A.  I registered the copyrights to all of the images that I

21  sent to The Wall Street Journal with the U.S. Copyright Office

22  before they were published.

23  Q.  If I could ask you to look at Exhibit No. 4 in the witness

24  binder.

25          THE COURT:  How much did you charge for this

I1o1cort                          Corson - Direct

1    photograph shoot?

2              THE WITNESS:  I was paid for the assignment, a flat

3    fee.

4              THE COURT:  How much?

5              THE WITNESS:  $600 for the photo assignment.  I was

6    paid $100 to shoot video additionally, and I was paid a nominal

7    amount of expenses.

8              THE COURT:  $600 for the whole shoot plus?

9              THE WITNESS:  $100 to shoot video.

10             THE COURT:  Anything else?

11             THE WITNESS:  I think they paid for the mileage and

12   maybe the meals.

13             THE COURT:  They reimbursed you for mileage and meals.

14             THE WITNESS:  Yes.

15             THE COURT:  So under a thousand dollars to take care

16   of everything.

17             THE WITNESS:  Yes.

18   BY MR. COWLEY:

19   Q.  Ms. Corson, I'm going to ask you to look at Tab 4 of

20   plaintiff's proposed Exhibit 4.  What is that document?

21   A.  That is the image that I took.  It's a screenshot of the

22   image of part of a slide show on The Wall Street Journal's

23   website.

24   Q.  I'm going to ask you to look back at Exhibit 3.  When you

25   saw your photograph in the online article, would you explain to

I1o1cort                         Corson - Direct

1    the Court what you mean by slide show.

2    A.   Yes.  So on The Wall Street Journal's website, they often

3    have what is called a slide show, which is a way to show

4    additional images within a small space on the website.

5              THE COURT:  You can click on a spot and one picture

6    after another in sequence will be shown, right?

7              THE WITNESS:  Yes, your Honor.

8              THE COURT:  All right.

9    Q.   And when you open the article to read at a given time,

10   would the same article appear any time you opened the article?

11   A.   Not necessarily.  It would probably often default to the

12   first image unless you opened the article multiple times, and

13   I'm not sure how the computer caches what you've looked at

14   before.  It might open it to something in the middle of the

15   slide show.

16   Q.   To see all of them, what would you have to do?

17   A.   You would have to click through each individual picture.

18   Q.   And which number in the slide show was the photograph at

19   issue in this case?

20   A.   It's No. 14.

21   Q.   And is this the photograph that is the subject of this

22   lawsuit?

23   A.   Yes, it is.

24             MR. COWLEY:  Your Honor, I move for admission of

25   Plaintiff's Exhibit 4.

I1o1cort                    Corson - Direct

1              MR. SAULITIS:  No objection.

2              THE COURT:  Received.

3              (Plaintiff's Exhibit 4 received in evidence)

4              THE COURT:  Did you get anything more for that

5      particular photograph --

6              THE WITNESS:  No, I did not.

7              THE COURT:  -- than was covered for the $600 for the

8      shoot?

9              THE WITNESS:  No, I did not.

10             THE COURT:  It was not.

11             THE WITNESS:  It was included in the flat fee for the

12     assignment.  I did not receive additional --

13             THE COURT:  $600.

14             THE WITNESS:  Yes.

15             THE COURT:  For the whole shoot.

16             THE WITNESS:  Yes.

17             THE COURT:  And nothing extra for this particular

18     photograph.

19             THE WITNESS:  No.

20     BY MR. COWLEY:

21     Q.  You mentioned earlier --

22             THE COURT:  You don't make a lot of money as a

23     photographer, do you?

24             THE WITNESS:  You make a lot of money if you start

25     doing commercial work and in licensing existing images, because

I1o1cort                         Corson - Direct

1    you can relicense them over the years.

2              THE COURT:  So you need a large inventory.

3              THE WITNESS:  You do.

4    BY MR. COWLEY:

5    Q.  Ms. Corson, you said earlier, in response to my question

6    about what you charge for the licensing of individual

7    photographs for a second use from your portfolio, you said that

8    you've charged up to $5,000.  Was that also a photograph that

9    was taken for a publication?

10   A.  No, it was not.

11   Q.  Was that taken as part of a group of photographs?

12   A.  That was taken on my own, not as part of an assignment.  It

13   was part of a group of photographs in the sense that I was out

14   photographing for the day on my own with the intention of

15   hopefully being able to license those images to someone.

16   Q.  On other occasions have you licensed photographs,

17   individual photographs that were taken as part of a group by a

18   publication's assignment?

19   A.  Yes, I have.

20   Q.  And in those instances have your licenses of the individual

21   photographs been for more than you were paid for the entire

22   photography assignment?

23   A.  Yes, I have.

24   Q.  I'll ask you now --

25              THE COURT:  Was the house photograph, Exhibit 3,

I1o1cort                        Corson - Direct

1    licensed by anyone else?

2            THE WITNESS:  No, it was not, your Honor.

3            THE COURT:  You had it offered for license, right?

4            THE WITNESS:  I have it on my portfolio website.

5            THE COURT:  If I called you up and I said, I'd like to

6    have a picture of a beautiful house, that one might fit, what

7    would you charge me?

8            THE WITNESS:  Depends on what you'd want to do with

9    that.

10           THE COURT:  Hang it up in my foyer.

11           THE WITNESS:  I would, for -- so you'd be interested

12   in a print of that image?

13           THE COURT:  Yes.

14           THE WITNESS:  It depends on the size.

15           THE COURT:  11 x 14.

16           THE WITNESS:  I don't sell a lot of fine art prints.

17   I don't know exactly.  I would do research.

18           THE COURT:  You have no experience for that.

19           THE WITNESS:  I don't so much.  I know kind of --

20           THE COURT:  What would I call you up for?

21           THE WITNESS:  You could call me up for that.  It would

22   just take me a bit of research to figure out what I would want

23   to charge for it.

24           THE COURT:  And how would you research it?

25           THE WITNESS:  I would look at different types of

I1o1cort                          Corson - Direct

prints and see how much someone was going to charge me to

actually print it, because I wouldn't be printing it.  I would

talk to you and find out, are you an art collector or do you

just want something to hang on your wall, do you want it to be

archival?  Archival print, you want it to last at least a

hundred years.  Or are you going to just put it in your office

cubby.  I would look at other photographers --

THE COURT:  Let's suppose I want to have a print so I

can show the designer of a house that's being built for me what

design I might like.  What would you charge?  Any experience?

THE WITNESS:  That's complicated, because that's then

commercial work instead of a fine art print, so that's like

including something in a brochure or in marketing.

THE COURT:  Okay.  So how much?

THE WITNESS:  I don't have so much experience.

THE COURT:  What do you sell these licenses for?

THE WITNESS:  I license a lot of images to other

publications.

THE COURT:  What do they pay you, in order of

magnitude?  A hundred dollars a photograph?

THE WITNESS:  On the low end, that's the minimum.

THE COURT:  $600 on the high end?

THE WITNESS:  $2,000 on the high end.

THE COURT:  What's the variable?  What determines

whether it's a hundred dollars or $2,000?

I1o1cort                        Corson - Direct

1          THE WITNESS:  It depends the circulation of the

2     publication, it depends on the size of the image --

3          THE COURT:  Well, it can be blown up to any size,

4     can't it?

5          THE WITNESS:  Depends on the size the publication

6     intends to run it.  Things are usually divided into spot use,

7     which is like a thumbnail, an eighth of a page, a quarter of a

8     page, a third of a page, a half of a page, a full page, and

9     then a cover image is more, and then sometimes something goes

10    across two pages.  That's more.

11         THE COURT:  What is typical?

12         THE WITNESS:  I'm sorry, your Honor?

13         THE COURT:  What's typical?

14         THE WITNESS:  What's typical?

15         THE COURT:  Yeah.

16         THE WITNESS:  Typical is 1 to $3,000 for a cover,

17    typical is a thousand to 350 for a full page.

18         THE COURT:  A thousand to 350 or a thousand to 3,500?

19         THE WITNESS:  350 to a thousand.  $350 to a thousand

20    dollars for a full-page picture.

21         THE COURT:  Okay.  Go on.

22    BY MR. COWLEY:

23    Q.  What about online?  You were talking about publications in

24    the print of a picture.  What about online use?  Have you

25    experienced licensing for commercial use for people to put it

I1o1cort                          Corson – Direct

1    on their website, on their businesses?

2    A.  I have typically, in -- in connection with -- or typically

3    not solely online, typically in connection with other -- other

4    uses, social media, which I guess is typically online but is

5    kind of billed out as a separate type of usage.  Social media

6    is different than a -- than a company's website.  Whether it's

7    a promotional website or a blog, that's a commercial website.

8    And then brochures.  People typically want to do multiple

9    things with the images, not just necessarily put it on their

10   website.

11   Q.  Social media site, is that something like Facebook or

12   LinkedIn?

13   A.  Yes, it is.

14   Q.  So someone might have their own page but someone else can

15   put it on, right?

16   A.  Yes.

17   Q.  Put it online?

18   A.  It's referred to as social media in terms of licensing.

19   Q.  So for commercial use, for someone to be able to use it on

20   their own website to sell the services, put it on social media

21   to advertise or make the services known, how does that affect

22   the price you charge compared to print photographs?

23   A.  Well, a commercial -- a commercial website, a commercial

24   use of -- use on a commercial website is going to be more

25   than -- than use in a publication, whether it's a print

I1o1cort                              Corson - Direct

1    publication or an online publication.  If you're talking in

2    terms of magazines and newspapers of editorial publications,

3    the print use is typically more expensive and the online use is

4    added on.

5                THE COURT:  So if you go on to another website, it's

6    some price below a hundred dollars to $8,000, which is the

7    range you gave me for licensing.

8                THE WITNESS:  I'm sorry.  I'm a little bit lost, your

9    Honor.

10               THE COURT:  If you're charging you said a thousand

11   dollars to $3,000 for a cover page --

12               THE WITNESS:  Yes.

13               THE COURT:  -- and $350 to a thousand dollars for a

14   full page, what happens if you are licensing to someone running

15   a social media site -- for example, Slate magazine?

16               THE WITNESS:  If they wanted to additionally use it on

17   their social media or solely use it on social media?

18               THE COURT:  I don't know.  Give me a range.

19               THE WITNESS:  A range for --

20               THE COURT:  Have you so licensed anything that way?

21               THE WITNESS:  Most of what I sell goes in print and

22   then it -- and then the web usage is kind of tacked on as an

23   additional fee, and it's a smaller fee than the print usage,

24   because it's kind of tacked on to the print usage.  It's kind

25   of like bundling the -- bundling the fee and giving --

I1o1cort                         Corson - Direct

1          THE COURT:  I get the picture.  Thanks.

2     BY MR. COWLEY:

3     Q.  Have you charged people who are purely commercial users,

4     selling their own goods and services but they're not

5     publications, they're not journals or social media sites -- do

6     you charge them more?

7     A.  Yes, I do.

8     Q.  What's the range that you charge for purely commercial use

9     of your photos to advertise other goods and services?

10    A.  It varies greatly depending on what the usage is, what the

11    scope of the usage is.  Per image, start, you know -- I've

12    licensed things for as much as $5,000 and as low as a thousand

13    dollars, as low as maybe $500 if it's a fair number of images

14    being used.  Sometimes when you license 20 images to someone

15    versus licensing one, you might license the first few for a

16    higher amount and then reduce the fee as they -- as they

17    license -- as they license more images, because there are so

18    many of them; you're kind of giving them a discount.

19    Q.  Are you saying that if someone wants to use just a single

20    image, they pay more for that on average than if they licensed

21    a lot?

22    A.  Yes, they do.

23    Q.  I'm going to ask you to look at Tab 1, Plaintiff's Proposed

24    Exhibit 1.  What is that document?

25    A.  This is my certificate of registration from the U.S.

I1o1cort                          Corson - Direct

1   Copyright Office for the images, including the image of the

2   home in question.

3   Q.  So this includes the image that was shown in Exhibit 4?

4   A.  Yes, it does.

5           THE COURT:  The house or pool or both?

6           MR. COWLEY:  Plaintiff's Exhibit 4 is the one

7   photograph of the outdoor pool.

8           THE COURT:  Yes.  So is it the registration for the

9   pool?

10          THE WITNESS:  It's the registration for the pool and

11  other images from the assignment that you don't see in these

12  exhibits.

13          THE COURT:  More than one registration?

14          THE WITNESS:  Yes, your Honor.

15  BY MR. COWLEY:

16  Q.  What date did you apply for the registration covering the

17  photographs you gave to The Wall Street Journal?

18  A.  March 18, 2015.

19  Q.  Why did you apply for registration?

20  A.  Because I had a number of images that were going to be

21  published soon and I wanted to register them before they were

22  published.

23  Q.  Why?

24  A.  Because I wanted to have the full protection of the law for

25  the images, against infringement.  If I published all the

I1o1cort                          Corson - Direct

1    images, before publication, if at all possible, I wanted to

2    have them all registered with the U.S. Copyright Office.

3            MR. COWLEY:  Your Honor, I move for admission of

4    Plaintiff's Exhibit 1.

5            MR. SAULITIS:  No objection.

6            THE COURT:  Received.

7            (Plaintiff's Exhibit 1 received in evidence)

8    Q.   I'll ask you to look at Plaintiff's Proposed Exhibit 16.

9    You testified earlier about maintaining websites to hold some

10   of your images out for people to license even though they were

11   taken for some other publication previously.  What is

12   Exhibit 16?

13   A.   This is an -- Exhibit 16 is a screenshot from -- from my

14   portfolio website.

15   Q.   So whose website is 16?

16   A.   This is my website.

17   Q.   And what's the purpose of having a photo on that website?

18   A.   The purpose of having this photo on this website is to show

19   people my work, to show people images that they could

20   potentially license if they wanted to license that type of

21   image, and to -- to also give my contact information so people

22   can contact me and to -- that's -- those are the reasons.

23           MR. COWLEY:  Your Honor, plaintiff moves for admission

24   of Plaintiff's Proposed Exhibit 16.

25           MR. SAULITIS:  No objection.

I1o1cort                          Corson - Direct

1          THE COURT:  Received.

2          (Plaintiff's Exhibit 16 received in evidence)

3   Q.  Looking at that image as listed on your website, do you see

4   below the photograph itself it says, "All content © 2017 Lisa

5   Corson," and then an email address and phone number?

6   A.  Yes.

7   Q.  Is that something you put on there?

8   A.  Yes, it is.

9   Q.  Why?

10  A.  Because even though the law does not require me to have a

11  copyright symbol next to my images, I -- my understanding is

12  that it's good practice as a photographer to assert my

13  copyright just to clarify on my website and to publicly state

14  that I indeed own a copyright to all of these images on my

15  website.

16         THE COURT:  Why did you put down 2017 when this item

17  has a certificate of registration of March 18, 2015?

18         THE WITNESS:  My understanding is that it's general

19  practice to change the date, the copyright date on your website

20  to be the current year.

21         THE COURT:  The year you're publishing it again.

22         THE WITNESS:  Yes.  So my website currently reads

23  copyright 2018.

24  BY MR. COWLEY:

25  Q.  I'm going to ask you to look at Plaintiff's Proposed

I1o1cort                          Corson - Direct

1    Exhibit 5.  What is that document?

2    A.   This is the Brown Harris Stevens bhshamptons.com website,

3    and this is the Talk of the Town blog.

4    Q.   Do you see your photograph in that screenshot?

5    A.   Yes, I do.

6    Q.   When did you see that --

7              THE COURT:  It's a reprint of a Wall Street Journal

8    article, isn't it, with your photograph?

9              THE WITNESS:  Yes, it is.

10   Q.   This reprint, first of all, when did you see it?

11   A.   I saw this -- I don't remember the first time I saw this.

12   I saw it when I was -- I work with ImageRights, and when I was

13   looking through my ImageRights account and the images that it

14   brought up that were uses of my images online, that directed me

15   to this link.  I visited the site the day that -- I believe it

16   was September 21, 2015.  I visited the site to verify that the

17   image was there, that it was my image, and to submit that

18   information and other information to ImageRights to begin

19   connecting me with an attorney to --

20   Q.   When you took those steps, were you looking at the Brown

21   Harris Stevens of the Hamptons website itself?

22   A.   Yes, I was.

23   Q.   Did you see all of the photographs and the video that were

24   published by The Wall Street Journal also copied and printed

25   there?

I1o1cort                          Corson - Direct

1    A.  No.  I saw the one photograph.

2    Q.  Just the photograph that's shown on this page of the screen

3    print.

4    A.  Yes.

5    Q.  Prior to your finding this on the website after being

6    informed by ImageRights, had Brown Harris Stevens of the

7    Hamptons ever given you notice that it had your photograph?

8    A.  No.  I've never been contacted by them.

9    Q.  What permission, if any, did you provide to Brown Harris

10   Stevens to copy and display your photograph?

11   A.  No permission.

12   Q.  I'm going to ask you to look at Exhibit No. 12.  And is

13   Plaintiff's Proposed Exhibit No. 12 another screenshot with

14   text below the top of the same article on the Brown Harris

15   Stevens website that you referred to a moment ago in Exhibit 5?

16   A.  Yes, it is.

17   Q.  Do you see here, it says September 22, 2015 date at the

18   bottom on the printout?

19   A.  Yes, I do.

20   Q.  Is that about the time that you saw online and confirmed

21   that ImageRights had found your photo?

22   A.  Yes, it was the day after.

23          MR. COWLEY:  Your Honor, plaintiff moves for admission

24   of Proposed Exhibit 12.

25          MR. SAULITIS:  No objection.

I1o1cort                              Corson - Direct

1              THE COURT:  Received.

2              (Plaintiff's Exhibit 12 received in evidence)

3              THE COURT:  Same story, same photograph, right?

4              THE WITNESS:  Yes, your Honor.

5      BY MR. COWLEY:

6      Q.   You mentioned working with ImageRights.  Can you explain to

7      the Court what that means.

8      A.   So I pay a yearly fee to ImageRights to be -- to use their

9      service, and part of their service entails me uploading small

10     jpgs of all of the images that I want to look out for

11     infringements of, so they have some kind of computer program

12     that searches by image rather than by name, so their program

13     searches the web for all of the images that I upload, and then

14     I go on the web, on the ImageRights website, into my account,

15     and I can see where those -- where those images were used, I

16     can see the URL of the site where the image is displayed, and I

17     can see the URL of the site where the image is stored on the

18     infringer's server, and I go through a lot of those, hundreds,

19     if not thousands of those sightings and I determine whether a

20     use is an authorized use, because all of the Wall Street

21     Journal, all of the WSJ.com usages appear as well, so I sort

22     them based on whether it's an authorized use or an unauthorized

23     use, and then ImageRights helps me determine whether a user is

24     just an individual with a blog that is not monetizing that or

25     if it's a company and -- and then they help me find lawyers who

I1o1cort                         Corson - Direct

1    will work on contingency to pursue infringement, to pursue

2    licensing.

3    Q.  When did you begin working with them?

4    A.  I don't remember exactly.  It was either 2013 or 2014.  I

5    think it was 2014.

6    Q.  Prior to beginning work with ImageRights, did you

7    experience any infringements of your work online?

8    A.  Yes, I did.

9    Q.  And how was it that you were able to find those

10   infringements before using ImageRights?

11   A.  I would search for my name in quotes on Google, and then

12   look at Google Images.

13   Q.  When you reviewed the Brown Harris Stevens website that

14   reproduced The Wall Street Journal article and reproduced your

15   photo, what credit or what naming of you on that website did

16   you find?

17   A.  My name was not on the website.

18   Q.  So prior to hiring ImageRights to work for you, would you

19   have any way on your own of even finding this infringement?

20   A.  I would not have had an easy way of finding it.  If I had

21   Googled, if I had searched Google Images with each of my images

22   individually, it would have appeared, but I have thousands of

23   images.  I don't know that I would have thought to search this

24   one.  I searched for some celebrity pictures I've taken before,

25   but I don't think I would have --

1            THE COURT:  How did you find this one?

2            THE WITNESS:  Through ImageRights, through their

3    computer program that searches thousands of my images

4    constantly.

5            THE COURT:  Do artists and photographers engage a

6    company like that to do those kinds of searches?

7            THE WITNESS:  They do.  There's a few companies now

8    that do, like ImageRights.

9            THE COURT:  It's to protect copyright interests?

10           THE WITNESS:  Yes.

11   BY MR. COWLEY:

12   Q.  How much do you pay for that?

13   A.  I pay a yearly fee and I pay a percentage of each

14   settlement.

15   Q.  How much?

16   A.  At the time of this infringement, I -- the lawyer that I'd

17   worked with would get a certain fee that -- I think that varies

18   sometimes, and then my -- and then the expenses, with any court

19   costs, any expenses would be taken off, and then ImageRights

20   and I would split the remainder of the settlement.  At the time

21   of this infringement, our split was 55 percent for me and

22   45 percent for ImageRights, and that is after the attorney

23   takes their percentage.  And it's currently changed a little

24   bit now.  It's 50/50, ImageRights and me, after the attorney's

25   fee and costs.

I1o1cort                          Corson - Direct

1        THE COURT:  Any attorney engaged by the image company?

2        THE WITNESS:  The ImageRights suggests an attorney and

3   I -- they facilitate an introduction, but then I then enter

4   into an agreement with the attorney directly and then

5   correspond with the attorney directly, typically, your Honor.

6   Q.  In this case what did you do after confirming that the --

7        THE COURT:  The attorney bills you, or bills

8   ImageRights?

9        THE WITNESS:  The --

10       THE COURT:  How does it go mechanically?  You make a

11  settlement, say, of a thousand dollars.  The attorney would

12  take off his fee.  Typically what is his fee?

13       THE WITNESS:  It's a percentage of the settlement.

14       THE COURT:  33?

15       THE WITNESS:  It's between -- it's generally between

16  30 and 40 percent, depending on how far the case goes, how long

17  it has gone.

18  BY MR. COWLEY:

19  Q.  After confirming that the notice that ImageRights gave you

20  of the Brown Harris Stevens site did in fact have your

21  photograph on that site, what did you do?

22  A.  I'm sorry.  Could you repeat the question?

23  Q.  You testified earlier, when I asked you how it was that you

24  came to look at the Brown Harris Stevens website to see the

25  article with your picture, you explained that it was after

I1o1cort                      Corson - Direct

1   ImageRights gave you notice that there was a URL with that

2   image found; you explained to the Court that you went and

3   looked at the website, confirmed it was there and it was yours.

4   What did you then do?

5   A.  I provided -- I provided ImageRights with the copyright

6   registration and all of the information in the certificate, the

7   date, whether it was -- I notified them whether it was -- that

8   it was published, or that it was registered before it was

9   published, and I agreed to -- I agreed to have them then submit

10  that information to an attorney to look over and determine

11  whether it was an infringement we would be pursuing.

12  Q.  And at some point did you engage my firm?

13  A.  I did.  I signed a letter.

14  Q.  Now when you began working with my firm, did you enter a

15  contingency agreement directly with my firm?

16  A.  Yes, I did.

17  Q.  And that's in addition to your agreement with ImageRights

18  where they have a contingent portion of their compensation in

19  addition to their flat charge, correct?

20  A.  Yes.

21  Q.  And you signed --

22          THE COURT:  Your fee was cut off first and then it

23  would be a 55/45 split with -- what's the name of the company,

24  Image?

25          THE WITNESS:  ImageRights.

I1o1cort                    Corson - Direct

1          MR. COWLEY:  The only correction, your Honor, is that

2     the costs come first.  They're paid as they go by -- or they

3     come first, then our fee, then ImageRights, and Ms. Corson's

4     split, based on their contract.

5          THE COURT:  What's your percentage?

6          MR. COWLEY:  When we commenced the lawsuit, it was

7     35 percent.  When we commenced discovery, 40.

8          THE COURT:  So that's 40 percent.

9          MR. COWLEY:  Yes.  And I would also say, for

10    completeness, your Honor, before we commenced the lawsuit, it

11    was only 30.  And that's --

12         THE COURT:  I think I know.  Let's move on.

13    BY MR. COWLEY:

14    Q.  Ms. Corson, please turn to Tab 13, Plaintiff's Proposed

15    Exhibit 13.

16         What did you initially engage us to do about the Brown

17    Harris Stevens posting of your photograph on their website?

18         MR. SAULITIS:  Objection, your Honor.  Best evidence

19    would be the engagement letter.

20         THE COURT:  That's not going to be disputed, is it?

21         MR. SAULITIS:  No.

22         THE COURT:  I assume at a point in time a letter was

23    written, right, a cease and desist letter, right?

24         MR. COWLEY:  That's all I was having her state for the

25    record.

I1o1cort                          Corson - Direct

1          THE COURT:  What's the exhibit?

2          MR. COWLEY:  There is no letter because I didn't put

3    the letter or the demand in.  I put the response back because

4    that --

5          THE COURT:  What was the response?

6          MR. COWLEY:  Tab 13, your Honor.

7    BY MR. COWLEY:

8    Q.  So Ms. Corson, is it correct that a notice of infringement

9    and a demand to Brown Harris Stevens went out --

10         THE COURT:  Just don't repeat.  We're on the response.

11   This is the response, Exhibit 13?

12   BY MR. COWLEY:

13   Q.  Ms. Corson, what is Exhibit 13?

14   A.  Exhibit 13 is an email, email correspondence between you

15   and Mr. Saulitis.

16   Q.  I'm sorry.  I identified the wrong -- I said 13 but I meant

17   11.

18   A.  Okay.

19   Q.  Ms. Corson, what is Exhibit 11?  And I apologize for my

20   error.

21   A.  Exhibit 11 is correspondence between you and Babette Krolik

22   from Terra Holdings and --

23   Q.  Was this the response to our initial demand to Brown Harris

24   Stevens?

25   A.  I believe so.  It's a response to the January 4, 2016

I1o1cort                           Corson - Direct

1   letter from you notifying them of their infringement.

2   Q.  Now --

3               MR. SAULITIS:  I'm sorry.  May I see a copy, please.

4               There's no demand letter to which that responds.

5   Could we also have that.  It seems to be a half of --

6               THE COURT:  He said because of the case settlement

7   numbers --

8               MR. COWLEY:  It's got the case settlement.

9               THE COURT:  Do you want it?  Mr. Saulitis?

10              MR. SAULITIS:  Yes.  I think for completeness, it's --

11              THE COURT:  Yes or no, do you want it in?

12              MR. SAULITIS:  Yes.

13              THE COURT:  Submit it.  Offer it.

14              MR. COWLEY:  I don't have it.

15              THE COURT:  Do you have it, Mr. Saulitis?

16              MR. SAULITIS:  No.

17              THE COURT:  Okay.  So we'll do without it.

18  BY MR. COWLEY:

19  Q.  Ms. Corson --

20              MR. SAULITIS:  And no objection otherwise.

21              THE COURT:  Good.  11 is received.

22              (Plaintiff's Exhibit 11 received in evidence)

23  BY MR. COWLEY:

24  Q.  Ms. Corson, I'd ask you to look at the email from Babette

25  Krolik.  It has a Terra Holdings --

I1o1cort                         Corson - Direct

1    THE COURT:  Apart from the document, one of the issues

2    here is how quickly Brown Harris Stevens took down the

3    infringing copy.  How are you going to prove that?

4    MR. COWLEY:  Well, your Honor, I was turning right to

5    what they said they did and what they actually did.

6    THE COURT:  How do you prove what they actually did?

7    MR. COWLEY:  Well, there's two ways, but

8    Mr. Davidowicz testified to it, which is already before you in

9    his 30(b)(6) testimony.

10   THE COURT:  Okay.  Go ahead.  Proceed.

11   BY MR. COWLEY:

12   Q.  Ms. Corson, looking at Ms. Krolik's email, starts at the

13   bottom of the first page, goes on to the second page, and says

14   that she's responding to the letter for Brown Harris Stevens.

15   Do you see halfway through that paragraph it says the

16   picture -- the story only appeared briefly in March or April of

17   2015 on the Brown Harris Stevens --

18   THE COURT:  I can read the letter myself.  It's in

19   evidence, right?

20   MR. COWLEY:  Yes.

21   THE COURT:  Okay.  So why do you need to have

22   Ms. Corson read it also?

23   BY MR. COWLEY:

24   Q.  When you were informed that this was Brown Harris Stevens'

25   response to our demand letter, did you believe that to be true?

I1o1cort                         Corson - Direct

1  A.  No, this is not true.

2  Q.  And how do you know it wasn't true?

3  A.  Because I saw the blog on September 21, 2015.

4  Q.  And you saw the blog where, on whose website?

5  A.  On Brown Harris Stevens' website.

6  Q.  At the bottom of that paragraph, she informs you that Brown

7  Harris Stevens deleted the article and pictures.  Did you

8  understand that they were conceding you owned the copyrights

9  and that they had no --

10         THE COURT:  That's an issue.  What she understands is

11  of no relevance.

12         MR. COWLEY:  Well, it is to our request for a

13  preliminary injunction, your Honor.

14         THE COURT:  She can't prove it from her understanding.

15  Q.  Did Brown Harris Stevens ever inform you that they agreed

16  you own the copyright and that they did not have a right to

17  repost --

18         THE COURT:  That's best evidence.

19         MR. COWLEY:  Sorry, your Honor?

20         THE COURT:  That's the best evidence rule.  Put in the

21  document.

22         MR. COWLEY:  There is no document.  No notes were

23  provided.  There's only one way to say that and --

24         THE COURT:  The document is not here because you

25  refrained from putting it in.

I1o1cort                         Corson – Direct

1          MR. COWLEY:  No, your Honor.  It's here in front of

2     you where they say they reserve all rights and they don't

3     concede anything about the claim.

4          THE COURT:  Well, all right.  So that's what they say.

5     BY MR. COWLEY:

6     Q.  So my follow-up question is:  Did there ever come a time

7     where they did concede that you had owned the copyright and

8     they had no right to post it?

9     A.  Not to my knowledge, no.

10    Q.  The Brown Harris Stevens general counsel, Ms. Krolik, then

11    referred you to address your claim with The Wall Street

12    Journal.  Did you try to determine whether The Wall Street

13    Journal in fact gave Brown Harris Stevens permission to post

14    your photograph?

15    A.  I reviewed all of the terms of use on the various Wall

16    Street Journal sites myself on WSJ.com and on djreprints.com,

17    which is their text licensing site, and I confirmed for myself

18    that Wall Street Journal on those sites says that you cannot

19    use copyrighted photographs or anything else, that third-party

20    copyright holders are the copyright holders and you have to

21    clear rights with them and that The Wall Street Journal does

22    not license images.

23         MR. SAULITIS:  Objection.  Hearsay.

24         THE COURT:  I'll allow it in.  If you feel that you

25    have a claim of right, you've got to prove a claim of right.

I1o1cort                         Corson - Direct

1    But I'll allow it in.

2    BY MR. COWLEY:

3    Q.  Following this email, what choice did you have to address

4    your concerns with Brown Harris?

5             THE COURT:  Mr. Cowley, you've proved origination,

6    you've proved infringement, and it's up to Mr. Saulitis to show

7    whatever claim of right he has and how long it took them to

8    take it down.

9             MR. COWLEY:  I'm addressing a different issue, and I

10   apologize if my question was confusing.  I'm stressing the

11   argument that we somehow only want to run up attorney's fees.

12            THE COURT:  You have a right to sue.  You have a right

13   to sue.

14            MR. COWLEY:  I'm trying to address the argument.

15            THE COURT:  You make the point that they didn't take

16   it down promptly so you sued.  You have a right.

17            You have a right to sue to take full advantage of what

18   the law provides you.

19   BY MR. COWLEY:

20   Q.  Ms. Corson, what effect on your business does the

21   infringement, such as what you found on Brown Harris Stevens'

22   website, does that image have?

23   A.  It's impossible to determine.  I don't know how many people

24   saw the article and were interested in that photograph

25   specifically, and, you know, maybe they wanted to contact me to

I1o1cort                        Corson - Direct

1   license it, but my name is not there so they don't know who

2   took the photograph.  Another part of my business is just

3   people seeing pictures of mine out there in prestigious

4   publications and other areas where, you know, they see -- they

5   see my work and they see the quality of my work and the types

6   of things that I photograph.  Luxury homes are not available to

7   everyone, so just seeing that I shoot luxury homes and the

8   quality of my photographs then drives other people to seek me

9   out to assign new work to me.

10  Q.  Do you actually have experience in your business with that

11  occurring on which you base to believe that it might have

12  incurred if there was credit given you?

13  A.  Yes, I do.

14  Q.  What's that experience?

15  A.  People contact me all the time saying that they have, you

16  know, seen my work in Los Angeles Magazine, in The Wall Street

17  Journal, in Sunset Magazine, wherever they've seen it, and that

18  they'd like to hire me to -- to photograph something.  They

19  typically will see my name, Google it, find my website, which

20  contains my email and my phone number, and they'll contact me

21  and ask me to do work for them.

22  Q.  Have you tried to quantify an amount of actual losses from

23  business that did not come to you as a result of an

24  infringement like this and not including your name?

25  A.  No.  I have no way of knowing.

I1o1cort                          Corson - Direct

1    Q.  What kind of use of your photographs did you find Brown

2    Harris was making on its website when it posted your image?

3    A.  Well, the website -- it's a commercial website.  They're

4    using it to drive traffic to their website in order to sell

5    luxury homes, so --

6    Q.  And have you tried to quantify a claim to disgorge the

7    amount that they earned as a result of using your photograph to

8    do that?

9    A.  I have no way of knowing.

10   Q.  And how could you know how many customers might have --

11              THE COURT:  She can't know.

12              MR. SAULITIS:  Objection.

13              THE COURT:  She can't know.  Unless the customers tell

14   her.

15   Q.  As a result of not being able to quantify your profit or

16   their profits that they may have gained -- excuse me.  Start

17   the question over.

18              As a result of being unable to quantify what profits

19   you may have lost in that the customers never called you, and

20   profits that they may have gained from customers who did call

21   them, what are you seeking in this case?

22              MR. SAULITIS:  Objection.

23              THE COURT:  You're seeking statutory damages for the

24   infringement and you're seeking injunction.

25              MR. COWLEY:  Your Honor, it's my understanding, for

I1o1cort                        Corson - Direct

1    the record, I was supposed to have the testimony -- nothing has

2    been agreed upon from this case in the beginning, so if I don't

3    have it on the record --

4              THE COURT:  The record is your complaint.  The

5    complaint is in the record.  That's what you're suing for.  You

6    want to stop them from doing this and you want to have

7    statutory damages.

8              Anything else?  Mr. Cowley?

9              MR. COWLEY:  Yes, your Honor.  Just a couple more

10   questions, I believe.

11   BY MR. COWLEY:

12   Q.  Given the nature of your work, the types of photographs you

13   take and where they're found, do you have any concern that this

14   might be repeated again by Brown Harris Stevens in the future

15   if they're not ordered to not do it?

16   A.  Definitely.

17   Q.  What's that concern based on?

18   A.  Well, I photograph a lot of luxury homes for Wall Street

19   Journal.  I've photographed over 20 over the years, maybe

20   closer to 30.  You know, looking at that blog, it kind of -- it

21   relies on -- it's entirely copying articles, you know, from

22   other publications, often from The Wall Street Journal, and

23   because I'm shooting a lot of luxury homes, it's highly

24   possible that an article that I photographed could be copied to

25   that blog in the future or to their website in general.

I1o1cort                        Corson - Direct

1          MR. COWLEY:  Your Honor, before I rest with this

2     witness, I would like to address the issue that the Court had

3     to do with the defendant's contested objection.  If it is going

4     to be allowed in, I will question the witness about those

5     issues.  If the Court agrees with me that they're not issues

6     that can be presented to the Court, obviously I won't present

7     testimony, against my objection.  May I explain?

8          THE COURT:  No.  Just ask questions.  Seems to me

9     we're finished.

10         MR. COWLEY:  Well, your Honor, the defendants have put

11    forward a proposed exhibit Rule 68 offer to --

12         THE COURT:  Just ask questions.

13    BY MR. COWLEY:

14    Q.  Ms. Corson, when -- well, did you receive --

15         THE COURT:  Don't anticipate the defense.  You'll have

16    an opportunity to come back on rebuttal.

17         MR. COWLEY:  Thank you, your Honor.  I will exercise

18    that opportunity.

19         THE COURT:  Okay.  So you're finished?

20         MR. COWLEY:  Let me just check the exhibits, your

21    Honor.

22         If I did not say already, I move for admission of

23    Exhibit 5, which was the Brown Harris Stevens printout that

24    showed the top of the printout that shows the Talk of the Town.

25    I believe there was no objection.

I1o1cort                    Corson - Cross

1              THE COURT:  5 is in evidence.  And 12 is in evidence.

2    What's in evidence is 2, 3, 4, 1, 16, 5, and 12.

3              (Plaintiff's Exhibit 5 received in evidence)

4              MR. COWLEY:  Thank you, your Honor.  No further

5    questions at this time.

6              THE COURT:  All right.  You're surrendering the podium

7    now to Mr. Saulitis?

8              MR. COWLEY:  I do, your Honor.

9              THE COURT:  Is 11 in evidence?

10             MR. COWLEY:  I have it, yes, as being allowed in

11   evidence.

12             THE COURT:  11 is in evidence.  Thank you.

13   CROSS-EXAMINATION

14   BY MR. SAULITIS:

15   Q.  Good morning, Ms. Corson.  Thank you for your direct

16   testimony.

17             You talked about the photo shoot that was in March of

18   2015 at which you took the picture that brings us here.  Do you

19   remember that day?

20   A.  I do.

21   Q.  How long did the photo shoot last, from the time you

22   started to travel to the time you finished and went home?

23   A.  It lasted around eight hours, maybe a little bit more.

24   Q.  Is that a normal photo shoot day in the course of your

25   professional photography business?

I1o1cort                    Corson - Cross

1    A.  It was a longish day, but that's not abnormal.

2    Q.  And --

3             THE COURT:  Where was the house you photographed?

4             THE WITNESS:  The house was in Beverly Hills, your

5    Honor.

6             THE COURT:  And did you have an office in Beverly

7    Hills?

8             THE WITNESS:  No.  I live in Ojai.

9             THE COURT:  So it's about a two-hour drive, three-hour

10   drive, right?

11            THE WITNESS:  Yes.

12            THE COURT:  Back and forth.

13            THE WITNESS:  Yes, your Honor.

14            THE COURT:  So you're driving about five hours, let us

15   say?  And how long was the shoot?

16            THE WITNESS:  The shoot was maybe four hours.

17            THE COURT:  Okay.

18   BY MR. SAULITIS:

19   Q.  And the agreement was that you would be compensated for

20   your mileage at 49 cents a mile?

21   A.  Yes.

22   Q.  Reimbursement for your mileage.

23   A.  Yes.

24   Q.  Now who chose the subject, the area, the location to be

25   photographed by you?

I1o1cort                      Corson - Cross

1   A.  Someone connected to The Wall Street Journal.

2   Q.  So they arranged -- that someone was somebody, who?  What's

3   the name of that person?

4   A.  Are you asking who set up the photo shoot?

5   Q.  Yes.  Was that Dana Kien?

6   A.  Yes, it was.

7   Q.  And that's somebody you know over The Wall Street Journal?

8   A.  Yes, it is.

9   Q.  And that's the person who from time to time asks you to do

10  photography for them?

11  A.  Yes, it is.

12  Q.  And Dana was in charge of getting photography for an

13  article that The Wall Street Journal was planning on writing?

14  A.  Correct.

15  Q.  And in fact invited you to be the photographer of the

16  pictures for that article.

17  A.  Correct.

18  Q.  And you went to the designated location, brought your

19  equipment, and proceeded to take pictures there?

20  A.  Yes.

21  Q.  And did Ms. Kien or anybody else from The Wall Street

22  Journal side ask you to take pictures of certain subjects that

23  were there?

24  A.  Yes.

25  Q.  And that included the area that you ultimately photographed

I1o1cort                          Corson - Cross

1    as part of this case?

2    A.   Included generally the exterior and the grounds of the

3    property, in addition to a number of other things.

4    Q.   These are called spec houses, fancy Beverly Hills kind of

5    homes?

6    A.   It's a house that a developer built without a buyer, just

7    built because they wanted to build that type of home.  It's a

8    showcase home.

9              THE COURT:  In hopes of finding a buyer.

10             THE WITNESS:  Yes, your Honor.

11   Q.   And so approximately how many photographs over the course

12   of the four-hour shoot did you actually take?  How many times

13   did that shutter go off on your camera, if that's what you use?

14   A.   I don't recall.

15   Q.   More than a hundred?

16   A.   Several hundred.  Every time I shoot any assignment, I

17   shoot a large number of images.

18   Q.   Those images are stored on your camera?

19   A.   Yes, they are.

20   Q.   Are they digital images?

21   A.   Yes, they are.

22   Q.   So it's not a film situation.

23   A.   No.

24   Q.   Only digital?

25   A.   Only digital.

I1o1cort                         Corson - Cross

1    Q.   What format are they stored on the camera, jpg or something

2    else?

3    A.   The file extension is .cr2.  It's referred to as a raw

4    file.

5    Q.   And then after you were done with the photo shoot, you had

6    all these images on your camera.  What did you do next?

7    A.   You mean what did I do next with the photographs?

8    Q.   Yes.

9    A.   Okay.  I -- I -- the photographs are stored on a card that

10   I eject from the camera and I plug into a device that reads it,

11   which is attached to my computer, and I download all of those

12   images onto my hard drive using a program called Adobe

13   Lightroom.

14   Q.   And then what do you do using -- well, you already covered

15   that.

16            After you're done doing whatever you did with Adobe

17   Lightroom, how do you get the pictures to The Wall Street

18   Journal, the person who commissioned you for the job?

19   A.   I select those images in Adobe Lightroom and I export them

20   as a .jpg file and then I log onto The Wall Street Journal's

21   FTP site and upload those images.

22   Q.   FTP means file transfer protocol?

23   A.   I believe so.

24   Q.   And so that was done the same day as the photo shoot or the

25   next day or --

I1o1cort                          Corson – Cross

1   A.  I don't recall.  Within a few days.

2   Q.  Okay.  So the files are converted to jpgs, which are

3   smaller format, correct?

4   A.  Correct.

5   Q.  And then they're sent electronically to The Wall Street

6   Journal to complete the job, correct?

7   A.  Correct.

8           THE COURT:  You send the entire shoot or select?

9           THE WITNESS:  A selection of them.

10          THE COURT:  You select them yourself.

11          THE WITNESS:  I do, your Honor.

12          THE COURT:  So you go through an editing process.

13          THE WITNESS:  Yes, I do.

14          THE COURT:  How long does that take?

15          THE WITNESS:  A number of hours.

16  Q.  And how many jpgs did you upload to Wall Street Journal for

17  that photo shoot?

18  A.  I don't recall the exact number.

19  Q.  What is your best recollection of the number of jpgs you

20  sent to Ms. Kien at the Wall Street Journal?

21  A.  Maybe 75.

22  Q.  And now when you were done with that process, did you send

23  a bill to The Wall Street Journal for your service?

24  A.  Yes, I did.

25  Q.  And if I could show the witness a copy of what has been

I1o1cort                         Corson - Cross

1    marked as Exhibit B for identification, which comprises a bill

2    and an attached receipt.  That would be B in the book,

3    Ms. Corson.

4    A.  Yes.

5    Q.  Do you see that there?

6    A.  I do.

7    Q.  Is that a copy of your bill and the attachments that were

8    sent there, that you sent to Dana Kien of the Wall Street

9    Journal on March 13, 2015?

10   A.  Yes, it is.

11   Q.  And you were paid that sum of money?

12   A.  Yes, I was.

13   Q.  And that you were reimbursed for a burrito at Chipotle and

14   for your mileage of $78.40, $9.43 for the burrito?

15   A.  Looks like it, yes.

16           MR. SAULITIS:  I offer the document.

17           MR. COWLEY:  No objection, your Honor.

18           THE COURT:  Received.

19           (Defendant's Exhibit B received in evidence)

20   Q.  Now in the course of arranging for the photo shoot with

21   Ms. Kien, you mentioned on your direct examination that this

22   was done via email conversation?

23   A.  Yes.

24   Q.  Can you take a look at the book that's been marked as

25   Exhibit A, please.

I1o1cort                          Corson - Cross

1   A.  Yes.

2   Q.  Do you have that in front of you there?

3   A.  I do.

4   Q.  Can you confirm for me that that is a copy of the email

5   communications you had with Ms. Kien concerning your being

6   engaged for the photo shoot of that day?

7   A.  Yes.

8            MR. SAULITIS:  I'd offer the document into evidence.

9            MR. COWLEY:  No objection, your Honor.

10           THE COURT:  Received.

11           (Defendant's Exhibit A received in evidence)

12  Q.  And you were paid the agreed amount?

13  A.  Yes.

14  Q.  And you showed us as Exhibit 16 in evidence a shot from

15  your website that contains the same photograph for a similar

16  photograph?

17  A.  Yes.

18  Q.  And that was the way that it appeared sometime in 2017?

19  A.  Yes.

20  Q.  And you kept that photograph on your website over what

21  period of time, including the present?

22  A.  I'm trying to recall when I first posted it.  I believe I

23  posted it in 2016.

24  Q.  2016?

25  A.  I believe so, yes.

I1o1cort                    Corson - Cross

1   Q.  Would you say early 2016, middle, late?

2   A.  I believe it was January.

3   Q.  Okay.  And that's been in your web portfolio ever since

4   that time?

5   A.  Yes, it has.

6   Q.  And have you ever received or have you ever provided a

7   price list for the photo on any kind of a price list for

8   licensing or sale?

9   A.  No, I have not.

10  Q.  Have you ever received from someone outside, unrelated to

11  you, an offer to license that photograph from someone who has

12  seen it perhaps on your website or elsewhere?

13  A.  No.

14  Q.  It is available for license, is it not?

15  A.  It is on my portfolio website.  It is not on my stock

16  agency website, my personal stock agency website or the outside

17  agency that I use.

18  Q.  So you mentioned that you have a stock agency.  I think you

19  called it Gallery Stock?

20  A.  Yes.

21  Q.  Can you just tell us what that means to have a stock

22  agency.

23  A.  I enter into an agreement with Gallery Stock to exclusively

24  license some of my images to anyone who's interested in

25  licensing them, both editorial and commercial clients, but they

I1o1cort                        Corson - Cross

1   require that they be the exclusive licensor of those images, so

2   I'm limited as to what I can give to them to license.

3   Q.  You've never licensed this particular photograph to Gallery

4   Stock, have you?

5   A.  No, I have not.

6   Q.  And you mentioned something about syndication photos.  Can

7   you explain what syndication means in your world.

8   A.  Syndication is just another term for licensing, typically

9   applies to newspapers and magazines where the licensing is

10  everything; the licensing is letting anybody use the image.

11  Syndication is -- it's just another term for letting a magazine

12  or a newspaper use your image for --

13  Q.  Have you ever offered the particular photograph for any

14  kind of syndication?

15  A.  I have not.

16  Q.  Have you received an offer from someone who wanted to

17  syndicate it from you?

18  A.  No.

19  Q.  And how about some of the other photographs from the same

20  photo shoot --

21  A.  No.

22  Q.  -- that you took?  Have you ever received an offer for any

23  of those photographs?

24  A.  No, I have not.

25  Q.  Have you offered any of those photographs for sale to

I1o1cort                    Corson – Cross

1    anyone in the outside world, other than The Wall Street

2    Journal?

3    A.  Not specifically.

4    Q.  How about generally?

5    A.  A few of them are available on my website.

6    Q.  And from that same photo shoot, do you have any kind of

7    asking price for any of those photos?

8    A.  The price greatly varies.

9    Q.  Did you post an asking price for any of the photos that are

10   available on your website for purchase?

11   A.  No.

12   Q.  Has anyone ever given you an offer to purchase or license

13   any of those other photographs from the same photo shoot?

14   A.  No.

15   Q.  So the only deal that you've ever had involving this

16   photograph --

17           THE COURT:  Wall Street Journal.

18   Q.  -- was The Wall Street Journal for $600 for 75 -- a photo

19   shoot comprising approximately 75 photos?

20           THE COURT:  No.  She got 600 bucks for a photo shoot.

21   Q.  Photo shoot.  And from that photo shoot --

22           THE COURT:  Mr. Saulitis, I have it.

23           MR. SAULITIS:  Okay.

24   Q.  Has that particular photograph ever been displayed in a

25   kind of artistic setting?

I1o1cort                          Corson - Cross

1    A.  Only on my website.

2    Q.  And you testified that in September of 2016 it came to your

3    attention that the photo appeared on Brown Harris Stevens'

4    website, is that accurate?

5    A.  Correct.

6    Q.  And you yourself looked at Brown Harris Stevens' website

7    then and saw your photo on that website, correct?

8    A.  Yes.

9    Q.  Did you then take any steps to contact Brown Harris Stevens

10   to say, that's my photo, take it down, or, pay me, or some

11   words to that effect?

12   A.  I did not.  I haven't found that successful in the past.

13   Q.  I just want to know if you did it.

14   A.  No, I did not.

15   Q.  Did you do anything to -- did you check a month later to

16   see -- a month later, two months later, three months later --

17   to see if that image was still on the Brown Harris website?

18   A.  I don't recall.

19   Q.  Other than the January 4th demand that was made on your

20   behalf by Mr. Cowley, had there been any other steps taken

21   prior to then to get the photo off the website?

22   A.  Not to my knowledge.

23   Q.  And did you ever go onto the Brown Harris Stevens website

24   after January 5th of 2015 when the demand was made and look to

25   see if the photo was still there?

I1o1cort                         Corson - Cross

1    A.  I might have.  I don't recall specifically.  I did this

2    week.

3    Q.  What did you see?  Did you see it there this week?

4    A.  I did not.

5    Q.  So other than what you saw, do you have any recollection,

6    after January 5th of 2016, of ever having seen that photograph

7    on Brown Harris Stevens' website?

8    A.  I don't recall.

9    Q.  Have you ever seen a screen print of that photograph,

10   screen print of Brown Harris Stevens that was made or dated

11   after January 5th of 2016?

12   A.  A screenshot?

13   Q.  Yeah, a screenshot.

14   A.  I don't believe so.

15   Q.  If someone were to have -- I mean, if somebody sees

16   something on the web, it takes about one or two clicks to make

17   a screenshot of that?

18           MR. COWLEY:  Objection, your Honor.

19   Q.  If somebody has seen it, is it easy to make a screenshot of

20   something on the web, a photograph?

21           MR. COWLEY:  Objection.

22           THE COURT:  Sustained.

23   Q.  Now when you looked at the Brown Harris Stevens website in

24   September 2015, did you click on the hyperlink to the original

25   article?

I1o1cort                    Corson - Cross

A.  I don't recall.

Q.  Okay.  Do you recall seeing that there was a hyperlink on
which a viewer could click onto the original Wall Street
Journal article?

A.  I don't recall.

Q.  Do you know whether, if you clicked the hyperlink to that
on the website, whether, going to the original source, your
name would be on the photograph that was on The Wall Street
Journal original web --

        THE COURT:  Ask another question.

Q.  Do you know if the Wall Street Journal, the article that
was published by The Wall Street Journal on its website
contained a credit to you?

A.  Yes, it did.

        THE COURT:  But the item on the Brown Harris Stevens
did not.

        THE WITNESS:  No, it did not, your Honor.  The
hyperlink only displays the -- that image if you log into the
site.

        THE COURT:  If you what?

        THE WITNESS:  If you log into The Wall Street
Journal's site.  They have a pay wall.  You have to be a
subscriber to see the full site, so you would have not seen
this image, which was lower in the article.

        THE COURT:  You would not have seen the image at all.

I1o1cort                       Corson - Cross

1                THE WITNESS:  Not on The Wall Street Journal site,

2      until you logged in.

3                THE COURT:  Anything more, Mr. Saulitis?

4                MR. SAULITIS:  I'm just checking my notes, because I

5      may be close to being finished.

6                THE COURT:  I think you are finished.

7      Q.  Oh.  Have you ever had the photo, today's photo appraised

8      by anyone?

9                THE COURT:  Not necessary for damages.

10               MR. SAULITIS:  But actual damages are relevant to a

11     consideration of statutory damages.

12               THE COURT:  There are no actual damages.

13               MR. SAULITIS:  A reasonable license fee is deemed to

14     be a measure of actual damages under the --

15               THE COURT:  Ask your question.

16     BY MR. SAULITIS:

17     Q.  Have you ever had the photograph appraised by any kind of

18     an appraisal service to determine what its value might be?

19     A.  I don't think an appraisal service exists for licensing

20     photographs.

21     Q.  Is there any kind of a -- have you ever consulted any

22     source to get an independent professional opinion as to what

23     the value of that photograph might be?

24               MR. COWLEY:  Objection, your Honor.

25               THE COURT:  Overruled.

I1o1cort                        Corson - Redirect

1   A.  Of that specific photograph?  No.

2   Q.  Yes.  And how about of any of the photographs that were

3   taken at the same photo shoot?

4   A.  Those specific photographs?  No.

5   Q.  Well, the ones that you took --

6           THE COURT:  She said no.

7   Q.  -- at the photo shoot.

8           THE COURT:  She said no.

9           MR. SAULITIS:  May I check for two seconds.

10          Thank you very much, Ms. Corson.

11          THE COURT:  Redirect?

12          MR. COWLEY:  Yes, your Honor.

13  REDIRECT EXAMINATION

14  BY MR. COWLEY:

15  Q.  Ms. Corson, near the end of the questioning by

16  Mr. Saulitis, he asked you what would happen if someone did

17  find the hyperlink on the Brown Harris Stevens website and

18  clicked through The Wall Street Journal.  You explained that

19  someone would have to be a subscriber to even get to The Wall

20  Street Journal article.  If someone was and entered their

21  password and saw it and Image No. 1 in the slide show was on

22  that article online, would they see a credit to you as the

23  photographer of Image No. 14 in the slide show?

24  A.  No.  They would have to scroll through to Image No. 14 to

25  see that specific information.

I1o1cort                              Corson - Redirect

1   Q.  At the beginning of Mr. Saulitis' questions, he asked you

2   about the amount of work and the number of photographs

3   resulting from the work that you had to put in on this Wall

4   Street Journal assignment and he asked you about the charge for

5   that work and what you were paid.  Why were you willing to do

6   so much work to be paid so little in order to have your

7   photograph in the Wall Street Journal?

8                MR. SAULITIS:  Objection.

9                THE COURT:  Sustained.

10  Q.  Ms. Corson --

11               THE COURT:  One minute.  One minute.

12  Q.  Ms. Corson, why did you agree to accept the amount paid by

13  The Wall Street Journal that's reflected in Defendant's Exhibit

14  B?

15               MR. SAULITIS:  Objection.

16               THE COURT:  Sustained.

17               MR. COWLEY:  May I have the basis, your Honor, so I

18  can understand how to rephrase the question.

19               THE COURT:  Not relevant.

20  Q.  Ms. Corson, is there some aspect of your business that

21  you --

22               THE COURT:  You did what you need to do.  There's

23  nothing that Mr. Saulitis did that was a surprise to you.  Why

24  do you go on?  Why don't you say, "I'm finished"?

25               MR. COWLEY:  Thank you, your Honor.  I'm finished.

1          THE COURT:  You can step down, Ms. Corson.

2          THE WITNESS:  Thank you, your Honor.

3          (Witness excused)

4          THE COURT:  Next witness.  Do you rest?

5          MR. COWLEY:  No, your Honor.  Mr. Davidowicz, please.

6    ERIK M. DAVIDOWICZ,

7          called as a witness by the Plaintiff,

8          having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10   BY MR. COWLEY:

11   Q.  Mr. Davidowicz, I apologize for mispronouncing your name

12   when I first called you.  And I apologize in advance if I

13   mispronounce it again.

14          THE COURT:  I think no one heard it, so let's go.

15   Q.  Mr. Davidowicz, are you an employee of the defendant Brown

16   Harris Stevens of the Hamptons?

17   A.  Yes, I am.

18   Q.  In 2015 you were the director of advertising for Brown

19   Harris Stevens, is that correct?

20   A.  Yes, it is.

21   Q.  As director of advertising in 2015, you managed several

22   people in handling Brown Harris Stevens' advertising and

23   marketing functions, correct?

24   A.  Yes.

25   Q.  Now Brown Harris Stevens is a real estate firm, correct?

I1o1cort                    Davidowicz - Direct

1    A.  Yes.

2    Q.  It is based in the Hamptons and makes revenue off of real

3    estate transactions that they place in the Hamptons to be

4    involved in, is that correct?

5    A.  That's correct.

6    Q.  Customers all over the world that might have homes in the

7    Hamptons, correct?

8    A.  Yes.

9    Q.  In addition to the people you manage at Brown Harris

10   Stevens itself, you worked for several people at Terra Holdings

11   in performing your job, correct?

12   A.  Yes.

13   Q.  Terra Holdings is a parent company of Brown Harris Stevens,

14   is that correct?

15   A.  Yes.

16   Q.  It's your understanding that Terra Holdings, in addition to

17   Brown Harris Stevens, owns a number of other real estate firms

18   in luxury markets, correct?

19   A.  Yes.

20   Q.  In performing your functions for Brown Harris Stevens, you

21   worked for Terra Holdings' head of public relations and

22   employees in its marketing department, correct?

23   A.  Yes.

24   Q.  Terra Holdings is based here in New York City, correct?

25   A.  Yes, it is.

I1o1cort                      Davidowicz - Direct

1   Q.  Mr. Davidowicz, please look at what's been marked as

2   Exhibit -- I'm sorry -- what's been put in as Plaintiff's

3   Proposed Exhibit 7 in the binder.

4            I'm sorry.  You don't have a binder.

5            MR. COWLEY:  May I approach, your Honor.

6            THE COURT:  You may.

7   Q.  Again, Mr. Davidowicz, I'm asking you to turn to Tab 7.

8            Before I focus on that question, in connection with

9   your job function for Brown Harris Stevens, you worked with the

10  Brown Harris Stevens website, correct?

11  A.  I work with the Brown Harris Stevens of the Hamptons

12  website, not directly with the parent website, which was

13  BrownHarrisStevens.com.

14  Q.  You didn't work on it, but you're familiar that they had

15  it, correct?

16  A.  Yes.

17  Q.  And the people that you worked with in managing the Brown

18  Harris Stevens of the Hamptons website also works with and on

19  the Terra Holdings website, correct?

20  A.  No.  The Brown Harris Stevens of the Hamptons website was

21  managed by an IT consultant who worked for Brown Harris Stevens

22  of the Hamptons, and the BrownHarrisStevens.com website is

23  managed here in New York City by their own marketing team.

24            THE COURT:  Why are we involved with Terra Holdings?

25  What's the relevance?

I1o1cort                    Davidowicz - Direct

1          MR. COWLEY:  There's two times it's going to be

2     relevant but including, it's relevant, your Honor, to

3     establishing statutory damages, financial worth of the

4     defendant, because --

5          THE COURT:  Brown Harris Stevens is one of the leading

6     realtors in the world.  Do you need Terra Holdings to prove

7     that any further?

8          MR. COWLEY:  Your Honor, I would simply -- this is the

9     only question I had about the size --

10         THE COURT:  Move to another subject.  They have plenty

11    of money if your judgment warrants it.

12    BY MR. COWLEY:

13    Q.  As part of your advertising and marketing functions for

14    Brown Harris Stevens in 2015, you had responsibility for a

15    section of its website that was called Talk of the Town,

16    correct?

17    A.  Correct.

18    Q.  You individually were responsible for putting all the

19    content in that section of the Brown Harris Stevens website,

20    correct?

21    A.  Yes.

22    Q.  At some point Brown Harris Stevens stopped posting new

23    content to the Talk of the Town section after receiving a

24    complaint in this case, correct?

25    A.  Correct.

I1o1cort                        Davidowicz - Direct

Q.   But prior to that you had been managing it since 2013,
correct?

A.   That's correct.

Q.   And the blog, that Talk of the Town section took a lot of
effort for Brown Harris Stevens' marketing department to
maintain in a timely fashion, correct?

A.   Yes.

Q.   One of the goals in maintaining the Talk of the Town
section of the Brown Harris Stevens website while it was being
actively maintained was to grow the Brown Harris Stevens brand,
correct?

A.   Yes.  As part -- to bring awareness to the company.

Q.   All of Brown Harris Stevens' advertising and marketing
efforts had that goal in mind, correct?

A.   Correct.

Q.   And this Talk of the Town was part of the company's overall
advertising and marketing efforts, correct?

A.   It was a part of the website -- it was a little different
than normal marketing and advertising.  It was part of the
website design to provide content other than the direct
marketing of the company or properties to provide information
to the public.

Q.   Whether normal for other companies, it was part of what
Brown Harris Stevens did as part of its marketing and
advertising efforts, correct?

I1o1cort                    Davidowicz – Direct

1   A.  Yes.

2   Q.  And you, as the marketing and advertising director for

3   Brown Harris Stevens, managed it personally, correct?

4   A.  That is correct.

5   Q.  To increase the company's brand means to make more people

6   aware of Brown Harris Stevens, correct?

7   A.  Correct.

8   Q.  And the ultimate goal of making more people aware of what

9   Brown Harris Stevens is and what it does is to try to get more

10  customers to use those services, correct?

11  A.  In a very broad sense, yes.

12          THE COURT:  Why are we going over the obvious?

13          MR. COWLEY:  Your Honor, the statement of facts said

14  that there was no profit whatsoever to this and that I

15  believe --

16          THE COURT:  It was part of the marketing effort.

17  That's clear.  Part of the overall marketing effort.  They may

18  not have sold a house, there was no income here, but it was

19  part of the overall effort to show luxury homes in the area.

20          You have to give a little credit that the judge has

21  something going also.

22          MR. COWLEY:  Your Honor, I mean absolutely no

23  disrespect.  I'm simply trying to --

24          THE COURT:  Well, then ask more intelligent questions.

25          MR. COWLEY:  I apologize, your Honor.

1   BY MR. COWLEY:

2   Q.  Please turn to Tab 6, Plaintiff's Proposed Exhibit 6.

3              THE COURT:  Are you responsible for this picture that

4   went up of the pool?

5              THE WITNESS:  Yes.

6              THE COURT:  Why don't you ask about that.

7              MR. COWLEY:  I will, your Honor.  Before I left the

8   topic, I did want to mark the exhibit that shows how much of

9   the posts were made over the years.

10             THE COURT:  Just go on with the posting of this

11  picture.

12             MR. COWLEY:  Your Honor, then I would like to move for

13  the admission of Exhibit 6 like I did earlier without

14  questioning about it, because it's not objected to.  This is a

15  list of 90 posts, and it's very relevant to serial

16  infringement.

17             MR. SAULITIS:  I need a copy of this.

18             THE COURT:  What does it show, that Brown Harris

19  Stevens is doing very well?

20             MR. COWLEY:  No, your Honor.  It shows serial

21  infringement.

22             THE COURT:  Serial infringement.

23             MR. COWLEY:  Yes.

24             THE COURT:  How does that come out of Exhibit 6?

25             MR. COWLEY:  Well, your Honor, again, I don't want to

I1o1cort                              Davidowicz - Direct

1   be the one testifying or tell a witness what to say, but my

2   offer of proof, if you're asking for it, is, this witness has

3   already testified at his deposition that all the content that's

4   shown on the Talk of the Town site that was copied and taken

5   from other sites, he simply copied, took, never asked for

6   permission, never paid for any of it, and you'll see --

7            THE COURT:  You may inquire.

8            MR. SAULITIS:  My objection is that Exhibit 6 does not

9   show a single photograph of anyone, anywhere.

10           THE COURT:  Objection overruled.

11  BY MR. COWLEY:

12  Q.  Mr. Davidowicz, I apologize.

13  A.  That's okay.

14  Q.  Looking at Exhibit 6 --

15           THE COURT:  Mr. Davidowicz.  Yes.

16  Q.  This is a printout of the index, if you will, the list of

17  Talk of the Town posts over the years, that you were actively

18  maintaining it, with the one exception of the removed post that

19  is at issue in this case, correct?

20  A.  Yes.

21  Q.  And so in this list --

22           MR. COWLEY:  First of all, your Honor, I move to admit

23  Exhibit 6.

24           THE COURT:  Oh, it's not admitted because you haven't

25  established relevance.

I1o1cort                          Davidowicz – Direct

Q.  In this list, you see the first entry where it says name of

a post or an article and then it has the New York Times,

December 31, 2015?

          THE COURT:  What was the process by which you quoted

all these articles or printed all these articles?  These are

reprints, right?

          THE WITNESS:  Correct.

          THE COURT:  This is an index of reprints starting with

2015 when you took over the helm, right?

          THE WITNESS:  Yeah.  Well, I was always in charge of

it from 2013, but this is from 2015.

          THE COURT:  This is an index of 2015.

          THE WITNESS:  Yes.

          THE COURT:  Going backwards in time starting in

December and going back to September.

          THE WITNESS:  Yes.

          THE COURT:  So what was the process by which you put

in these reprints?

          THE WITNESS:  Well, when I was looking for an article,

I would search the internet on relevant websites for content

that was appropriate for real estate topics that we would like

to cover, and if I found an article that I thought was

interesting and relevant and of interest possibly to viewers, I

would take the article, post it into our blog, along with the

link that it refers to -- actually it would be source material,

I1o1cort                        Davidowicz – Direct

1    and identifying the source, as you can see, as in the first

2    instance, the New York Times, and identifying the source.  And

3    what you can't see in the printout is that that text that says

4    the New York Times was actually a hyperlink to the original

5    article.

6              THE COURT:  With regard to any of these articles, did

7    you get permission from the source for this reprint?

8              THE WITNESS:  No.

9              THE COURT:  Anything further?

10             MR. COWLEY:  Oh, yes, your Honor.

11   BY MR. COWLEY:

12   Q.  So Mr. Davidowicz, looking at Exhibit 6, this is actually

13   going back to May of 2013, correct?

14             THE COURT:  Oh, there are successive pages.

15   A.  Yes.

16   Q.  The Talk of the Town blog isn't maintained where there's a

17   new blog post today on the Talk of the Town's main website; on

18   the website you can find this list and click on any one of

19   these articles, correct?

20   A.  Not today, no.

21   Q.  This is a current printout of the list of the blog posts,

22   is it not, sir?

23   A.  Not to my knowledge.  I was informed by our IT consultant

24   that the entire blog had been pulled down from the website and

25   that there was no content there.

I1o1cort                         Davidowicz - Direct

 1   Q.  Was that after January 27, 2017?

 2   A.  It was after January of 2016.

 3   Q.  Can you see the top of this printout, January 2017?

 4           THE COURT:  How long were you at Brown Harris Stevens?

 5           THE WITNESS:  Since 2001.

 6           THE COURT:  And you're still there?

 7           THE WITNESS:  Yes, I am.

 8           THE COURT:  So you know what's in the blog and not,

 9   you know what's been pulled down and --

10           THE WITNESS:  Well, if you go to our website, the blog

11   is no longer there.  If it's found in an archive, I'll have to

12   check with our IT consultant who manages the websites, but this

13   blog was originally on the home page, and if you go to our

14   site, it is no longer there.

15           THE COURT:  When was it pulled down?

16           THE WITNESS:  I don't know exactly, but it was very

17   soon after the initial complaint that we received.

18           THE COURT:  From the plaintiff here?

19           THE WITNESS:  Yes.

20   BY MR. COWLEY:

21   Q.  Mr. Davidowicz, this list doesn't include the blog entry

22   with The Wall Street Journal article attached, correct?

23   A.  Yes.

24   Q.  Because you know you have to have pulled down -- you were

25   authorized to have it pulled down, correct?

I1o1cort                          Davidowicz - Direct

1    A.  Correct.

2    Q.  But it does list all the other entries that you put in the

3    Talk of the Town section from 2013 to 2015, correct?

4    A.  I can't tell you if this is a printout so I'll have to take

5    your word for that.  I'll go back and check the website itself,

6    because to my knowledge it is no longer there.  That's what I

7    was told by our IT consultant.

8    Q.  But you can't explain why this list exists of all --

9              THE COURT:  Is this list an accurate listing of all

10   the Talk of the Town articles, reprinted items from newspapers?

11             THE WITNESS:  Yes.  It refers to the actual content

12   that was originally part of the blog.

13             THE COURT:  You have what you need.  What more do you

14   want?

15             MR. COWLEY:  I appreciate that, your Honor.  I'm just

16   making the representation, we printed this off in connection

17   with his deposition in January of 2017, long after they stated

18   the blog was down and gone.  That's the representation that I'm

19   making when I'm submitting this article.  This witness

20   claims --

21             THE COURT:  You're testifying.

22             MR. COWLEY:  I'm not.  I'm suggesting, your Honor.

23   You're asking me to go on, and I'm trying to establish he

24   doesn't actually know what's up or not up on that website

25   because he seems to be making testimony that now looks like he

I1o1cort                        Davidowicz - Direct

can't --

          THE COURT:  When you pulled it down, what did you do?

          THE WITNESS:  A man named Lawford, our IT consultant

who manages the website, he was instructed to remove the blog

in its entirety.

          THE COURT:  You instructed him?

          THE WITNESS:  Yes.

          THE COURT:  And did he report back that he removed it

in its entirety?

          THE WITNESS:  Yes, he did.

          THE COURT:  Have you had occasion to look for these

reprints or any of them?

          THE WITNESS:  No.  They weren't of any relevance to

us.  There was no reason to look for them.

BY MR. COWLEY:

Q.  Mr. Davidowicz, please turn three pages into the exhibit.

And the dates of those articles that are listed run from the

top of May 21, 2015 down to February 25, 2015.  Do you see

that?

          THE COURT:  The pages are numbered on the bottom.

          MR. COWLEY:  Well, they run two or three at a time.

          THE WITNESS:  Yes, I see the page.

          THE COURT:  What's the page?

          MR. COWLEY:  The third page into the exhibit, the

third physical page.

I1o1cort                          Davidowicz - Direct

1    Q.  The Wall Street Journal --

2              THE COURT:  Hold on.  The top entry is, "Green roof

3    options"?

4              MR. COWLEY:  The top entry is, "Brown Harris Stevens

5    launches 12 new estates on Two Trees Lane in Bridgehampton."

6              THE COURT:  Okay.  Got it.  Fifth page in.

7              MR. COWLEY:  I apologize.  I'm looking at double

8    sides.

9    BY MR. COWLEY:

10   Q.  Chronologically, The Wall Street Journal article that you

11   copied and then added the photograph at issue in this case

12   would appear on this page but for its removal, correct?

13   A.  Yes.

14   Q.  You didn't instruct the person in charge of the web to take

15   down only The Wall Street Journal article, you told him to take

16   down the whole blog, correct?

17   A.  No.  That's only partially correct.  His initial

18   instruction was to remove the article that contained the

19   photograph by Ms. Corson.  Subsequent to that, at a later date,

20   he was informed to remove the entire blog.  We decided to no

21   longer maintain the blog.

22   Q.  You can't testify from your personal knowledge that all

23   these weren't still up in January 2017 right before your

24   deposition, can you?

25   A.  No.  To my knowledge they should not have been there and I

1   was told by the consultants that they were not there.

2   Q.  But do you know after your deposition you looked into it

3   and you now say they're all gone?

4   A.  No.  I had informed the consultant two years ago to remove

5   it, he instructed me that he had removed it all.  It was no

6   longer there.  If you go to the home page where the blog

7   appeared, it was no longer visible, and to my knowledge no one

8   has ever informed me that these articles were still available,

9   and obviously we will find that out and have them removed if it

10  is in fact true.

11  Q.  One other question about the entries.  You described them

12  as being taken from other sources, but these entries that you

13  made to Talk of the Town also included content that your firm

14  created by itself and posted, correct?

15  A.  Yes, that is true.

16  Q.  So you were capable of creating your own articles on topics

17  of interest, putting up your own content and images, correct?

18  A.  That is correct.

19  Q.  And this list shows a number of those entries, correct?

20  A.  Yes.

21  Q.  Because you could type in your blog, as you call it,

22  correct?

23  A.  That is correct, mm-hmm.

24          MR. COWLEY:  Your Honor, I move for admission of

25  Plaintiff's Proposed Exhibit 6.

1        MR. SAULITIS:  Objection.

2        THE COURT:  Grounds?

3        MR. SAULITIS:  It is incomplete because it does not

4   show the content, whether that hyperlink leads to anything that

5   is actually on the web.

6        THE COURT:  Overruled.

7        (Plaintiff's Exhibit 6 received in evidence)

8   BY MR. COWLEY:

9   Q.  I'll ask you to turn to --

10       THE COURT:  How much more do you have on this exhibit?

11       MR. COWLEY:  About half an hour.

12  BY MR. COWLEY:

13  Q.  Looking at what's now admitted as Exhibit 3.  Sometime

14  around March 20, 2015 you saw this Wall Street Journal article

15  on the newspaper's website, correct?

16  A.  Yes.

17  Q.  You decided to copy the article and post it to the Talk of

18  the Town section of the Brown Harris Stevens website because

19  you believed the article fit your company's luxury market

20  posts, correct?

21  A.  Correct.

22  Q.  Exhibit 5, turn to that.

23       THE COURT:  Why is this necessary?

24       MR. COWLEY:  To show how he did this, your Honor.

25       THE COURT:  We know that's what he did.  He took

I1o1cort                          Davidowicz - Direct

1   reprints of articles that he thought were useful to him for his

2   article on Talk of the Town for marketing Brown Harris Stevens

3   and they did not ask for permission.

4            MR. COWLEY:  He did more than that with the photo,

5   your Honor.  We can make a proffer if you'd like.

6            THE COURT:  Ask him about that.  Don't get caught up

7   in the background.

8   BY MR. COWLEY:

9   Q.  Mr. Davidowicz, you were the person who personally created

10  the entry on the website that's marked as Exhibit 5, correct?

11  A.  Yes.

12  Q.  I'm sorry.  Did you answer?

13  A.  Yes.

14  Q.  To create the Brown Harris Stevens post that's marked as

15  Exhibit 5, you copied The Wall Street Journal article text,

16  just copied and pasted directly onto the Brown Harris Stevens

17  website, correct?

18  A.  Correct.

19  Q.  And as a result of that, the text of the article all went

20  over, correct?

21  A.  That is correct.

22  Q.  You knew that the article on The Wall Street Journal

23  website, because you viewed it, was accompanied by a number of

24  photographs and a video, correct?

25  A.  Yes.

I1o1cort                         Davidowicz - Direct

1    Q.  You only took one photograph of the 19 that were there and

2    not the video, correct?

3    A.  Correct.

4    Q.  You decided to copy the one photo you took because it

5    caught your eye, correct?

6    A.  Yes.

7    Q.  And you thought it was appropriate to go with the overall

8    theme of the Talk of the Town blog, correct?

9    A.  Yes.

10   Q.  And that was Ms. Corson's photo, correct?

11   A.  Yes.

12   Q.  When you saw the photo on the website, you saw the

13   photographer's credit that The Wall Street Journal had along

14   with the photo, correct?

15   A.  I probably saw it.  I can't recall.

16   Q.  You had to look at the photo to take the copy, correct?

17   A.  Of course.

18        THE COURT:  So did you notice that it was there?

19        THE WITNESS:  The credit?  I don't know if I was

20   looking at it.  I don't know if I noticed it.

21        THE COURT:  But you expect that there would be

22   credits.

23        THE WITNESS:  Yeah.  It's common practice on sites.

24        THE COURT:  So you can assume that it was there.

25        THE WITNESS:  Oh, yes.

I1o1cort                      Davidowicz - Direct

1            THE COURT:  So why didn't you copy that?

2            THE WITNESS:  Well, it was my understanding at the

3    time that by providing the link to the original source of the

4    article that it was --

5            THE COURT:  You saw enough to repeat the entire text

6    and not just the reference in your Talk of the Town.

7            THE WITNESS: Yes.  Again --

8            THE COURT:  You didn't write the story --

9            THE WITNESS:  No.

10           THE COURT:  -- from scratch.  You took the New York

11   Times story and put it in whole, right?

12           THE WITNESS:  Yes.

13           THE COURT:  And you took in the picture whole.

14           THE WITNESS:  Correct.

15           THE COURT:  But not the credit.

16           THE WITNESS: Right.  Yes.

17           THE COURT:  Did you think you were slighting the

18   creator of that or the photograph?

19           THE WITNESS:  I didn't think so, because again, we

20   linked to the original source of the article.

21           THE COURT:  But you were reprinting; you're not

22   looking so much to the hyperlink.  You're telling them, here,

23   here it is, here's the whole thing.

24           THE WITNESS:  Yes, but this is a purely digital format

25   and it's very similar to what The Wall Street Journal offered.

I1o1cort                        Davidowicz - Direct

1     THE COURT:  A pure digital format, and you're copying.
2     There's no more effort to copy the source, the creator.
3     THE WITNESS:  Well, in the structure of the blog, the
4     way it was presented to me, if you use -- there was no space
5     for a credit along with the picture.
6     THE COURT:  So you simply left it out.
7     THE WITNESS:  Yes.  Otherwise, I'm not sure where it
8     would have went.
9     THE COURT:  You could have added your own editorial
10    credit, couldn't you?
11    THE WITNESS:  Well, I could add it to the text
12    possibly of the article, but it's my -- again, my thinking at
13    the time that to be faithful to the original source, I didn't
14    want to change it or edit it in any way.
15    THE COURT:  You thought that was the attribution.
16    THE WITNESS:  Yes, sir.
17    THE COURT:  All right.  Lunchtime?
18    MR. COWLEY:  Thank you, your Honor.
19    THE COURT:  I have an issue on a violation of
20    supervised release that we'll take at 2:30.  So can you come
21    back at 2:45.  We can resume then.  Clear the tables, please.
22    MR. COWLEY:  Thank you, your Honor.
23    THE COURT:  Mr. Davidowicz, you're a witness here,
24    you're not a party, so I instruct you not to talk to anyone
25    about the case during lunchtime.

I1o1cort                        Davidowicz - Direct

1             THE WITNESS:  Okay.  Understood.

2             THE COURT:  Okay?

3             (Luncheon recess)

4                          AFTERNOON SESSION

5                            2:48 p.m.

6             THE COURT:  Mr. Davidowicz, come on up.  Let's go back

7    to work.

8             I remind you that you're still under oath.

9             And where were we?  I think it's your turn,

10   Mr. Saulitis?

11            MR. COWLEY:  I have not completed, your Honor.

12            THE COURT:  You have not completed.  It must have been

13   wishful thinking.

14            All right, Mr. Cowley.  Go ahead.

15   BY MR. COWLEY:

16   Q.  Mr. Davidowicz, prior to the lunch break we were talking

17   about --

18            THE COURT:  Louder, Mr. Cowley.

19            MR. COWLEY:  I apologize.

20            THE COURT:  Louder.

21   BY MR. COWLEY:

22   Q.  Mr. Davidowicz --

23            THE COURT:  Forget the microphone.  Project your

24   voice.  You're a trial lawyer.  Project your voice.

25   BY MR. COWLEY:

I1o1cort                    Davidowicz - Direct

1    Q.  Mr. Davidowicz, prior to the lunch break you were talking

2    about the steps you took to copy The Wall Street Journal

3    article, paste it on the Talk of the Town section of the Brown

4    Harris Stevens blog.  When you completed that step, no

5    photograph that was on The Wall Street Journal site

6    automatically came over and was on your website, correct?

7    A.  Correct.

8    Q.  You had to take additional special steps to go back and get

9    a photograph to put up on your website, correct?

10   A.  That's correct.

11   Q.  So you went back to The Wall Street Journal site and

12   copied -- selected Ms. Corson's photograph for copying,

13   correct?

14   A.  Yes.

15   Q.  You copied it to your computer at Brown Harris Stevens,

16   correct?

17   A.  Yes.

18   Q.  And you put it in a software program that Brown Harris

19   Stevens created in order to put images up on its website,

20   correct?

21   A.  Yes.

22   Q.  And then you used that software program to upload the image

23   directly to the website from there, correct?

24   A.  It was a single step, yes, to upload the photo.

25   Q.  But it was different because it wasn't automated as a

I1o1cort                    Davidowicz - Direct

1   single step was with the text of The Wall Street Journal

2   article, correct?

3   A.  Yes.

4   Q.  You knew you could have just left the Talk of the Town blog

5   post concerning The Wall Street Journal's

6   hundred-million-dollar spec house article with the text of the

7   article and your hyperlink back to The Wall Street Journal,

8   correct?

9   A.  Yes.

10  Q.  But you preferred to have the photo accompanying it?

11          THE COURT:  Why are we delaying this?  Make your

12  point.  Move on.  It's not a deposition.

13  Q.  Mr. Davidowicz, you never conferred with the IT person for

14  Brown Harris Stevens who handled the software program you used

15  to determine if it was possible to also include a

16  photographer's credit, correct?

17  A.  Not to my recollection, no.  But there wasn't a field for

18  such a thing.

19  Q.  You never --

20          THE COURT:  What do you mean there was no field for

21  such a thing?  It's part of the picture.

22          THE WITNESS:  In the WordPress template that we used

23  for the blog, there was a -- an item for the title, the link to

24  the article, the body of the text, and an image, but there

25  wasn't a separate field to put a caption next to the

I1o1cort                      Davidowicz - Direct

1    photograph.

2         THE COURT:  So you took another step; you took the

3    picture.  With the picture you could have taken the credit

4    below the picture.

5         THE WITNESS:  No, not in the structure that we were

6    using the --

7         THE COURT:  Why?

8         THE WITNESS:  The way it was built, there was no field

9    for the caption.  The picture alone is loaded into the picture

10   frame, but there isn't a separate --

11        THE COURT:  Yes, but it's attached to the picture.

12   There's a notice underneath it about who creates it.  It's part

13   of the picture.  You see it when you look at the photograph.

14        THE WITNESS:  On The Wall Street Journal it is, but

15   when you copy the picture, the credit doesn't come along with

16   it.

17        THE COURT:  It's hard for me to believe that.

18        THE WITNESS:  Oh, it's true.  Otherwise it would have

19   been there.  I didn't alter the photo at all.  I simply copied

20   the photo onto the hard drive and uploaded it.  If the caption

21   was all with the image, it would have been part of the image.

22        THE COURT:  It's a function of how wide and how deep

23   the picture is you're taking over.  It's a jpg, isn't it?

24        THE WITNESS:  It is, but --

25        THE COURT:  So there's no logic that says you can't

I1o1cort                      Davidowicz – Direct

1    have words in a jpg.

2           THE WITNESS:  No.  But the jpg that was copied from

3    The Wall Street Journal article didn't include any of the text

4    of the caption or the photo credit on it.

5           THE COURT:  I know it didn't, but it could have.

6           THE WITNESS:  Well, I would have had to type it into a

7    Photoshop program, add the caption onto the actual image

8    itself.

9           THE COURT:  Why?  Why couldn't you just make a copy of

10   the caption directly into the photograph?

11          THE WITNESS:  Well, that's what I was saying.  The way

12   that the WordPress blog's template works, there was no space to

13   put the text underneath the photo because it's just running

14   text and it formats differently, so you couldn't put the text

15   within the article and --

16          THE COURT:  You could have pretended the text was part

17   of the picture.

18          THE WITNESS:  I mean --

19          THE COURT:  Don't pictures have text in it?

20          THE WITNESS:  Yes, but this one didn't.  I would have

21   had to add the text to the picture.

22          THE COURT:  Just have a larger screen.

23          THE WITNESS:  No, no.  I would have had to alter the

24   image to add the caption onto the image.

25          THE COURT:  You need to persuade me of that,

I1o1cort                        Davidowicz - Direct

1    Mr. Davidowicz.  That's important, because I can't believe it.

2    BY MR. COWLEY:

3    Q.  Mr. Davidowicz, the software program that you were working

4    with, that you used to add the picture, that software program

5    was maintained by an IT specialist, correct?

6    A.  Yes, using the WordPress template.

7    Q.  Right.  And you didn't have those IT skills, correct?

8    A.  Correct.

9    Q.  And you never conferred with a person that did to say, can

10   I make it add the photographer's credit, did you?

11   A.  No, I did not.

12   Q.  When you took The Wall Street Journal article and

13   Ms. Corson's photograph from The Wall Street Journal site and

14   put them up on the Harris Stevens website, you did not first

15   review The Wall Street Journal's licensing policy to determine

16   if that was permitted, did you?

17   A.  No, I did not.

18   Q.  You never contacted anyone from the Wall Street Journal to

19   find out if it was okay with them that you copy and post any

20   part of their article without paying a fee, did you?

21   A.  No.

22   Q.  You never contacted --

23          THE COURT:  You made your point.

24   Q.  You never reached out to Ms. Corson to ask for any

25   permission from her regarding her photo, did you?

I1o1cort                          Davidowicz - Direct

```
 1   A.  No.
 2              THE COURT:  Let me ask you this:  You were director of
 3   advertising.  You want to get credit for your work, right?
 4              THE WITNESS:  Me personally?
 5              THE COURT:  Yes.
 6              THE WITNESS:  Yes, but not -- actually, not publicly,
 7   no.
 8              THE COURT:  Whatever.  I mean, you want your boss to
 9   know what a good job you're doing.
10              THE WITNESS:  Yes, of course.
11              THE COURT:  You want the customers to know what a good
12   job you're doing.  So does it ever dawn on you that the person
13   who took the photograph also would have liked to have the
14   credit for her work?
15              THE WITNESS:  No.  Again, because I was linking
16   directly to the source material where she gets credited, in my
17   mind it was similar to the way people are using Facebook or --
18              THE COURT:  But you said the whole point of reprinting
19   is not just to have a reference but to have the article itself.
20   But you know readers are not likely to use a hyperlink; they're
21   going to read the article and move on to the next.  That's why
22   you wrote the article, right?
23              THE WITNESS:  Well, we wanted to have content on the
24   website, yes.
25              THE COURT:  Did it ever dawn on you that the person
```

I1o1cort                       Davidowicz - Direct

1    who created the photographs would have liked to have had the

2    credit for the reprinting of it?

3              THE WITNESS:  No, honestly, it did not.

4              THE COURT:  As you sit here today, do you think you

5    should have?

6              THE WITNESS:  Yes, obviously, yes.

7              THE COURT:  Why obviously?

8              THE WITNESS:  Well, after the initial complaint, it

9    brought forth all the copyright issues that are entailed and

10   what best practices should be.

11             THE COURT:  Do you think it's a moral issue as well?

12             THE WITNESS:  Personally, I don't think so, because in

13   all honesty, I was linking -- I thought the link to the article

14   was sufficient.  I'm a photographer myself.  I have access

15   to -- we deal with professional photographers all the time, and

16   we have thousands of photographs that we work with for the

17   homes that we represent.  We don't give photographer credits on

18   our website to the photographs that we purchase and commission.

19             THE COURT:  Because of the deal you make with the

20   photographers, right?

21             THE WITNESS:  Yes.  Well, they do not stipulate --

22             THE COURT:  It's not the same.  Do you know if

23   Ms. Corson had given up her rights in the deal with The Wall

24   Street Journal?

25             THE WITNESS:  No.

I1o1cort                      Davidowicz - Direct

1      THE COURT:  Go on.

2   BY MR. COWLEY:

3   Q.  Photographers who you use their photos and who agree not to

4   require credit, you pay them to use the photos, correct?

5   A.  Correct.

6   Q.  Can I ask you to turn to Tab 8 of the -- oh, I have to do

7   that.

8      MR. COWLEY:  May I approach the witness again, your

9   Honor.

10      THE COURT:  Yes.

11  Q.  Ask you to look at Tab 8 of Plaintiff's Proposed Exhibit 8

12  titled Computer Use Policy.  Are you there?

13  A.  Yes.

14  Q.  That you understood was a policy of your company applicable

15  to all employees, including yourself, correct?

16  A.  Correct.

17  Q.  On page 2 of the policy, there's a Section A, Ownership and

18  Purpose.  Do you see that?

19  A.  Yes.

20  Q.  And under that there's a number of headings.  I'm going to

21  ask you to look at the second heading, Intellectual Property.

22  You agree that in the second sentence, the company is

23  expressly -- did expressly inform employees like yourself that

24  you may not reproduce or use information received through

25  computer resources, which is the company's computers, correct?

I1o1cort                    Davidowicz – Direct

1   A.  Yes.

2   Q.  That may infringe on the intellectual property rights,

3   including copyrights, of others.  Do you agree with that?

4   A.  Yes.

5   Q.  You were aware of that, correct?

6   A.  Yes.

7   Q.  It says that you will comply with all copyrights when using

8   your computer, correct?

9   A.  Yes.

10  Q.  And one sentence from the end of that section, it says,

11  you, the user, cannot copy or distribute copyrighted or

12  otherwise restricted information from the internet.  Do you

13  agree with that?

14  A.  Yes.

15  Q.  The company never did discuss with you and explain to you

16  what those copyrights required or prohibited you to do, did

17  they?

18  A.  No.

19  Q.  In fact you never had any conversation with the general

20  counsel of the company about copyrights until after

21  Ms. Corson's complaint, correct?

22  A.  Correct.

23          MR. COWLEY:  Plaintiff moves for admission of

24  Exhibit 8, your Honor.

25          MR. SAULITIS:  No objection.

I1o1cort                     Davidowicz - Direct

1           THE COURT:  Received.

2           (Plaintiff's Exhibit 8 received in evidence)

3    Q.  Could I ask you to turn to Tab 10.  Plaintiff's Proposed

4    Exhibit 10 is titled Brown Harris Stevens Terms and Conditions.

5    Do you see that?

6    A.  Yes.

7    Q.  This is on the Brown Harris Stevens website and directed

8    toward people who would like to use the Brown Harris Stevens

9    website for some reason.  Correct?

10   A.  Yes.

11   Q.  There's a section titled Copyright on the first page.  If I

12   could draw your attention to that.  It claims that users of the

13   website -- that all content on the Brown Harris Stevens

14   website, including sales and rental information, it goes on to

15   include photographs and other material that is subject to

16   copyrights of third parties, constitutes content of Brown

17   Harris Stevens.  Correct?

18   A.  Yes.

19   Q.  Reading down under Scope of Use, users of the Brown Harris

20   website -- strike that.  I apologize.

21          That broad description of the content that's covered

22   by this policy included your Talk of the Town section and your

23   articles, correct?

24   A.  Well, if I may, this terms and conditions of use is on the

25   BHS USA, BrownHarrisStevens.com website, and this blog was on

I1o1cort                        Davidowicz - Direct

1    the bshhamptons.com website.

2              THE COURT:  What's the difference?

3              THE WITNESS:  They're two different websites, run

4    separately.

5              THE COURT:  So all these regulations don't apply to

6    you?

7              THE WITNESS:  I'm not saying that.  Just the actual

8    document is not -- it's taken from a different website.

9              THE COURT:  When someone is on the document, does that

10   apply to them?

11             THE WITNESS:  Yes, I believe so.

12             THE COURT:  Yes or no?

13             THE WITNESS:  Yes.

14   BY MR. COWLEY:

15   Q.  It applies to users who you want to look at your content.

16   If you go through to the Hamptons website from USA website,

17   they agree to these terms and conditions when using the

18   website, correct?

19   A.  Yes, although there's no direct link between the two.

20   Q.  This terms and conditions at Brown Harris Stevens asked its

21   users to agree to -- specifically states that none of them

22   could copy any content on the website, correct?

23   A.  Yes.

24   Q.  They can't -- I'm looking at the Scope of Use section.

25   Brown Harris Stevens prohibits users of its website from

1   copying, transferring, displaying, or linking to any content on

2   its website, correct?

3   A.  Yes, although --

4   Q.  That's exactly what Brown Harris Stevens allowed you to do

5   with all those other publishers whose articles you used in your

6   Talk of the Town section, correct?

7           MR. SAULITIS:  Objection.

8           THE COURT:  Overruled.

9   A.  Yes.

10  Q.  I'd ask you to turn to the next page, 2 of 6.

11          THE COURT:  Do you want to offer 10?

12          MR. COWLEY:  I do, your Honor.

13          MR. SAULITIS:  Objection.  Grounds, best evidence.

14  That's a Brown Harris Stevens USA document.  The best evidence

15  is the Brown Harris Stevens of the Hamptons, the separate

16  website document that would speak for itself.  That I wouldn't

17  have an objection, but I do object to having a different,

18  separate, nonlinked document, albeit maybe similar, but it's

19  still not the best evidence.

20          THE COURT:  Overruled.

21          (Plaintiff's Exhibit 10 received in evidence)

22          MR. COWLEY:  Is 10 in, your Honor?

23          THE COURT:  Yes.  Proceed.

24  BY MR. COWLEY:

25  Q.  If I could ask you, Mr. Davidowicz, to turn to the second

I1o1cort                     Davidowicz - Direct

1     page of Exhibit 10, under the caption Violations of Terms and

2     Conditions of Use.  Do you see that?

3     A.  Yes, I do.

4     Q.  In this section Brown Harris demands that its users of its

5     website agree that if they copy any content from its website or

6     link to it as prohibited on the first page, that they would owe

7     Brown Harris Stevens $20,000, correct?

8     A.  That is what it says.

9                THE COURT:  Where is that, Mr. Cowley?

10               MR. COWLEY:  Page 2 of Exhibit 10, the third from the

11    bottom caption, called Violations of Terms and Conditions of

12    Use.  Last sentence.

13    Q.  So if a user --

14               THE COURT:  That applies only to people on the

15    document.

16               MR. COWLEY:  Copying anything from their website.

17               THE COURT:  But it applies only to people who are

18    signatories to this document.

19               MR. COWLEY:  Which is all the users who have to click

20    through on the terms and conditions of use of the website.

21               THE COURT:  I don't think it's relevant.

22    BY MR. COWLEY:

23    Q.  Within Brown Harris Stevens you did not get permission to

24    take down Ms. Corson's photograph and The Wall Street Journal

25    article until after Ms. Corson complained, correct?

I1o1cort                        Davidowicz - Direct

A.  Yes.

Q.  So it wasn't already down from the website in March or
April of 2015, was it?

A.  No.  As soon as we received the complaint, that's when it
was initiated.

Q.  Brown Harris Stevens does not track data concerning
visitors to its website in a way that will permit it to
identify someone who views an article in your Talk of the Town
blog and then goes on to --

          THE COURT:  Why do we worry about the policy of Brown
Harris Stevens?

          MR. COWLEY:  Your Honor, the argument is that we're
supposed to be limited in our statutory damages because we
haven't established a high profit earned by this defendant.
I'm trying to establish in the record that that's what --

          THE COURT:  Brown Harris' profits are not relevant to
the plaintiff's entitlement.  It doesn't set up any standard.
It's just Brown Harris.  Move on, please.

          MR. COWLEY:  Your Honor, my only offer and proffer is
that if they're arguing that our inability to prove that they
obtained big profits because they don't track the customers'
use, so we can't show their profits --

          THE COURT:  Move on to the next subject.

BY MR. COWLEY:

Q.  Mr. Davidowicz, Brown Harris Stevens' lawyer on this

I1o1cort                    Davidowicz - Direct

litigation throughout has worked for the company on a retainer,
correct?

          THE COURT:  What's the relevance?

          MR. COWLEY:  On willfulness, your Honor.  Their
argument in the proposed statement of fact is we've tried to
drive up attorney's fees.  Our argument is exact counter, that
they are --

          THE COURT:  I'm sorry.  I have to take this.

          (Recess)

          (In open court)

          THE COURT:  Sorry, folks.  Please continue.

          MR. COWLEY:  Your Honor, you asked me to explain the
relevance of my prior question.  Do you want me to explain it?
Do you recall what the question was?

          THE COURT:  I don't know what facts.  You're
prosecuting the lawsuit.

          MR. COWLEY:  The relevance, your Honor, under the
statutory damages, one of the purposes of statutory damages is
determinative.  Obviously the company that has set it up so
that they pay nothing to defend infringement has left
themselves in the best position as possible to risk serial
infringement.  That requires --

          THE COURT:  They're a major realtor.  They had
lawyers.  They know about lawyers.  They know about suits.
They sue all the time, they defend all the time.  What more do

I1o1cort                      Davidowicz - Direct

1    I need to know?

2              MR. COWLEY:  All I'm suggesting, your Honor, is he

3    didn't answer the question.  I don't know if he's going to

4    answer the question or not.

5              MR. SAULITIS:  There's an objection to it.

6              THE COURT:  Objection sustained.

7    BY MR. COWLEY:

8    Q.  Mr. Davidowicz, one last question about Exhibit 10, as to

9    style on that exhibit.

10   A.  Yes.

11   Q.  Very first line under Terms and Conditions of Use, it says,

12   "Welcome to the Brown Harris Stevens website.  Brown Harris

13   Stevens and its affiliated companies," which it then has a

14   definition, couple definitions.  Brown Harris Stevens of the

15   Hamptons is an affiliated company of Brown Harris Stevens?

16             THE COURT:  They're a separate company and no other

17   defendant is in the case, and if you have a judgment, if you

18   win a judgment, they'll be able to stand for it.  No more.

19             Are you finished?

20             MR. SAULITIS:  Your Honor, in terms of the process

21   here, if the plaintiff rests here, then I would be happy to

22   consolidate my cross and my direct for the witness.

23             THE COURT:  Mr. Cowley, what about it?

24             MR. COWLEY:  I have no further witnesses, your Honor.

25             THE COURT:  Okay.  That's fine.  Plaintiff rests?

I1o1cort                          Davidowicz - Cross

 1   Plaintiff rests, Mr. Cowley?

 2           MR. COWLEY:  Yes, your Honor.  I may need to rebut,

 3   have rebuttal questions of this witness or have a rebuttal

 4   witness.

 5           THE COURT:  You'll have cross-examination when

 6   Mr. Saulitis puts on his case.

 7           Okay.  Your case.

 8   CROSS-EXAMINATION

 9   BY MR. SAULITIS:

10   Q.  Good afternoon, Mr. Davidowicz.  Tell us --

11           THE COURT:  So now you're doing a direct examination.

12           MR. SAULITIS:  Yes, this is going to be direct

13   examination.

14           THE COURT:  Okay.  Combined with the cross.

15           MR. SAULITIS:  Okay.

16   Q.  By whom are you currently employed?

17   A.  Brown Harris Stevens of the Hamptons.

18           THE COURT:  Loud, please.

19           THE WITNESS:  Oh.

20   A.  Brown Harris Stevens of the Hamptons.

21   Q.  And is the full name of that company Brown Harris Stevens

22   of the Hamptons, LLC?

23   A.  Yes, it is.

24   Q.  Have you ever been employed by Brown Harris Stevens,

25   without the --

I1o1cort                        Davidowicz - Cross

1           THE COURT:  What's the difference?

2           MR. SAULITIS:  They are separate, distinct companies.

3           THE COURT:  So what?

4           MR. SAULITIS:  Separately managed, separately owned.

5           THE COURT:  So what?  So what?

6           MR. SAULITIS:  To make sure that matters that are

7    suggested on the part of a separate company in this case not be

8    confused with the company of --

9           THE COURT:  What's going to hang on that,

10   Mr. Saulitis?  If there's a judgment against your client,

11   there's a judgment against your client.  No other defendant is

12   sued.

13          MR. SAULITIS:  Right.  I recognize that, your Honor.

14   It's just that the question of willfulness --

15          THE COURT:  There's plenty of willfulness in what has

16   been done by Brown Harris Stevens of the Hamptons, LLC.

17          MR. SAULITIS:  I just want to be --

18          THE COURT:  Whatever happens to other companies does

19   not count, does not matter.

20          MR. SAULITIS:  Okay.

21   BY MR. SAULITIS:

22   Q.  Now have you ever been employed in the past by any other of

23   the so-called affiliated companies, Terra, Brown Harris

24   Stevens, LLC, Halstead Properties, or any other company in that

25   family?

I1o1cort                    Davidowicz - Cross

1    A.  No.

2    Q.  Can you take us back a little bit.

3          What is your educational background?

4    A.  I graduated from Temple University in Philadelphia with a

5    bachelor's degree in communications, in 1990.

6    Q.  And after Temple, can you tell us what -- please summarize

7    your employment history since that time.

8    A.  I worked a number of jobs in the years after graduation.  I

9    worked as a photo lab technician in a photo lab in New City,

10   New York, for a few years.

11   Q.  What does a photo lab technician do?

12   A.  This is back in the day of film, actual film photography,

13   so it largely entailed processing and developing and printing

14   film and developing slides as well.

15   Q.  This was in a dark room.

16   A.  Pretty much.  Large machines, and in the dark room.

17   Q.  And what next after that stint did you do?

18   A.  Let's see.  I worked in New York City at the Guggenheim

19   Museum for a few years as a gallery guard, and after that I

20   worked for the New York Public Library as a librarian in

21   training.

22   Q.  So as a gallery guard, you stood guard so people would

23   behave?

24   A.  Pretty much.  It was -- also entailed sort of being a

25   docent as well, talking about the artwork that was on display

I1o1cort                    Davidowicz - Cross

1    to visitors that came in each gallery.

2    Q.  And after the Guggenheim, what came next?

3    A.  The New York Public Library here in Manhattan, as a

4    librarian in training.

5    Q.  And how long -- what period of time were you in the public

6    library?

7    A.  I think it was about two and a half years.

8    Q.  And what next?

9    A.  That's when my wife and I moved to Long Island and I worked

10   at the Parrish Art Museum as a database manager and assistant

11   to the development director.

12   Q.  And over what period of time did you work for the Parrish

13   Museum?

14   A.  That was about two years, maybe two and a half years.

15   Q.  And next after that?

16   A.  Then I worked for Dunemere Associates, which was a company,

17   real estate company that was subsequently purchased by -- about

18   three years after that by Brown Harris Stevens.

19   Q.  So this Dunemere organization, where was that located?

20   A.  It's solely in the Hamptons.  It was -- my office was in

21   East Hampton, but they owned offices in Southampton,

22   Bridgehampton, and Sag Harbor.

23   Q.  Was that a small, medium, or large real estate brokerage

24   operation?

25   A.  Large for the Hamptons.  Overall it's a small-ish to

I1o1cort                     Davidowicz - Cross

1    medium-sized company.

2    Q.   What did you do for that organization?

3    A.   I began as a -- what was called an advertising coordinator,

4    and like the name sounds, I was organizing, placed advertising

5    in newspapers, magazines, wrote ad copy, and arranged

6    photography and all the services involved with advertising,

7    marketing properties.

8    Q.   So all the advertising involved was for real estate

9    offerings that the company had?

10   A.   Yes.  For rent or sale, yeah.

11   Q.   And when did that company get acquired by Brown Harris

12   Stevens of the Hamptons, LLC?

13   A.   It was in early 2004.

14   Q.   And since that time have you been employed by Brown Harris

15   Stevens of the Hamptons?

16   A.   Yes.

17   Q.   So tell us what -- from the beginning of your employment

18   with Brown Harris Stevens of the Hamptons up until -- have you

19   held any other positions other than the one you currently have?

20   Just tell us your background through, you know, your tenure

21   with the company.

22   A.   Yeah.  Essentially been the same position.  The position

23   has grown along with the size of the company and the size of

24   the marketing department and the amount of advertising and

25   marketing we do, so I'm in charge of the promotion and

I1o1cort                    Davidowicz - Cross

1    advertising of all the properties in the Hamptons, and we have

2    several smaller offices now as well.  It's a little bit larger.

3    Q.  And did there come a time when Brown Harris Stevens of the

4    Hamptons put together a website for use?

5    A.  Yes.  We always had a website.  It's gone through several

6    iterations and designs over the years.

7    Q.  And what, if anything, was your involvement with that

8    website?  And if you can, include the time frames involved.

9    A.  Well, the most recent was in early -- well, started in 2012

10   but it was developed in 2013, so the current basic format was

11   done then, and myself, our IT consultant, Walfrid Lundborg, who

12   had actually did the programming, and hosting of the website,

13   as well as my immediate managers in the Hamptons together as a

14   team worked on the overall design and layout and scope of the

15   website.

16   Q.  And who did the coding for the website?

17   A.  Walfrid Lundborg did.

18   Q.  And at some point in time did the website contain the Talk

19   of the Town blog?

20   A.  Yes.

21   Q.  For those of us who aren't as internet savvy, what is a

22   blog?

23   A.  A blog, abbreviation for a weblog, is sort of like a online

24   diary or reporting so you can basically post information, post

25   photographs, articles, links to articles, that are contained

I1o1cort                          Davidowicz - Cross

1   and archived, so however frequently you do it, the main article

2   appears prominently and then when a subsequent article gets

3   posted, that goes into the archive, where it's listed by its

4   title and is available for future reference, but it's no longer

5   prominently visible.

6   Q.  In simplest terms, how is a blog different from, say, my

7   Facebook page?

8   A.  It's just a variation of the same concept of posting

9   articles or information, and in fact there's -- it falls under

10  the rubric of social media in general, where people share

11  information and share articles and obviously photographs as

12  well.

13  Q.  So the same way if I see an article in ESPN or Sports

14  Illustrated or New York Times and I want to share it with my

15  Facebook friends --

16          THE COURT:  I think we've learned about blogs.  Let's

17  move on.

18  Q.  Okay.  Now what were your specific duties and

19  responsibilities with respect to the Talk of the Town blog?

20  A.  Basically finding content and placing it on a fairly

21  regular basis to keep it somewhat fresh so the information

22  doesn't get too stale.

23  Q.  How did you go about finding such content?

24  A.  Basically, unless there was something very specific to the

25  company that we created original content, it was -- it would

I1o1cort                        Davidowicz – Cross

have been perusing the internet websites that are likely to

have content that is related to real estate and the real estate

market, whether it be design, architecture, or just nature of

the market conditions.

Q.  How did you come across The Wall Street Journal article

that ultimately wound up in the blog?

A.  Basically just going directly to The Wall Street Journal

website and to the real estate section and seeing the article

and reading it and thinking it was relevant to, you know, our

topics that we post about.

Q.  In doing that, did you have a paid subscription to the Wall

Street Journal?

A.  No, I did not.  In fact, when I --

Q.  Did the company -- or where you found the article, did you

find the article through a company paid subscription to the

Wall Street Journal?

A.  No, I did not.

            THE COURT:  Did you ever?

            THE WITNESS:  No.

            THE COURT:  You just found it.

            THE WITNESS:  Yes.  In fact, when choosing articles

for the blog, I specifically looked for articles that did not

require a sign-in because I didn't want to have that layer to

impede anybody viewing the article from the link, and that's

why I never --

1          THE COURT:  You didn't want The Wall Street Journal to

2     know you might be reprinting their articles?

3          THE WITNESS:  No, no, no.  All I meant is, anyone who

4     would click on the link could view the original article,

5     shouldn't have to log in if they didn't have an account.  They

6     should be able to read the article in its entirety without

7     being required to log in.

8          THE COURT:  Logging in would have identified you.

9          THE WITNESS:  I would assume so.  The thinking was --

10          THE COURT:  And doing what you were doing didn't

11     identify you.

12          THE WITNESS:  Not me per se.  I was thinking of the

13     viewers of the blog who would click on our link.  We didn't

14     want them --

15          THE COURT:  By going in the way you did and getting

16     the day's headlines, you didn't identify yourself.

17          THE WITNESS:  No.  They have my IP address.  They

18     could identify me that way.

19          THE COURT:  If they wanted to, they could research to

20     find it, but you wouldn't identify yourself.

21          THE WITNESS:  No.

22     BY MR. SAULITIS:

23     Q.  When you access The Wall Street Journal's web page, you

24     open yourself up to having a cookie implanted on whatever

25     computer you're using, aren't you?

I1o1cort                         Davidowicz - Cross

A.  Yes.

Q.  You're thus accepting an identifier that allows, say, The
Wall Street Journal to find you for purposes of advertising,
isn't that correct?

A.  Correct.

Q.  And did you access The Wall Street Journal in any different
way than anybody who goes on the internet accesses The Wall
Street Journal without a paid subscription?

A.  No.

Q.  Now once the --

        THE COURT:  Are you regularly getting The Wall Street
Journal?  Do you regularly get The Wall Street Journal?

        THE WITNESS:  The office gets a subscription to the
print version.

        THE COURT:  Do you follow it?

        THE WITNESS:  I usually read it online rather than the
print version.

        THE COURT:  You have a subscription?

        THE WITNESS:  Not anymore.  I had in the past.

        THE COURT:  2013?

        THE WITNESS:  Again, I had never used a login at work.
I had a personal subscription, but in my office, I was just
careful to never be logged in because I didn't want to use
anything that, again, would require a user to log in where they
may not have access to it if they didn't have an account.

I1o1cort                         Davidowicz - Cross

1          THE COURT:  Go ahead.

2     BY MR. SAULITIS:

3     Q.  Now when the article caught your eye, what exactly did you

4     do next with respect to the blog?

5     A.  Well, using the standard copy-and-paste tools, I copied the

6     text of the article and the headline of the article as well as

7     the URL of the article and pasted those into the forms on the

8     blog of bhshamptons.com.

9     Q.  When you say URL, you mean Uniform Resource Locater that is

10    located in a field on the upper portion of your computer?

11    A.  Correct, that's the link, and to the original source

12    article.

13    Q.  Is that also known as a hyperlink?

14    A.  Yes, one could link to the text, yes.

15    Q.  You did the same thing that you see and you put it into a

16    place where somebody else could see exactly the same thing that

17    you see, correct?

18    A.  Correct.

19    Q.  Now you mentioned something called WordPress.  What is

20    WordPress?

21    A.  WordPress is a software program that provides a variety of

22    templates for people to create their own websites.

23    Q.  Is it something like Microsoft Word or Adobe Acrobat, it's

24    something you go out and it's commonly available for --

25    A.  Yes.  It's one of the most, if not the most, popular

I1o1cort                         Davidowicz - Cross

1   program to create websites for people who aren't doing all the

2   coding themselves.  It makes it easier to use a variety of what

3   they call widgets, different programs that you can add in, like

4   a blog.

5   Q.  Is it also referred to as web publishing software?

6   A.  Yes, I believe so.

7   Q.  And --

8          THE COURT:  Why do I need to know all this?

9          MR. SAULITIS:  Because there were -- the witness was

10  describing special features that he used or could not use in

11  his direct testimony, and I want the record to be crystal

12  clear --

13         THE COURT:  The record's got to be crystal clear about

14  relevant evidence.  This is not relevant evidence.  All it

15  shows to me is it was very easy to copy, which may have a

16  bearing on willfulness, but this is not a point you want to

17  bring up.

18         MR. SAULITIS:  I want the witness to address the

19  point.

20         THE COURT:  So let him.  Ask the right question.

21  BY MR. SAULITIS:

22  Q.  Now in performing the act of transferring the article onto

23  the blog, what steps -- what did you do, using WordPress?

24  A.  As I mentioned, the WordPress -- WordPress template for the

25  blog contained a field for the title, a field for the source,

I1o1cort                    Davidowicz - Cross

in this case would be The Wall Street Journal, and a linked

field for the hyperlink or the URL, a field for the body of the

text, and then the ability to upload an image as well, and

those are the basic functions available in that template.

Q.   Now in the thing on The Wall Street Journal, the original

source, there is somewhere an attribution to the photographer

near the photograph itself, isn't there?

A.   Yes.

Q.   And if one wanted to put that information or that layer, if

you will, onto a blog, how would one do that using WordPress?

A.   Well, in the version that we were using, it wasn't readily

available.  I would have to basically type in that information.

There's no ability to copy it directly because the structure of

how it formatted in The Wall Street Journal doesn't carry over

any other way, but there was no field to do that in the

WordPress template, so again, I would have to probably type it

in somewhere within the body of the text, but then it wouldn't

appear next to the photograph.  It would be just somewhere in

the body of the text.

Q.   And why didn't you --

          THE COURT:  What did you have to do to capture the

picture?

          THE WITNESS:  The picture itself and the caption

exist -- even though they may appear as one image on The Wall

Street Journal site, they're actually not a single image.  So

I1o1cort                      Davidowicz - Cross

1    the photograph -- as I copied the photograph, it didn't copy

2    the caption information.

3          THE COURT:  Well, just take the photograph.  How,

4    physically, do you do that?  You run your cursor over the

5    photograph?

6          THE WITNESS:  Exactly.

7          THE COURT:  And it created an outline of what you want

8    to copy?

9          THE WITNESS:  Basically, right.  You hover over it.

10         THE COURT:  What happens if you add another half inch,

11   and copy the attribute as well?

12         THE WITNESS:  It wouldn't work that way, because

13   you're copying --

14         THE COURT:  The whole computer would collapse,

15   correct?

16         THE WITNESS:  No, no.  It just doesn't capture that

17   information.  You don't outline it because you're copying it

18   from the website, so if you right click and say save image --

19         THE COURT:  What would happen if the source or the

20   creation was inside a painting, for example, of Jackson

21   Pollock?

22         THE WITNESS:  If it was literally part of the image,

23   it would come with it.

24         THE COURT:  So enlarge the image and capture the

25   source.

I1o1cort                          Davidowicz - Cross

1          THE WITNESS:  Yes, but in this case the text is not

2     part of that image.  It doesn't copy it.

3          THE COURT:  Simply by enlarging it, wouldn't it?

4          THE WITNESS:  No.  It doesn't come with the image is

5     what I'm saying.  You can actually try it.  If you right click

6     and save the image, it doesn't carry across.  Otherwise it

7     would certainly be there.

8          THE COURT:  So if Ms. Corson had put her name inside

9     the photograph itself, you would be able to capture it, but

10    putting it below it, you can't capture it.

11         THE WITNESS:  Right.  They call it a watermark if you

12    put it on the image itself, and some people do that so if you

13    do copy the image, it would come across with it.

14         THE COURT:  Okay.  I understand.

15    BY MR. SAULITIS:

16    Q.  Now the article itself contains a by line, literally, by

17    Candace Jackson, The Wall Street Journal.  Did you see the by

18    line when you looked at the article?

19    A.  I'm sure I did.

20    Q.  That would be the author of the article, correct?

21    A.  Correct.

22    Q.  What if anything did you do to make sure the by line was

23    transferred to the image on the blog?

24    A.  I'd have to refer to the image itself, but --

25    Q.  Exhibit 5 I think is a -- if you have Exhibit 5, you can

I1o1cort                        Davidowicz - Cross

1   refer to that in the book in front of you.

2   A.  Okay.  So that was -- the same as when copying the text

3   above it, using the copy-and-paste tools directly and --

4          THE COURT:  So where it says, "By Candace Jackson, The

5   Wall Street Journal," you could have had another line which

6   would have said, "Photograph by Lisa Corson."

7          THE WITNESS:  Yes, that would have been possible.

8          THE COURT:  You could have done that.

9          THE WITNESS:  I could have.

10  BY MR. SAULITIS:

11  Q.  But doing so, would you have been altering the layout of

12  the original article?

13         MR. COWLEY:  Objection to form, your Honor.

14         THE COURT:  Go ahead, sir.  Overruled.

15  A.  Yes.

16         THE COURT:  You would have?

17         THE WITNESS:  Yes.

18         THE COURT:  So this article has the first sentence,

19  "Developers aim for new highs and high prices for speculatively

20  built homes.  By Candace Jackson, Wall Street Journal."  In the

21  original, would that attribution be above the text?

22         THE WITNESS:  The Candace Jackson part?

23         THE COURT:  Yes.

24         THE WITNESS:  I don't think -- I think the "Developers

25  aim for new highs" was like a subheadline.

I1o1cort                        Davidowicz - Cross

1              THE COURT:  The headline.

2              THE WITNESS:  It was a subheadline to the headline,

3      which was "The race to the $100 million spec house," and

4      then --

5              THE COURT:  So did you realign anything when you

6      copied this?

7              THE WITNESS:  Not in -- only in the sense that a web

8      page, depending on how you view it, will move text around, but

9      I don't believe so.  I tried to keep the same structure and

10     order of the information.

11             THE COURT:  I notice you deleted the date.  The

12     original, which you can see on Exhibit 3, has italicized text

13     for the name Candace Jackson and followed by a date, March 19,

14     2015.

15             THE WITNESS:  Right.  Well, we did have the date next

16     to the -- underneath "The race to the 100 million spec house."

17             THE COURT:  So you moved it.

18             THE WITNESS:  I guess so.

19             THE COURT:  You manipulated the text.  And you changed

20     italics to Roman.

21             THE WITNESS:  Yes.

22             THE COURT:  You admitted to it.

23             THE WITNESS:  Apparently.

24             THE COURT:  Apparently.  And it would have been a

25     simple matter to put in, "Photograph by Lisa Corson."

I1o1cort                    Davidowicz - Cross

1          THE WITNESS:  Yes, if I thought it was necessary, then

2    I would have done that, but --

3          THE COURT:  If you thought it was necessary.

4          THE WITNESS:  Yes.

5          THE COURT:  How about if you felt it was fair?

6          THE WITNESS:  Yes.

7          THE COURT:  If you thought it was moral, you would

8    have done that too?

9          THE WITNESS:  I would have, yes.

10   BY MR. SAULITIS:

11   Q.  Now in terms of the picture itself, the photograph, did you

12   alter -- other than size, did you alter the photograph in any

13   way at all?

14   A.  No.

15   Q.  In terms of the -- now you mentioned the -- where on

16   Exhibit 5 --

17         THE COURT:  Well, that's not quite true, is it?

18   Because the original, if you look at Exhibit 3, puts it under

19   text and above text, but it doesn't have text to the right of

20   it.

21         THE WITNESS:  Correct.

22         THE COURT:  So you eliminated that also.

23         THE WITNESS:  Well, yes, by printing -- the article of

24   the online version doesn't actually capture the way it looks

25   visually.  I don't believe this is how -- the way -- how it

I1o1cort                         Davidowicz - Cross

1    appeared online.  The printing of the online version changes

2    the layout as well.

3    BY MR. SAULITIS:

4    Q.  Now if you can refer to Exhibit 5, can you just point out

5    as best you can where the hyperlink to the original article is

6    actually found.

7    A.  The italic words underneath "The race to the 100 million

8    spec house" versus "The Wall Street Journal," that is the

9    hyperlink.

10   Q.  And how does one know that from looking at the picture?

11   A.  Well, online, it's more obvious, but also, if you see to

12   the right of it, there's a little graphic, a green square, with

13   a little white kind of squiggle line there, that indicates that

14   there is a hyperlink there or the ability to share that

15   information.

16   Q.  And when you click on that hyperlink right after you post

17   it, what happens?

18   A.  It opens in another window the article in The Wall Street

19   Journal, on The Wall Street Journal's website.

20   Q.  Do you have to do any other navigation other than clicking?

21   A.  No.

22   Q.  And do the picture or pictures that are in the original

23   article come into view, including their attribution?

24   A.  Yes.  From what I recall, it's a slide show that rotates.

25   Q.  Taking you back to where you started from.

I1o1cort                        Davidowicz - Cross

A.  Correct.

Q.  Now how long did the article, did the blog article remain visible on the Brown Harris Stevens website after you posted it there?

A.  I'm not sure when the next -- I'd have to refer to the other exhibit, when the next item in the blog was posted, but basically this is what's considered the home page of Talk of the Town, and only the current article is readily visible there where the photograph is seen.  When the next article would be posted, if you look to the right where it says Recent Articles, that's where this blog post would move over to, so then you would need to click on the link on the right in order to open that article.  So while this archived on the website, it's no longer -- after the next blog post, it's not readily visible on the home page.

Q.  And how soon after you posted that blog were there other postings placed on the website that would have the effect of what you just described, moving the original article down the line?

A.  Usually within a few weeks.

Q.  Now after you posted the blog, did you do anything else with it going forward?

A.  No.

Q.  Did you share it with anyone or further copy it or talk about it or anything like that?

I1o1cort                         Davidowicz - Cross

1    A.   No.

2    Q.   When was the next time you heard anything about the

3    photograph or The Wall Street Journal article on the blog?

4    A.   It was January of 2016.

5    Q.   And how did that come to your attention?

6    A.   I was forwarded an email I believe that was directed

7    towards Peter Turino and Babette Krolik about the initial

8    complaint from the law firm that was --

9    Q.   Who is Mr. Turino?

10   A.   Peter Turino is the president of Brown Harris Stevens of

11   the Hamptons.  He's a co-owner of that part of Brown Harris

12   Stevens of the Hamptons.

13   Q.   And he's the ultimate boss of yours?

14   A.   Locally, yes, and then there are bosses in the city as

15   well.

16   Q.   And who is Ms. Krolik?  I don't know if we have that

17   information.

18   A.   Ms. Krolik is a general counsel for Brown Harris Stevens.

19        THE COURT:  Excuse me.  Exhibit 5, what's the date of

20   Exhibit 5?

21        MR. SAULITIS:  It contains the date of March 20th of

22   2015.

23        THE COURT:  But that's a reference to The Wall Street

24   Journal.

25        MR. SAULITIS:  Right.  But it does not contain a date

I1o1cort                      Davidowicz - Cross

1   as to when the screenshot was taken.

2           THE COURT:  Is the record established of the date?

3           MR. SAULITIS:  I don't believe so.

4           MR. COWLEY:  Your Honor, I can answer.  The deposition

5   testimony was --

6           THE COURT:  It doesn't count.  It's not part of the

7   record.  Thank you.

8   BY MR. SAULITIS:

9   Q.  Now to continue, you heard something from Mr. Turino and

10  Ms. Krolik on January -- is it the 4th of 2016?

11  A.  Sounds right.

12  Q.  What did you do in response to the communication you

13  received from Ms. Krolik and Mr. Turino?

14  A.  Well, it was actually forwarded to me from my immediate

15  manager, who's Aspasia Comnas.  She's the managing director of

16  Brown Harris Stevens of the Hamptons and my immediate

17  supervisor.  So before -- I wanted to check with her to make

18  sure, before we moved ahead to remove the blog article, that it

19  was okay, I was authorized to do so.  I didn't want to make it

20  seem as if we were trying to hide anything or make believe that

21  it wasn't there.  So I wanted to be sure that it was okay to

22  remove it.  And once we got permission to do that task, Walfrid

23  Lundborg was involved in removing it, but he was also advised

24  to make a backup copy of it off line that would not be visible

25  to be used as a reference.

I1o1cort                         Davidowicz - Cross

1    Q.   How quickly did you receive the permission and

2    authorization to remove the posting?

3    A.   I believe it was within 24 hours.

4    Q.   And once that happened, what exactly did you do in response

5    to that instruction?

6    A.   I contacted Walfrid Lundborg to initiate the proceedings of

7    tearing down the item from the website and making sure that it

8    was no longer visible.

9    Q.   How did you ascertain yourself, if at all, that it was no

10   longer visible after January the 5th of 2016?

11   A.   By the same link that was included in the initial complaint

12   that was sent over, testing it to make sure that it was no

13   longer directing to the -- to the item.

14   Q.   Would it be fair to say you saw with your own eyes that it

15   was no longer there?

16   A.   Correct.

17   Q.   And in the ordinary course of your work at Brown Harris

18   Stevens of the Hamptons, is there a tool, a methodology that is

19   available for you to ascertain whether there has been any

20   traffic or hits on the particular blog posting, on the page

21   that contains the blog posting?

22   A.   Yes.  Built in within the BHS Hamptons website are what is

23   called Google Analytics, and it allows the ability to drill

24   down to any page on the website to see, over any particular

25   time period, how much traffic there was to that specific page.

I1o1cort                          Davidowicz - Cross

1   Q.  Did you have occasion to use that with respect to the

2   specific photo and the posting that we're talking about here?

3   A.  Yes, I did.

4   Q.  And did you print out a report from Google Analytics?

5   A.  Yes.

6   Q.  Can you turn please to Exhibit E that is in front of you.

7          THE COURT:  Did you establish the date, Mr. Saulitis,

8   when Mr. Davidowicz took down the article?

9          MR. SAULITIS:  I believe it was the same day the

10  demand was made or the next day.  It was January 4th or 5th of

11  2016.

12         THE COURT:  Is that in the record?

13         MR. SAULITIS:  Yes.  And it's reflected in

14  Ms. Krolik's response to Mr. Cowley via email in which the

15  representation is made that it had already been taken down.

16         THE COURT:  We're now working with Exhibit E?

17         MR. SAULITIS:  Yes, your Honor.

18  BY MR. SAULITIS:

19  Q.  On Exhibit E, you personally created this report in the

20  regular course of business?

21  A.  Correct.

22  Q.  What is the date range of the report and the date you

23  created it?

24  A.  The date range is March 1, 2015 to March 1, 2016.

25  Q.  And is that --

I1o1cort                        Davidowicz - Cross

1            MR. SAULITIS:  I offer the document into evidence.

2            THE COURT:  Why is it relevant?

3            MR. SAULITIS:  Because it demonstrates that after

4     January of 2016 there was no hit on the website, on the page --

5            THE COURT:  I can't tell that from this document.  You

6     need to have some testimony on that.

7     BY MR. SAULITIS:

8     Q.  Can you tell from the document in front of you whether

9     there was any traffic onto the original location of the

10    posting, the blog posting?

11    A.  Yes, I can.

12    Q.  And can you explain to the Court how you can know that from

13    the document.

14    A.  Yes.  Towards the top of the page, there's a graph that

15    goes lengthwise across the page with peaks and valleys, and

16    that measures how many hits or views on that particular page

17    there were from March of 2015 through March of 2016, and so you

18    see in early March of 2015 through April, there were several

19    peaks there of three or four views, and on subsequent days --

20            THE COURT:  How do you get that?

21            THE WITNESS:  You can see there is a measurement here,

22    to line 5 and then 10, and then all of them except -- until you

23    get to January, when the complaint was issued, where there was

24    more activity viewing the page.  So they're all under five

25    throughout the year.  October, you can see where I think the

I1o1cort                              Davidowicz - Cross

1    initial discovery by ImageRights occurs, you see there's

2    another peak there, and all the subsequent views after that.

3    So the total -- if you just move down to Page Views in the

4    column where it's 84 all together over this span from where it

5    was initiated to when it was taken down.

6             THE COURT:  84 different instances when that page was

7    viewed.

8             THE WITNESS:  Correct.

9             THE COURT:  And it occurred back in March.

10            THE WITNESS:  Yes.  And then zero after January of

11   2016.

12   BY MR. SAULITIS:

13   Q.  Can you look at the item toward the middle of the page

14   where it says Brown Harris, bhsusa.com, and it says 17.  What

15   does that tell you?

16   A.  Where the original source -- before people came to our

17   website, the source of how they found bhshamptons.com; not the

18   blog article but how they came to our website.  So at the time

19   there was a link from BHS USA to bhshamptons.com, and 17 of

20   those customers came from our website to the Hamptons and then

21   subsequently this is the page with the blog on it.

22   Q.  What does the line item No. 3, ImageRights.com and the

23   number 11 tell us?

24   A.  It tells us that the company that was secured by Ms. Corson

25   to find the images visited the site 11 times.

I1o1cort                    Davidowicz - Cross

1    Q.  So this would have included views Ms. Corson herself or

2    ImageRights or you yourself did when taking a look at the

3    content?

4    A.  Yes, that would be the total of everyone involved.

5              MR. SAULITIS:  I offer the document into evidence.

6              MR. COWLEY:  No objection, your Honor.

7              THE COURT:  Received.

8              That's E, right?

9              MR. COWLEY:  It's not the E that was identified to us,

10   and I don't believe that's the E in your book.  It's not the E

11   in my book.

12             THE COURT:  It's E in my book.  It's got a graph

13   across the page, the top third, and it's got 16 entries below

14   that.

15             MR. COWLEY:  I'm just going by the list that you gave

16   us.

17             THE COURT:  Do you have the document?

18             MR. COWLEY:  I have it as F, and I thought we gave it

19   to you as F, but I don't know how --

20             THE COURT:  Document E is received.

21             (Defendant's Exhibit E received in evidence)

22   BY MR. SAULITIS:

23   Q.  Now, Mr. Davidowicz, the article itself, which is Exhibit 5

24   here, describes a dream house on a hillside lot in Beverly

25   Hills, California.  Is it your understanding that the

1    photographs depict the Beverly Hills, California property?

2    A.  Yes.

3    Q.  Do you know if that property was listed or offered for sale

4    by Brown Harris Stevens of the Hamptons?

5    A.  It was not.

6    Q.  And how do you know that?

7    A.  We don't have any properties for sale outside of -- Brown

8    Harris Stevens of the Hamptons has no listings outside of New

9    York, and Brown Harris Stevens only has offices on the East

10    Coast.  We have none in California.

11    Q.  Where is Brown Harris Stevens licensed to sell real estate?

12    A.  In New York City, in the Hamptons, on the North Fork in

13    Long Island, Palm Beach, and Miami.

14    Q.  None in Beverly Hills, California.

15    A.  No.

16    Q.  And did --

17          THE COURT:  So why did you copy it?

18          THE WITNESS:  Because the article itself is about

19    luxury homes, spec homes that I thought was interesting to

20    people who are interested in real estate.

21          THE COURT:  If they move to Beverly Hills and buy the

22    house?

23          THE WITNESS:  No, not at all.  It wasn't a tool to

24    sell anything.  Just like we have information about the local

25    towns, we provide information on how to buy and sell a home, we

I1o1cort                         Davidowicz - Cross

1    provide a mortgage calculator.  It's about providing

2    information.

3            THE COURT:  To show the house.

4            THE WITNESS:  And things that are of interest and

5    hopefully capture their --

6            THE COURT:  Nice pool in back.  Could be built in the

7    Hamptons.

8            All right.  Go ahead.

9    BY MR. SAULITIS:

10   Q.  So if I understand you correctly, this was not shown as a

11   way to attract attention to some property that Brown Harris

12   might wish to be a broker for.

13   A.  No, certainly not.

14   Q.  To your knowledge does Brown Harris Stevens of the Hamptons

15   stand to make any money from the blog?

16   A.  No.

17           MR. COWLEY:  Objection, your Honor.

18           THE COURT:  Overruled.

19   Q.  Does Brown Harris Stevens generate any advertising revenue

20   ever from the publication of the blog?

21   A.  No.

22           THE COURT:  It's a goodwill venture, right?

23           THE WITNESS:  Yes.

24           THE COURT:  Which we can't value.

25           THE WITNESS:  No.

I1o1cort                          Davidowicz – Cross

1          THE COURT:  But obviously you wouldn't put it in

2    unless it would add to the website of Brown Harris Stevens.

3          THE WITNESS:  Correct.

4    BY MR. SAULITIS:

5    Q.  And did Brown Harris Stevens directly or indirectly ever

6    participate in the sale of the property depicted in the --

7          THE COURT:  You already said that.

8          MR. SAULITIS:  Sorry.  I apologize.

9    Q.  Now prior to your posting the picture in March of 2015, to

10   your knowledge did Brown Harris Stevens of the Hamptons ever

11   receive a cease and desist letter from anyone regarding

12   anything ever posted on its website?

13         MR. COWLEY:  Objection, your Honor.  General

14   counsel --

15         THE COURT:  I can't hear you murmuring.

16         MR. COWLEY:  There's no foundation for this.  He never

17   worked with the general counsel, never even spoke with the

18   general counsel before this.

19         THE COURT:  That wasn't the question.

20         MR. COWLEY:  He would have no way of knowing.

21         THE COURT:  To your knowledge did Brown Harris Stevens

22   ever receive a cease and desist letter on anything?

23         THE WITNESS:  Not to my knowledge, no.

24         THE COURT:  Is this your first experience with a cease

25   and desist letter?

I1o1cort                          Davidowicz – Cross

1            THE WITNESS:  This is my first, yes.

2            THE COURT:  And in fact, you learned about it from

3    somebody else in the company.

4            THE WITNESS:  Yes.

5            THE COURT:  Who may have had experience with cease and

6    desist letters.

7            THE WITNESS:  Possibly.  I had it forwarded to me.

8            THE COURT:  You don't know.

9            THE WITNESS:  Yes.

10   BY MR. SAULITIS:

11   Q.  And as director of advertising --

12           THE COURT:  I think you established.  This has no

13   relevance at all.

14   Q.  To your knowledge has Brown Harris Stevens of the Hamptons

15   ever itself sent a cease and desist letter to somebody for

16   using --

17           THE COURT:  Objection is sustained.

18   Q.  Has Brown Harris Stevens of the Hamptons ever brought a

19   lawsuit to your knowledge --

20           THE COURT:  Objection is sustained.  I think you're

21   finished with your cross, or direct, whatever it is.

22           MR. SAULITIS:  Let me make sure of that, your Honor.

23           THE COURT:  Well, you have been asking senseless

24   questions.

25           Okay.  Mr. Cowley?

I1o1cort                          Davidowicz - Redirect

1          There's no need to ask a question if you don't have

2      questions.

3          MR. COWLEY:  I have a couple follow-up on what was

4      just asked a moment ago about profiting in any way from the

5      blog.

6      REDIRECT EXAMINATION

7      BY MR. COWLEY:

8      Q.  You testified to and identified the tracking of where

9      people came from to look at the blog.  And that's been marked

10     as Exhibit E.  Do you recall that, sir?

11     A.  Yes.

12          THE COURT:  Just ask the substantive question.

13          You've tracked where people came from in looking at

14     that blog.

15          THE WITNESS:  Yes.

16          THE COURT:  Because that would be possible customers

17     for you.

18          THE WITNESS:  We were looking at it to see how many

19     visitors, not really where they were coming from, because we

20     don't follow up on that.  We're just trying to find out how

21     many visitors there are.  Very often a homeowner may ask how

22     many people viewed their home on our website, and that's the

23     tool we use for that.

24          THE COURT:  So why were you interested in this when

25     the building was built on spec?

I1o1cort                    Davidowicz - Redirect

1      THE WITNESS:  Not the house.  I was interested in it

2  since the complaint was made; I was curious as to how many

3  people actually viewed the blog item, not where they came from.

4      THE COURT:  Oh, you didn't do this at the time; you

5  did this afterwards.

6      THE WITNESS:  Correct, yeah.  It was after January of

7  2016.  That's why I measured --

8      THE COURT:  Just a matter of curiosity.

9      THE WITNESS:  Yeah.

10  BY MR. COWLEY:

11  Q.  The exhibit that you went over with Attorney Saulitis, it's

12  now been marked, you didn't show in that exhibit where they

13  went next, did you?

14      THE COURT:  What's the difference?

15      MR. COWLEY:  Because if they went to look at any of

16  the listings that Brown Harris was selling --

17      THE COURT:  It's goodwill.  It's goodwill.  That's

18  what it is.

19  BY MR. COWLEY:

20  Q.  Mr. Davidowicz -- I'm sorry.  I do not intend to

21  mispronounce your name but I clearly am.

22      THE COURT:  Davidowicz.

23      MR. COWLEY:  Davidowicz.

24  A.  That's okay.

25  Q.  You testified earlier about whether or not The Wall Street

I1o1cort                          Davidowicz - Redirect

1   Journal article, that post was visible and for how long.

2   You're only referring in any of that testimony to someone who

3   starts at the website main home page and looks around from

4   there, correct?

5   A.   I'm sorry.  I didn't follow that.

6   Q.   You testified about the --

7          THE COURT:  When did he testify?

8          MR. COWLEY:  In response to Mr. Saulitis' question

9   about how long this post with the picture that's at issue here

10  was visible.

11  Q.   You were talking about visible to someone looking at the

12  main home page, correct?

13  A.   No.  I was talking about the actual Talk of the -- on the

14  main website home page, it was never visible.  It was only

15  visible on the Talk of the Town page, and only there it was

16  visible until the next article was posted and then you had to

17  click on the link.

18  Q.   But if someone did a Google search for spec houses or

19  popular houses or valuable houses --

20         THE COURT:  Objection sustained.

21         MR. COWLEY:  No further questions.

22         THE COURT:  All right.

23         MR. SAULITIS:  Just one follow-up question, your

24  Honor.  And I apologize.  I neglected to --

25         THE COURT:  Go ahead.  Ask it.

I1o1cort                        Davidowicz - Recross

1    RECROSS EXAMINATION

2    BY MR. SAULITIS:

3    Q.  Was the Talk of the Town blog itself discontinued at some

4    point, and if so, when and why?

5    A.  Yeah, it was discontinued, and I don't recall the exact

6    date -- it was obviously after January of 2016 -- due to a

7    number of reasons; partly because of what came to light with

8    the potential for copyright infringement, but also, in viewing

9    the tracking of views like we just discussed, the blog items

10   were never a real source of much web traffic on our website,

11   there wasn't much activity there, and it didn't warrant the

12   amount of work involved in maintaining it anymore.  So it was

13   subsequently removed in its entirety.

14   Q.  Is there any intention to bring back the blog or ever again

15   to use The Wall Street Journal article or the photograph or any

16   other such article?

17            MR. COWLEY:  Objection, your Honor.

18   A.  No.

19            THE COURT:  Sustained.

20            MR. SAULITIS:  Thank you.

21            THE COURT:  You can step down, please.

22            THE WITNESS:  Thank you.

23            (Witness excused)

24            THE COURT:  Next witness.

25            MR. SAULITIS:  The defense rests their portion of the

I1o1cort

1     case, your Honor.

2           THE COURT:  The only portion then we're talking about

3     is the issue of infringement and statutory damages.  You've

4     reserved the issue of attorney's fees for later, right?

5           MR. SAULITIS:  That's my understanding.

6           MR. COWLEY:  Yes, your Honor.

7           THE COURT:  Okay.  Both sides rest?

8           MR. COWLEY:  Yes, your Honor.

9           THE COURT:  Ten minutes.

10          (Recess)

11          (In open court)

12          THE COURT:  Be seated, everyone.

13          These will be my findings and conclusions to end this

14    phase of the case.

15          Plaintiff, Lisa Corson, filed this claim for direct

16    copyright infringement under 17 U.S.C. Section 512, alleging

17    that Brown Harris Stevens of the Hamptons, LLC infringed on her

18    copyrighted photograph.  Brown Harris has conceded that it

19    infringed.  The only issue at trial was whether the

20    infringement was willful, and on that basis, whatever and to

21    what extent statutory damages should be ordered.

22          I find that the infringement was willful, and I find

23    that the conduct of indifference to the rights of others was

24    egregious and that the statutory damages should be $25,000.

25    There were no actual damages.

I1o1cort

1          More specifically, the action was filed in this court

2     January 25, 2016, and service was timely.

3          Plaintiff is a professional freelance photographer who

4     lives and works in Ojai, California.

5          Defendant is a New York limited liability company and

6     a licensed real estate brokerage firm, whose main office is

7     located at 27 Main Street, East Hampton, New York, 11937.  The

8     defendant, with its affiliated companies, is a leading real

9     estate brokerage firm in New York City and other areas.  This

10    particular defendant is confined, however, to the Hamptons.

11         Plaintiff worked as a photo editor for The Wall Street

12    Journal between July 2010 and March 2013.  She then developed

13    an independent photography business but took assignments from

14    The Wall Street Journal on a freelance basis.

15         She entered a freelance agreement, which is Exhibit 3,

16    dated March 27, 2013, with the parent of the Wall Street

17    Journal.  Under this agreement, Corson was commissioned from

18    time to time to shoot original photographs for use in print and

19    online editions of the Wall Street Journal.  Among its

20    provisions was a clause that said that specific rights would be

21    set out from time to time for her work plus reimbursement of

22    expenses and other incidental matters.

23         On or about March 13, 2015, at the request of The Wall

24    Street Journal, Corson was engaged to take a photo shoot of a

25    house at 9945 Beverly Grove, Beverly Hills, California.  The

I1o1cort

house was a particularly luxurious house, with a swimming pool
in the background, and was being built on speculation.  The
article intended to use this house as an example of luxury
speculative homes.

         Plaintiff took her photo shoot in or about March of
2015, spending a day in Beverly Hills and substantial time
thereafter in editing the photographs selected for review by
The Wall Street Journal.  She was paid $600 for the photo
shoot, plus another hundred dollars for video footage, taking a
$700 fee in all.  She was also reimbursed for mileage and food.

         On March 18, 2015, plaintiff applied for and obtained
a copyright registration, including these photographs.

         A photograph, a relevant photograph, was published in
the March 20, 2015 edition of the Wall Street Journal.  The
article was entitled "The race to $100 million spec house."
The article appeared in its print and online editions.  The
article was accompanied by the photograph at issue, along with
three other photographs taken by plaintiff, plus photographs
taken by other photographers.  The particular photograph that's
in issue is a photograph of the swimming pool in the back of
the house showing a rather luxurious-looking swimming pool and
deck.  The online version of The Wall Street Journal article
displayed the photograph at issue -- that is, of the swimming
pool -- as part of a slide show, along with a number of other
photographs and a video.  Plaintiff's photograph was the 14th

I1o1cort

in a series of 19 photographs, all being a slide show that
could be accessed from the media edition of The Wall Street
Journal.  Those who wanted to see the slide show would have to
scroll through it one after the other.  As I said, four of the
photographs in the slide show were taken by plaintiff; the
others were taken by other photographers.

Pursuant to a license agreement, plaintiff licensed
The Wall Street Journal to use her photographs but retained
ownership of the copyrights in her photographs.  Plaintiff
published the copyrighted photograph on her website, along with
a copyright registration notice.  It was to sell photographs to
other users, but there was no evidence that a sale took place
of the photograph in question.

Plaintiff testified that typical license fees could
range between a hundred dollars and $8,000.  Somewhat
inconsistently, the testimony was that for a cover page, a
typical license fee might be a thousand dollars to $3,000, and
a full page, not a cover page, could be anywhere from $350 to a
thousand dollars.  I find this testimony and these ranges too
wide to really have any particular relevant value, and I find
from this that plaintiff's damage was not proved, that there
was no actual damage involved.

At the time The Wall Street Journal article was
published, defendant maintained a blog within its website
entitled Talk of the Town.  The blog was not used to sell

I1o1cort

particular homes.  It was created generally as a goodwill

venture, intended to be of interest to potential buyers of

luxury homes and to enhance the defendant's stature in the

industry.  It is part of a larger marketing set of activities.

Erik Davidowicz, who testified here, was the director

of advertising for defendant.  His habit was to search the

internet for articles written and published by other entities.

He then copied the entire text of an article from a third party

and, through various software owned by defendant, pasted it

into his blog entries, along with a hyperlink back to the

original source.

On or about March 20, 2015, Davidowicz found The Wall

Street Journal article and copied it to the Talk of the Town

blog.  He copied the entire Wall Street Journal article, pasted

it into a Talk of the Town blog post, and made reference to The

Wall Street Journal, specific reference in the form of a

hyperlink to the original article.  However, he did not obtain

permission from The Wall Street Journal article to reprint the

article, nor did he obtain clearances from any other of the

sources that were depicted in the article.

He chose, along with the article, plaintiff's

photograph with the swimming pool.  In order to do it, he had

to scroll through and disregard at least 13 other photographs.

Presumably, he viewed and discarded all 18 of the photographs

not taken.  His repeat of the photograph showed no attribution.

I1o1cort

He claimed that it was not possible in the software that was
used by the defendant to copy the attribution, but it's clear
that with a minimum of effort, a reference could have been
given.  There was no reference given.

     Defendant is a sophisticated company.  It's
sophisticated in all aspects of the business, and it should
have known, to the extent it didn't know, that just as it seeks
protection for its original activities, so others who create
photographs and other creative matters have and should be
expected to have interests to preserve their property interests
in their creations.  Davidowicz and The Wall Street Journal
were oblivious to these other interests, although they clearly
knew there were such a thing.  I find this indifference of the
rights of others to be egregious.

     The record produced by the defendant shows that the
particular blog post depicting the plaintiff's photograph was
viewed approximately 84 times, 13 of which were viewed by
ImageRights, an entity that plaintiff and others hired to
protect copyrights by finding and identifying illegal uses of
others'.  Although defendant did not obtain any material gain
specifically from the use of this photograph, or the reprint of
the article, it cannot be said to have enjoyed any specific
profit from its infringing use, nevertheless, these kinds of
depictions enhanced its goodwill, the main purpose of the blog
post Talk of the Town.

I1o1cort

1        Defendant conceded infringement from the beginning of

2   the case.  It made various offers of judgment that the

3   plaintiff thought were inadequate and were rejected.  Thus,

4   there was substantial discovery and a one-day trial of the

5   issues.

6        It's clear to me that plaintiff is entitled to

7   vindicate rights not, in plaintiff's opinion, adequately

8   compensated, and it is defendant's right to vigorously reject

9   efforts they considered windfall damages.  Thus, I blame

10  neither party for these proceedings.  Whether and to what

11  extent the fees that were generated by prevailing party in this

12  litigation was appropriate will be the subject of the next

13  proceeding.

14       So first the main issue was whether defendant's

15  infringement was willful.  I find here willfulness entitles

16  plaintiff to the enhanced statutory damages provided by 17

17  U.S.C. Section 504(c)(2).  The standard for willful

18  infringement is not only knowledge on the defendant's part that

19  what it did was infringement but also reckless disregard of the

20  practice of protecting creativity, the very purpose of

21  copyright.  When the plaintiff can demonstrate, either directly

22  or through circumstantial evidence, that defendant had

23  knowledge that its actions constituted infringement, or

24  recklessly disregarded that possibility, enhanced statutory

25  damages for willful copyright infringement under 17 U.S.C.

I1o1cort

Section 504(c)(2) are appropriate.  I cite *Twin Peaks Productions, Inc. v. Publications International Ltd.*, 996 F.2d 1366, 1381-1382 (2d Cir. 1993), in a district court decision and decisions of other circuits.  Another case is *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 112 (2d Cir. 2001).  And many cases have held reckless disregard of the copyright holder's rights suffices to warrant award of enhanced damages regarded by the copyright laws.  One district court decision so holding is *Bryant v. Europadisk Ltd.*  I only have a reference to the U.S. Patent Quarterly, 91 USPQ2d 1825 (S.D.N.Y. April 15, 2009).  The case was affirmed by the Second Circuit 2010, 603 F.3d 135, and certiorari was denied.

          Plaintiff successfully proved that her photograph was copyright protected.  It's clear that defendant, as a sophisticated business, knew there was copyright involved and did nothing to check those rights or to clear permission to reprint from the photographer.

          The next question is what amount of statutory damages should be awarded.  The Supreme Court instructs that the statutory rule formulated after long experience not merely compels restitution of profit and reparation from injury but also a desire to discourage wrongful conduct.  *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952).

          Court of Appeals, in its usual way, has listed criteria that a district judge can use in assessing what amount

I1o1cort

1    of statutory damages would be appropriate.  There are a number

2    of cases, but one case is *Psihoyos v. John Wiley & Sons,* 748

3    F.3d 120, 126 (2d Cir. 2014).  There are essentially five other

4    cases.  I spelled out the sixth.  None of these factors are

5    essential in and of themselves but are guides a district court

6    can use.  The infringer's state of mind, the expenses saved and

7    profits earned by the infringer, the revenue lost by the

8    copyright holder, the deterrent effect on the infringer and

9    third parties, the infringer's cooperation in providing

10   evidence concerning the value of the infringing material, and

11   the conduct and attitude of the parties.  *Bryant v. Media Right*

12   *Productions, Inc.*, 603 F.3d 135, 144 (2d Cir. 2010).

13           Taking these factors one at a time, the first one is

14   the infringer's state of mind.  There may not have been an

15   intent to infringe, but there was a disdain and indifference to

16   the rights of others, which I find to be egregious,

17   particularly by a sophisticated company.  By and large, unless

18   the photographer has national or international fame,

19   photographers don't make much money and they don't have much

20   wherewithal to vindicate their rights.  I don't know the

21   plaintiff's status, but the fact that she takes an entire day

22   plus part of another day for editing to take a photo shoot for

23   $700 indicates the lack of power on the part of the plaintiff.

24   Whether there was a secondary market, as the photographer

25   hopes, for photographs is a speculative concern.  It's a

I1o1cort

difficult business.

Defendant, a sophisticated company, like all other real estate companies, takes a great deal of pride in its listings and its creative work and working with clients and the like.  I take judicial notice of that, and there are so many cases in this court and other courts where parties in this business seek protective orders and protection for these rights.  A company involved with these rights ought to know that others are equally entitled to the enjoyment of their creative work.  The way that defendant acted shows a disdain for the creative work of others, and I find that to be egregious.  That's the infringer's state of mind.

The expenses saved and profits earned by the infringer.  There were no profits earned by the infringer.  The expenses saved were minimal.  The cost of a license in relationship to everything else the defendant did was not a substantial expense, and so this was not something that was done to save a lot of money.  There was a goodwill concern, but the main factor is other of these criteria, specifically the infringer's state of mind and the fourth criterion, the deterrent effect on the infringer and third parties.

Before I go on to that, I talk about the revenue lost by the copyright holder.  This is speculative.  Plaintiff did not sell that work to others and didn't seem to have the kind of specific knowledge of how much could be obtained for a

I1o1cort

1    photograph to indicate that there was any substantial profits

2    that she obtained in the secondary market, so I can't say that

3    plaintiff lost any appreciable amount of money.  However,

4    there's always that potential.

5         The main point put forth in the criteria is the

6    deterrent effect on infringer and third parties.  I find this

7    the most important criterion, and on reflecting on this, I came

8    to my award of $25,000 of statutory damages, the least amount

9    that I think appropriate to deter the defendant and other

10   similarly situated third parties.

11        The fifth criterion is the infringer's cooperation in

12   providing evidence concerning the value of the infringing

13   material.  I can't say that there was any lack of cooperation,

14   and I can't say that anybody was forthcoming as to the issues

15   that proved to be of main interest at the trial, so I consider

16   that a neutral factor.

17        And sixth, the conduct and attitude of the parties.

18   It's clear that the defendant wanted to settle from the

19   beginning and made that clear in preliminary conferences.  But

20   that's not enough.  There were two offers of judgment in the

21   case that are public because they were filed.  Is that right,

22   Mr. Saulitis?

23        MR. SAULITIS:  They've been filed with the record of

24   this –– with the pretrial order as proposed exhibits, but they

25   were not filed yet electronically with the court.

I1o1cort

1          THE COURT:  But they were public in the sense of being

2     expressed in the pretrial materials.

3          MR. SAULITIS:  Yes, indeed.

4          THE COURT:  Then I can reference them.

5          There was an early offer of $3,000 and a later offer,

6     after discovery had begun, of $5,000.  Plaintiff rejected both.

7     I can't say that the amounts offered were sufficiently

8     attractive that the plaintiff was unreasonable in rejecting

9     them.  It clearly was inadequate in terms of deterrent effect.

10    The offer did not reflect any substantial interest on the

11    defendant's part to settle the case, nor its realization that

12    what it had done was wrong, and therefore I can't say that the

13    conduct and attitude of the plaintiff in litigating this case

14    was unreasonable.

15          I think I've completed the issues with regard to

16    statutory damages.

17          Plaintiff also asks for a permanent injunction under

18    17 U.S.C. 106, and the Supreme Court has, again, several

19    criteria: evidence of irreparable injury; whether damages that

20    are available at law, such as monetary damages, are inadequate

21    to compensate for the injury; whether, considering the balance

22    of hardships, a remedy in equity is warranted; and whether the

23    public interest would not be disserved by a permanent

24    injunction.

25          I don't think there is evidence of irreparable injury

I1o1cort

1    because there's compensation by statutory damages, and these

2    are remedies available at law.  Statutory damages, in my

3    judgment, are adequate to compensate for any injuries suffered

4    by the plaintiff and to provide deterrent effect to the

5    defendant.  The testimony was clear that defendant took down

6    the infringing photograph when demand was made to take it down,

7    and soon after that took down the entire blog which reflected

8    its indifference to creative rights.  There seems to be no need

9    for an injunction because no need will be served.  And

10   therefore, in the balance of hardships, since there's nothing

11   really to be gained by the plaintiff and a loss potentially

12   sufferable by the defendant, I think that the balance favors

13   the defendant.

14           And the public interest does not need a permanent

15   injunction in this case.  I'm convinced that defendant has

16   learned its lesson and will not repeat its disdain for others'

17   creative rights.

18           Mr. Cowley, are there any other findings that I need

19   to make?

20           MR. COWLEY:  Your Honor, I would like to address, at

21   the attorney's fees level or now, if you prefer, the finding

22   related to when the waiver of the defenses occurred, not at the

23   beginning.  You have before you --

24           THE COURT:  What waiver of defenses?

25           MR. COWLEY:  In your findings you stated that the

I1o1cort

<pre>
 1  defendant conceded infringement from the beginning.  That did
 2  not happen.  You have before you the answer --
 3              THE COURT:  I remember distinctly in the first
 4  pretrial conference in this case the defendants admitted
 5  infringing.  I think there may have been some reservation
 6  language and the like, but I don't think there was a waiver of
 7  any defenses.  And when the answer came, what did the answer
 8  say?
 9              MR. COWLEY:  They asserted fair use license and lack
10  of copyright.  We had to litigate all of those defenses until
11  the summary judgment.
12              THE COURT:  I'll take that up in the next phase.
13              Any other findings?
14              MR. COWLEY:  I believe that's the only issue that I
15  had.
16              THE COURT:  Mr. Saulitis, any findings that --
17              MR. SAULITIS:  No, your Honor.
18              THE COURT:  Okay.  So those are my findings and
19  conclusions, concluding this phase of the case.
20              As for the issue of fee, I think by a certain date the
21  plaintiff should produce his time records along with any
22  supporting material arguing for whatever fee the plaintiff
23  thinks is appropriate.  I also want plaintiff to address the
24  relationship of my award to any monetary expectation he has
25  from the plaintiff or from -- what's the name of that company
</pre>

I1o1cort

1    that you're sharing with, Ms. Corson?

2              THE PLAINTIFF:  ImageRights.

3              THE COURT:  ImageRights.

4         Second, Mr. Saulitis will tell me when he thinks his

5    opposition papers should be filed.  I'll ask the parties then

6    at that time to discuss this between themselves and then any

7    reply papers on the part of the plaintiff.

8         So Mr. Cowley, when do you think would be an

9    appropriate date?

10             MR. COWLEY:  I've already produced my time records and

11   costs through the end of the year.  The only additional -- it

12   would take me a week to get the accounting records out for the

13   fees related to this trial, pretrial and trial.

14        I would like to ask your Honor, because the cases say

15   it's a relevant consideration, what time was put into the case

16   by the defendant.  When a defendant challenges plaintiff's time

17   is unreasonable but spends that or more, courts are permitted

18   to consider it, so I would ask that they be asked to do the

19   same.  We requested that of the defendant.

20             THE COURT:  I'm not going to require that.

21             MR. COWLEY:  Then I only need, your Honor -- and I'm

22   happy, your Honor, if you prefer, I could on the record now

23   disclose what you ask in terms of the relationship of an

24   attorney's --

25             THE COURT:  No, I don't want to do it now.  When do

I1o1cort

```
1    you want to submit it?  By when?  February what?

2              MR. COWLEY:  I do have depositions --

3              THE COURT:  Don't tell me your problems.  Just give me

4    a date.

5              MR. COWLEY:  May I have till the 22nd?  Sorry, the

6    23rd, the end of that week?

7              THE COURT:  February 23rd?

8              Mr. Saulitis?

9              MR. SAULITIS:  Three weeks on top of that, please.

10             THE COURT:  March 16.  March 16th.

11             I want you to have a meeting in Mr. Cowley's office

12   the week of the 19th.  And any reply papers by March 2.

13             MR. COWLEY:  I'm sorry?

14             THE COURT:  I'm sorry.  I made a mistake.  The

15   conversation will be the week of the 19th and the position or

16   reply March 30th.  All right?

17             MR. COWLEY:  May I just make sure I have what you want

18   in the opening brief.  Do you want the documents produced

19   relating to the allocation of fees or just the representation

20   of counsel as to how it --

21             THE COURT:  Whatever you need to support your

22   position.

23             MR. COWLEY:  You've asked me to disclose how a fee

24   award would be allocated.  I'm asking, is my representation

25   sufficient to the Court?
```

I1o1cort

1          THE COURT:  If it's not sufficient to the defendant,

2    it's not sufficient to me.  So ask Mr. Saulitis.

3          MR. COWLEY:  We produced the ImageRights --

4          THE COURT:  I don't want you to discuss it now.  Do it

5    on your own time.

6          Anything else?

7          MR. COWLEY:  I have nothing.

8          MR. SAULITIS:  Nothing further, your Honor.

9          THE COURT:  Okay.  We're finished today.  Thank you.

10         ALL COUNSEL:  Thank you.

11                              o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         INDEX OF EXAMINATION

2    Examination of:                                    Page

3    LISA MICHELLE CORSON

4    Direct By Mr. Cowley . . . . . . . . . . . . . 4

5    Cross By Mr. Saulitis  . . . . . . . . . . . .56

6    Redirect By Mr. Cowley . . . . . . . . . . . .71

7

8

9    ERIK M. DAVIDOWICZ

10   Direct By Mr. Cowley . . . . . . . . . . . . .73

11   Cross By Mr. Saulitis  . . . . . . . . . . . 110

12   Redirect By Mr. Cowley . . . . . . . . . . . 141

13   Recross By Mr. Saulitis  . . . . . . . . . . 144

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFF EXHIBITS

Exhibit No.                                              Received

1     . . . . . . . . . . . . . . . . . . . . . . . . .36

2     . . . . . . . . . . . . . . . . . . . . . . . . .13

3     . . . . . . . . . . . . . . . . . . . . . . . . .23

4     . . . . . . . . . . . . . . . . . . . . . . . . .27

5     . . . . . . . . . . . . . . . . . . . . . . . . .56

6     . . . . . . . . . . . . . . . . . . . . . . . . .88

8     . . . . . . . . . . . . . . . . . . . . . . . . 103

10    . . . . . . . . . . . . . . . . . . . . . . . . 105

11    . . . . . . . . . . . . . . . . . . . . . . . . .47

12    . . . . . . . . . . . . . . . . . . . . . . . . .40

16    . . . . . . . . . . . . . . . . . . . . . . . . .37


DEFENDANT EXHIBITS

Exhibit No.                                              Received

A     . . . . . . . . . . . . . . . . . . . . . . . . .63

B     . . . . . . . . . . . . . . . . . . . . . . . . .62

E     . . . . . . . . . . . . . . . . . . . . . . . . 136